## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. PETER J. BONZANI, JR., | : |
| | : *FILED IN CAMERA* |
| | : *AND UNDER SEAL* |
| Plaintiffs, | : *PURSUANT TO 31 U.S.C. § 3730(b)(2)* |
| | : |
| v. | : CIVIL ACTION NO. 3:16CV 1730-JCH |
| | : |
| UNITED TECHNOLOGIES | : *JURY TRIAL DEMANDED* |
| CORPORATION | : |
| and | : |
| PRATT & WHITNEY | : |
| Defendants. | : |
| | : |

## COMPLAINT FOR DAMAGES AND OTHER
## RELIEF UNDER THE FALSE CLAIMS ACT

Pursuant to 31 U.S.C. § 3730(b)(1), Relator, Peter J. Bonzani, Jr. ("Relator"), on behalf of the United States of America, brings this civil action under the False Claims Act, 31 U.S.C. § 3729 *et seq* ("FCA"). In accordance with § 3730(b)(2) of the FCA, this Complaint is to be filed in camera and remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders. The government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and information. In support of the Complaint, Relator alleges as follows:

## I.   INTRODUCTION

        1.     This case arises from the intentional and/or reckless conduct of Defendants, United Technologies Corporation ("UTC") and Pratt & Whitney ("P&W") (collectively "Defendants"). Defendants knowingly and/or recklessly used a flawed manufacturing process which resulted in the creation of defective engine parts for United States' Air Force's fighter jets. Defendants deliberately and/or recklessly used inappropriate spray equipment and flawed test methodologies, as well as, deliberately falsely manipulating test

procedures in the manufacture of internal engine parts for the F119 engine used exclusively in the Air Force's F-22 Raptor, specifically the coating for knife edge seals used in the engine rotors.  Upon information and belief, Defendants also utilized a similarly flawed spraying process in the manufacture of the F100 engine used in the Air Force's F-15 and F-16 fighter jets.

2.      In so doing, Defendants have submitted false claims for payment and have made or used false records and certifications to get claims paid in violation of the FCA.

3.      As a result of Defendants' flawed spray techniques and falsified tests, upon information and belief, from at least 2012 through late 2015, F119 engines supplied to the Air Force are at risk for premature wear and possible catastrophic failure, putting pilots and others at risk.

4.      Further, as a result of the use of flawed spray techniques, upon information and belief, F100 engines sprayed at the San Antonio P&W facility between 2004 and 2014 are at risk for premature wear and possible catastrophic failure.

5.      In addition, in violation of 31 U.S.C. § 3730(h), Defendants summarily suspended and then later wrongfully terminated Relator when he advised his superiors of the flawed spraying process and the fraudulently manipulated test procedures taking place at the P&W facility in Middletown, Connecticut.

## II.     JURISDICTION AND VENUE

6.      This action arises under the FCA to recover statutory treble damages and civil penalties on behalf of the United States of America arising out of Defendants' violations of the FCA.

7.      Under §3732 of the FCA, this Court has jurisdiction over actions brought under the FCA.  Furthermore, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

8.      This Court has personal jurisdiction over the Defendants and venue is proper in this District.  Pursuant to § 3732(a) of the FCA,: "any action under §3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any

one defendant, can be found, resides, transacts business, or in which any act proscribed by §3729 occurred." Defendants reside in this District.  Moreover, at all times material hereto, Defendants have regularly conducted substantial business within this District.  In addition, proscribed acts by Defendants, among those that are the subject of this action, occurred in this District.  Venue is additionally proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

III.     **FILING UNDER SEAL**

9.      Under the FCA, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.  The Government may elect to intervene and proceed with the action within sixty (60) days after the Government receives the Complaint.

10.     As required by the FCA, Relator will voluntarily serve on the United States a copy of the Complaint and all other relevant information in the form of a written disclosure statement provided to the United States Attorney General and the United States Attorney for the District of Connecticut, containing information in his possession pertaining to the allegations contained in this Complaint.

IV.     **PARTIES**

11.     Relator is a citizen and a resident of Bolton, Connecticut.  Relator brings this action on behalf of the United States.

12.     From September 2012 through November 2015, Relator worked as an independent contractor and later a full-time employee for P&W in its East Hartford, Connecticut facility.  From September 2012 until April 2014, Relator worked for Rapid Global Business Solutions, Inc. ("RGBSI"), an employment staffing service, retained by P&W to provide engineers and others to work on P&W projects and contracts.  Relator provided automation and thermal spray expertise and services to P&W.  Relator soon became the "go-to" person at P&W regarding both thermal spray coatings issues and robotic programming.

13.     As a result of Relator's substantial expertise and experience in thermal spray coatings and robotic programming and his trouble-shooting capabilities, P&W soon began

recruiting Relator, who was working for RGBSI as a contractor, to accept an engineering position directly with P&W.  Initially, Relator declined due to other business he did as an independent consultant and other commitments he had.  Finally, P&W asked Relator what it would take for him to join P&W as a full-time P&W employee.  After continued negotiations during which Relator revealed his independent consulting business, as well as a commercial property he owned in which he leased space to other businesses, Relator was offered and accepted a position as a P&W staff engineer in April 2014.

14.     Despite having knowledge of the consulting business, Defendants did not require Relator to forgo his consulting business.  Nonetheless Relator ceased doing any outside consulting once he became a P&W employee.  Despite having knowledge of Relator's ownership of the commercial property, Defendants did not ask nor require Relator to discontinue or transfer his ownership of the property.

15.     Prior to working at and for P&W, Relator had extensive education, experience and expertise with thermal spraying.  This extensive expertise and experience enabled Relator to trouble shoot thermal spraying issues and problems for P&W which he was frequently asked to do during the three plus years he worked at P&W.

16.     After his hiring, P&W invested significant time and cost to secure Secret security clearance for Relator.

17.     As a result of his employment and position with P&W, Relator has first-hand knowledge of the business operations of P&W, the intentionally faulty spray process utilized by P&W in the manufacture of the F119 and F100 engines and the falsely manipulated test procedure used in the Middletown facility for the F119 engine.

18.     Relator brings this action based on direct and independent knowledge. None of the actionable allegations set forth in this Complaint is based upon a public disclosure as set forth in 31 U.S.C. §3730(e)(4).  Notwithstanding the same, Relator is an original source of the facts alleged in this Complaint due to the first-hand knowledge he gained while working at P&W.  Prior to filing this Complaint, Relator voluntarily provided information regarding

4

Defendants' conduct, faulty spray process, manipulated false testing and other information to the federal government.

19. Defendant UT is incorporated under Delaware law. Its principal place of business is in Farmington, Connecticut.

20. UT provides systems and services to the aerospace, construction and security industries and sells its services and products to commercial and governmental entities.

21. P&W is a subsidiary or division of UT with a principal place of business in East Hartford, Connecticut. P&W manufactures and sells engines and engine parts to commercial and government military entities.

## V.   **THE FALSE CLAIMS ACT**

22. The FCA imposes liability upon any person who: (a)"knowingly presents or causes to be presented [to the government] a false or fraudulent claim for payment or approval"; or (b)"knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) and (B), as amended.

23. The FCA imposes liability not only for intentionally false or fraudulent conduct, but also where an individual "acts in deliberate ignorance of the truth or falsity of the information" or "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(ii) or (iii).

24. The FCA defines claim as (A) "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

DM1\7226609.2

25.     The FCA defines material as "having a natural tendency to influence or be capable of influencing the payment or receipt of property or money." 31 U.S.C. § 3729(b)(4).

VI.     **HISTORY AND BACKGROUND OF THE P&W F-119 ENGINE**

26.     In April 1991, the United States Air Force chose P&W's F119 engine, in combination with Lockheed's YF-22, to be developed into the Air Force's F-22 Raptor Air Superiority Fighter ("F-22").

27.     The Air Force entered into a contract with P&W to manufacture and supply F119 engines for use in the F-22.

28.     P&W manufactured and produced engines under its original contract with the Air Force for the F-22 engines through December 2012.

29.     Over the years since its initial contract award from the Air Force for the F119 engines, P&W has also been awarded follow-on Air Force contracts to provide additional engines, spare parts, maintenance and other services for the F119 engine.

30.     The Air Force contracts with P&W for the F119 engine required P&W to build to print, which also calls out coating specifications and quality control procedures.  The Air Force contracts required P&W to comply with all of its quality control procedures and requirements.

31.     The F119 engine requires specially spray coated seals to contain the hot gases required to propel the jet aircraft.  These seals are essential to engine function, engine wear and engine safety.

32.     The Part Print called out in the Air Force contracts with P&W for the F119 engines calls out a Specification and in particular for this claim, Specification PWA53.

33.     The critical issue of relevance to this clam involves the PWA 53-37/53-11 coating used on integrally bladed rotors ("IBRs") for the F119 engine.

34.     Upon information and belief, the Specification also mandates that this is likely a level 2 Key Part Characteristic ("KPC2") which specifies that the coatings are critical to

the function of the plane.  In other words, failure to follow process or procedure for the coatings could result in risk to the plane and pilots.

35.     The Specification sets forth requirements for composition, powder qualifications, as well as other requirements and procedures such as processing procedures, and evaluation procedures.

36.     There is an Evaluation Procedure for coating.  It specifies the requirements for porosity, cracking, bond strength, interface and oxides among others.

37.     P&W manufactured the F119 engine at various P&W facilities across the country, including the P&W facility in East Hartford Connecticut and in Middletown Connecticut.

38.     Upon information and belief, from the commencement of the P&W F119 contracts with the Air Force until late 2012, the P&W facility in East Hartford performed the spray coating that was done on the IBRs for the F119 engine.

39.     In late 2012, the spray coating process that was done on the IBRs for the F119 was moved from the P&W East Hartford facility to the P&W Middletown facility.

40.     Upon information and belief, the spray coating for the IBRs for the F119 was done at the P&W Middletown facility from late 2012 through late November 2015.

## VII.   P&W'S DELIBERATE USE OF INAPPROPRIATE SPRAY EQUIPMENT, FLAWED TEST METHODOLOGIES AND FALSELY MANIPULATED TESTING IN MIDDLETOWN

41.     In November 2015, Relator was asked by his superiors to travel to the P&W Middletown facility on November 19, 2015 to trouble shoot a spray coating problem that had developed in the Middletown facility.

42.     The Middletown facility was suddenly not able to pass a test piece for the knife-edge seals with PWA 53-37/53-11 coating used on the ninth stage IBR for the F119 engine.

DM1\7226609.2

43.     Relator was advised that the test samples on the IBRs had successfully passed for the preceding three years at Middletown, but recently all of the test samples were failing.

44.     Relator set about to determine what had changed, why they were failing and to get the Middletown facility back into production.

45.     After arriving in Middletown, Relator and his mentee were initially not given access to the failed test results by the Materials Control Lab ("MCL") in Middletown.  The MCL staff appeared defensive and asked Relator to return in an hour.

46.     Relator then asked to see the set-up for the spraying in Middletown.  The spray equipment used in Middletown was an old self-contained spray system which used an Allen Bradley style manipulator with a Praxair SG-100 plasma spray gun.

47.     Relator also observed that the Middletown facility was not using the 2700 Extension for the SG-100 Plasma spray gun.  The use of the 2700 Extension or similar close quarter spray gun is critical to spraying a proper seal and to meeting Specification because the 2700 Extension or similar gun enables the operator to get at the hard to get to seals located deep within the engine and in other hard to get to locations.

**48.**     The Build to Print contractual requirement requires that the Master Spray Schedule be followed which mandates that the spraying be done in a manner that ensures that the hard to get to seals are properly sprayed.

49.     Upon information and belief, due to quality control, other contract required inspection procedures, sign-offs and approvals, P&W management was aware and had knowledge that the Middletown facility was not employing the 2700 Extension or other similar close quarter gun to do the spraying of the IBRs.

50.     The test set-up for the IBR spraying is designed to hold a test sample and mimic the geometric environment that the actual knife seal would experience.

51.     The purpose of the test was to verify that the two layers of seal coatings met quality specifications necessary to resist the extreme heat generated by the jet engine.

DM1\7226609.2

52.    In order to assess the testing problem, Relator asked the Middletown personnel what had changed.  He was advised that previously Middletown was using an extremely worn out test rig, but had switched to a newer and better set-up.  After the change to the newer test rig, none of the test samples passed.

53.    In reviewing the test set up, Relator observed that the spray gun to work distance was too far out, well in excess of 4 inches and the angle was too shallow to produce acceptable coatings as required under the contracts.  If the spray angle is too shallow, the spray will be compromised and will subject the part to premature wear at best and catastrophic failure at worst.

54.    Several hours later, Relator was finally shown the failed test results. Relator asked and pressed the staff at Middletown regarding how the samples had previously passed given the contractually excessive distance, improper angle and lack of proper spray gun. Relator was advised by the P&W Middletown MCL staff that the test operators at Middletown routinely cheated by moving the sample closer to the thermal spray gun in order to get it to pass the test.  This intentional manipulation of the test enabled the samples to falsely pass the test.

55.    Relator reported what he had learned and observed regarding the worn out test rig, the improper distance and angle for the spraying, failure to use the proper spray gun and the cheating on the tests to his superiors.

56.    Although spraying was halted in the Middletown plant in November 2015, upon information and belief, P&W did nothing to review any or all of the knife-edge seals sprayed at the Middletown plant from late 2012 through November 2015, whose tests had been intentionally manipulated to produce a false positive test result.

57.    Upon information and belief, P&W did not report the cheating on the tests nor any of the other spraying problems and failure to follow specifications and procedures to the Air Force.

58.    All of the knife-edge seals sprayed in Middletown between late 2012 and 2015 are at risk for premature wear, damage and potential catastrophic risk.

9

59.     After Relator reported the cheating and improper spraying in Middletown, no further spraying was performed in Middletown. Spraying was temporarily moved to East Hartford. Thereafter, P&W engaged Praxair Surface Technologies in Manchester, Connecticut to do the spraying.

## VIII.   DEFENDANTS' RETALIATION AGAINST RELATOR FOR REPORTING THE FALSE MANIPULATED TESTING AND FAULTY SPRAY PROCEDURES

60.     The day following his trip to the P&W Middletown facility, Relator was abruptly and without prior warning or notice suspended by Defendants and escorted from the P&W East Hartford premises. Ninety days thereafter Relator was advised by telephone that he was being terminated.

61.     On November 19, 2015, following Relator's review and assessment of the false testing at the P&W Middletown facility, at approximately 5:00 p.m., Relator called the Business Unit Manager at the P&W East Hartford facility to inform him of the manipulated false testing and the contractually improper spray procedures that had been done at the Middletown facility from late 2012 through November 2015. This same information was again relayed to the Business Unit Manager during a meeting in the East Hartford facility in the morning of November 20, 2015.

62.     On November 19, 2015, following Relator's review and assessment of the failed testing at the P&W Middletown facility, during a meeting in the Middletown facility, Relator informed the Product Director, the Operations Manager, as well as other engineers and staff at the Middletown facility of the manipulated false testing and the contractually improper spray procedures.

63.     On the morning of November 20, 2015, during the annual meeting of Relator's work cell at the East Harford facility, Relator also informed other P&W East Hartford engineers and East Hartford MCL personnel that there was cheating and other improper procedures taking place at the P&W Middletown facility.

DM1\7226609.2

64.     In addition, on the morning of November 20, 2015, during a phone call, Relator advised the Product Director of the P&W East Hartford facility that there were issues, problems and lack of expertise at the Middletown facility and that the spraying needed to be moved to East Hartford.

65.     In the late afternoon of November 20, 2015, less than 24 hours after Relator witnessed and reported the falsely manipulated testing and improper test procedures taking place at Middletown, Relator was summoned to the Security Office at P&W.  The Chief of Government Security Compliance and three in-house counsel were present.

66.     Relator was advised that it had been brought to Defendants' attention that Relator owned two businesses.  Relator advised that this was disclosed to P&W at the time of his hire both verbally and in writing.

67.     Relator was then grilled for hours about his businesses.  Relator advised that he was not pursuing and had not pursued his consulting business since he took the position with P&W and offered to provide his tax returns to show that no income was earned for the business and that no work was ever performed by the company before or since he started with P&W.  Relator further advised that the other business only involved his ownership of a building in which he leased space to various commercial tenants.

68.     Following the grilling, Relator's laptops were confiscated and then he was escorted from the premises in front of his colleagues.  Relator was advised that he would be contacted as needed.  Relator was ordered not to contact anyone from or at P&W.

69.     There was no contact whatsoever from Defendants until 90 days later when Relator received a phone call and was told he was terminated.  Defendants then conducted a security de-briefing improperly and illegally over the telephone.

70.     Within one day of Relator's wrongful termination, Defendants made false and defaming statements to numerous P&W employees regarding Relator's termination, which led to the same defamatory information being made available to other entities and companies, thereby preventing Relator from securing other employment.  Said defamatory statements also

11

caused Relator to suffer extreme emotional distress and angst, as well as significantly harming Relator's reputation.

71.     Upon information and belief, following Relator's wrongful termination, Defendants made false statements to the United States regarding Relator's security clearance thereby further damaging Relator's reputation and preventing Relator from securing other employment requiring security clearance.

## IX.   DEFENDANTS' DELIBERATE USE OF IMPROPER SPRAY EQUIPMENT IN THE F100 ENGINE USED IN THE F-15 AND F-16 FIGHTER JETS

72.     P&W also intentionally used a flawed spraying process in its repair facility in San Antonio Texas.

73.     This flawed spray process involved the F100 engine outer combustors sprayed at the P&W San Antonio facility from 2004 through 2014.

74.     In November 2004, P&W entered into contracts with the Air Force to remanufacture engine combustion chambers for the F-15 and F-16 aircraft.  The work for this contract was to be done at the P&W San Antonio Engine Center at KellyUSA.

75.     This was followed by a 2010 Air Force contract with P&W to provide maintenance for F100 engines including module overhaul covering the fan, engine core, low-pressure turbine, high-pressure turbine and gearbox in the F100 engines.

76.     A problem arose when the P&W facility in Springdale, Arkansas ("P&W PSD") was attempting to do a first-time qualification for P/N 4073523 outer combustor. According to the contract specifications, these parts were coated with PWA 265 coating system, which consisted of PWA 1365 Bond Coat and PWA 1375 Top Coat.

77.     The first-time qualification arose due to the closure of the P&W San Antonio facility and the move of spray coating processing to the P&W PSD.

78.     Relator was consulted to assist P&W to determine why the P&W PSD facility was incurring extreme difficulty in coating the parts as per the contract specifications, taking many months when the task should have been completed in weeks at most.

DM1\7226609.2

79.     Relator was advised that P&W PSD was utilizing the exact same spray parameters that had been used at the San Antonio facility from 2004 through 2014.

80.     Relator requested the Spray Parameters.  Relator was provided the parameters only for the SG-100 spray gun.

81.     When Relator asked for the spray parameters for the 2700 extension gun required to reach the entire surface to be sprayed, he was advised that San Antonio had only used the SG-100 spray gun.

82.     Relator advised the P&W management team in Springdale Arkansas and members of the P&W Global Services Engineering ("GSE") division in East Hartford who asked for his consultation that San Antonio's use of only the SG-100 spray gun was improper, contrary to contract specifications and posed substantial risk because it was impossible to spray the inner part of P/N 4073523, known as the "Tig-Seal" without the use of the 2700 extension or similar close quarter spray gun.

83.     Upon information and belief, due to quality control and other contract required inspection procedures and sign-offs, P&W management knew that the San Antonio facility was not employing the required 2700 Extension or similar close quarter spray gun.  In other words, this was not mere operator error, but rather an intentional decision by P&W Management to short cut the contract required spray process in San Antonio.

84.     Use of the 2700 Extension or close quarter spray gun takes additional time and creates additional costs.  The 2700 Extension or equivalent gun requires skill and expertise to properly program.  Due to the small nozzle geometry, its deposition rate is greatly reduced compared to a standard SG-100, thereby taking more time and precision to spray.  In addition, due to its small size and general configuration, the spray gun nozzle wears more quickly causing increased downtime, labor and higher costs.  The 2700 extension or similar close quarter spray guns are difficult to rebuild and maintain, due to extra parts and water cooling seals in the gun.

85.     Due to P&W's failure to use a 2700 Extension or other similar close quarter spray gun in San Antonio, all of the P/N 4073523 parts sprayed at San Antonio from 2004 through 2014 are at risk for premature wear and potentially catastrophic risk.

## X.     DAMAGE AND HARM TO THE GOVERNMENT

86.     The Government has suffered actual damages by paying for defective engines of unknown reliability that failed to conform to Defendants' contractual obligations.

87.     In addition, by delivering defective engine parts to the Government, Defendants have placed pilots and others at risk because the intentionally improper sealing processes and falsely manipulated tests will cause premature wear and potentially catastrophic harm to pilots and others.

88.     Defendants have submitted invoices and received payments from the Government knowing that they have supplied defective engines.

89.     Defendants have made false statements and certifications to the Government regarding contractual performance and compliance.

90.     The Government was unaware of Defendants' knowing false certifications and requests for payment and relied upon Defendants' certifications and requests for payment.

91.     Information regarding Defendants' intentional failure to follow the contractual spraying specifications and procedures, as well as, Defendants' false manipulation of the testing process, would have been material to the Air Force's decision to make payments to the Defendants.

## COUNT I

### Violations of False Claims Act – Presentation of False Claims

92.     Relator realleges and incorporates paragraphs 1-91 of this Complaint as if fully set forth herein.

93.     In performing the acts described above, Defendants, through their own acts or through the acts of their officers, employees or agents, knowingly and/or recklessly

DM1\7226609.2

presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

94.     These claims were false and fraudulent because Defendants made claims for payments knowing that they had supplied engines to the Government that did not conform to contractual requirements and had falsely manipulated test results.

95.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments that would otherwise have not been paid and/or were ineligible for payment, which resulted in its being damaged in an amount to be determined.

96.     By reason of Defendants' wrongful conduct, the United States has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

(1)     Three times the amount of actual damages which the United States has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $10,781 and not more than $21,562 for each false claim which Defendants presented or caused to be presented to the United States;

(3)     Pre- and post-judgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT II

### Violation of False Claims Act – False Statements

97.     Relator realleges and incorporates paragraphs 1- 91 of this Complaint as if fully set forth herein.

98.     In performing the acts described above, Defendants through their own acts or through the acts of their officers, agents or employees, knowingly made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

99.     Such records or statements include the false certifications alleged herein.

100.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments which resulted in its being damaged in an amount to be determined.

101.    By reason of each Defendants' wrongful conduct, the United States has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

(1)     Three times the amount of actual damages which the United States has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $10,781 and not more than $21,562 for each false record or statement Defendants made to get false or fraudulent claims paid or approved by the Government;

(3)     Pre- and post-judgment interest; and

(4)      All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

DM1\7226609.2

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT III

### Retaliation And Violation of 31 U.S.C.§ 3730(h)

102.    Relator realleges and incorporates paragraphs 1 - 91 of this Complaint as if fully set forth here.

103.    At all times material hereto, Defendants were an employer covered by 31 U.S.C. § 3730(h).  Section 3730(h) precludes retaliation, suspension, threats, harassment and other discriminatory conduct against employees who investigate, provide testimony or assistance in any action filed or to be filed under the FCA or make any efforts to stop one or more violations of the FCA.

104.    The termination of Relator's employment and harassment as set forth above were in violation of 31 U.S. C.§ 3730(h).

105.    As a direct and proximate result of the termination, retaliation and harassment by Defendants, Relator suffered and incurred and continues to suffer and incur loss of compensation and other benefits, harm and damage to reputation and emotional distress.

106.    Defendants' conduct was and is malicious, fraudulent and oppressive in violation of public policy and in violation of 31 U.S.C. § 3730(h).

WHEREFORE, Relator requests that judgment be entered against Defendants in his favor and that he be awarded any and all relief pursuant to 31 U.S. C. § 3730(h) including, but not limited to:

a.    Two times the amount of back pay;

b.    Interest on back pay;

c.    Any and all other compensatory and special damages;

d.    All litigation costs and reasonable attorney's fees;

DM1\7226609.2

e.     Punitive damages; and

f.     Any and such further relief that this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Relator demands a jury trial on all claims alleged herein.

Respectfully submitted,

DUANE MORRIS LLP

Teresa N. Cavenagh, Esquire
tncavenagh@duanemorris.com
Michael M. Mustokoff, Esquire
mmustokoff@duanemorris.com
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1808

AETON LAW PARTNERS

N. Kane Bennett, Esquire
nkb@aetonlaw.com
101 Centerpoint Drive, #105
Middletown, CT  06457
(860) 724-2163

Attorneys for Plaintiff/Relator