IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. PETER J. BONZANI, JR., | : | *FILED IN CAMERA* |
| | : | *AND UNDER SEAL* |
| Plaintiffs, | : | *PURSUANT TO 31 U.S.C. § 3730(b)(2)* |
| | : | |
| v. | : | CIVIL ACTION NO. <u>16-cv-1730</u> |
| | : | |
| UNITED TECHNOLOGIES | : | *JURY TRIAL DEMANDED* |
| CORPORATION | : | |
| and | : | |
| PRATT & WHITNEY | : | |
| Defendants. | : | |
| | : | |

SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER
<u>RELIEF UNDER THE FALSE CLAIMS ACT</u>

Pursuant to 31 U.S.C. § 3730(b)(1), Relator, Peter J. Bonzani, Jr. ("Relator"), on behalf

of the United States of America, brings this amended civil action under the False Claims Act, 31

U.S.C. § 3729 *et seq* ("FCA"). In support of this Second Amended Complaint, Relator alleges

as follows:

## I.  INTRODUCTION – A VOICE IN THE <u>WILDERNESS</u>

1.  This case arises from a pattern of intentional and/or reckless conduct by

Defendants, United Technologies Corporation ("UTC") and Pratt & Whitney ("PW")

(collectively, Defendants) that resulted in the payment of tens of millions of dollars of false

claims by the United States and deliberately and knowingly exposed United States military

aircraft and pilots to substantial—and wholly unnecessary—risk.

2.  This case arises from the Defendants' knowing employment and concealment of a

defective spray coating process employed in the manufacture of jet engines in its Middletown,

Connecticut plant, as well as other plants in the United States and elsewhere.

3.    Defendants perpetrated their fraud on the United States and its pilots by intentionally manipulating, and/or recklessly disregarding, product quality, durability testing and related procedures in the production of military jet engines on an *international scale*—over a period of *decades*.

4.    Defendants' deliberate and/or reckless conduct consisted of, *inter alia*, using inappropriate spray coating equipment; manipulating contractually required test procedures and results; and flouting routine product quality controls, in the manufacture of internal engine parts for military aircraft, including, but not limited to the F119 engine used in the Air Force's F-22 Raptor and the F100 engine manufactured in Middletown, Connecticut and then employed in the Air Force's F-15 and F-16 fighter jets and possibly other aircraft.

5.    Upon information and belief, every contract between government suppliers and the United States Department of Defense obligates suppliers to meet certain necessary standards of quality and inspection before making a claim for payment. For example:

    a.    "[T]he Contractor shall prepare and furnish to the Government a material inspection and receiving report in the manner and to the extent required by Appendix F, Material Inspection and Receiving Report, of the Defense FAR Supplement." *See* DFARS 252.246-7000.

    b.    The Contractor shall provide notification, "not later than 72 hours, after discovering or acquiring credible information concerning nonconformances and deficiencies" for parts which could have a safety impact. *See* DFARS 252.246-7003.

    c.    The "Contractor shall provide and maintain an inspection system acceptable to the Government." *See* FARS 52.246-2; FARS 52.246-3.

    d.    If "the Contracting Officer determines that a defect exists in any of the supplies or services accepted by the Government under this contract, the Contracting Officer shall promptly notify the Contractor of the defect, in writing." *See* FARS 52.246-19.

    e.    "The Contractor shall test ___ unit(s) of Lot/Item ___ as specified in this contract. At least _____ calendar days before the beginning of first article tests, the

Contractor shall notify the Contracting Officer, in writing, of the time and location of the testing so that the Government may witness the tests." 48 C.F.R. § 52.209-3(a).

f.   "The Contractor shall deliver ___ unit(s) of Lot/Item ____ within ____ calendar days from the date of this contract to the Government at ___ [insert name and address of the testing facility] for first article tests…The characteristics that the first article must meet and the testing requirements are specified elsewhere in this contract." 48 C.F.R. § 52.209-4(a).

6.    Defendants have failed to satisfy their contractual requirements with the United States Department of Defense.

7.    Defendants have submitted false claims for payment and have made or used false records and certifications to obtain payment from the government in violation of the FCA.

8.    As a result of Defendants' intentional and/or reckless conduct, engines supplied by Defendants to the United States military are at risk for premature wear and possible catastrophic engine failures.

9.    Defendants have had knowledge of their reliance on flawed spray coating techniques concealed by falsified tests from at least 2012 through late 2015 affecting F119 and F100 engines supplied to the Air Force.

10.    As a result of the defective coating of internal jet engine parts, most particularly, knife edge seals, the durability of those engines are now at constant risk for premature wear and possible catastrophic failure.

11.    "Durability testing" is generally understood to be a subset of reliability testing. Reliability is intended to identify mechanical problems <u>before</u> they occur in the field.  It seeks to prevent <u>unexpected</u> interruptions in service and is tested in an actual use environment.

12.    The generally accepted definition of durability testing is a performance test performed over time under various conditions.

13.     Durability testing is intended to determine reliability <u>over time</u>.

14.     Durability testing requires the use of prequalified samples.   Selection of appropriate samples and perfection of the simulated testing environment is critical to the quality of the durability test.

15.     During the three plus years that Relator, Peter Bonzani, worked at PW, he observed numerous examples of flawed durability testing and deliberately flawed selection of test samples.

16.     As a result of those substandard processes, substandard engine parts were permitted to "escape" into production.

17.     Corporate President Robert Leduc admitted that PW's deliberately compromised durability testing and failed oversight were directly related to the recent premature breakdown of PW engines in Europe and India.

18.     Upon information and belief, PW produced engine parts for U.S. military customers using the same or similar intentionally manipulated and/or recklessly inadequate durability testing procedures.

19.     Upon information and belief, these failures in durability testing have either been concealed or falsified in PW's production records.

20.     Upon information and belief, these failures of durability testing and quality control oversight were contributing factors in the catastrophic failures of two military jets in April 2018 powered by F119 engines.

21.     F119 engines and their repair parts used in maintenance were built at Defendants' plant in Middletown, Connecticut.

DM1\8903479.4

22.    As a result of Mr. Bonzani's expertise in spray coating technology, he was called upon to troubleshoot and attempt to correct substandard spray coating at other PW locations.

23.    On or about November 19, 2015, Mr. Bonzani was called upon to witness and troubleshoot why test sample knife edge seal samples had failed quality testing at PW's Middletown, Connecticut plant.

24.    He quickly determined that the "plume" of the spray gun—that is, the outer-bounds of its effectiveness—being used was too short to reach the inner crevices of the engine and its **knife edge seals**.[1]

25.    The technician administering the test admitted that samples had been passed as being production worthy by use of a test rig manipulated to give a positive result.

26.    The flawed testing also deliberately concealed inadequate spray techniques at other PW locations.

27.    Based on official reports made to Mr. Bonzani, the very same flawed spray techniques and inappropriate equipment was employed at the PW facility in San Antonio.  F100 engines sprayed at the San Antonio PW facility between 2004 and 2014 are also at risk.  Those engines are now also subject to premature wear and possible in-flight catastrophic failure as their parts are stressed in use over time.

28.    Unlike Middletown, where it was knife edge seals being sprayed, in San Antonio, it was a different coating and jet engine part, the  outer combustor coated with thermal barrier coating, that was sprayed using the wrong equipment resulting in substandard coating.

---

[1] To better understand the concept of a spray gun's plume, one might analogize to the use of spray paint to cover a wall or fence. The effectiveness of the painting will be impacted by the distance the painter is holding the can to the wall—too far away, and the surface of the fence will not be evenly coated.  Plasma guns work in much the same way. A plasma gun that is used to spray at a distance greater than the optimal distance will deposit an inferior coating that will not have the durability of a properly sprayed part.

29.    The hazards posed by Defendants' intentional and/or reckless conduct are neither hypothetical nor hyperbolic.

30.    On February 9, 2018, Defendant PW issued a press release, acknowledging defects in the **knife edge seals** of the high pressure compressor PW 1100G-JM engine used to power the Airbus 320 NEO plane.

31.    Subsequently, the U.S. Federal Aviation Administration, the European Aviation Safety Agency, and the Indian Directorate-General of Civil Aviation each issued air-worthiness directives, or their equivalents, concerning these engines.  These directives warned that PW's engines were prone to in-flight shut-down.

32.    PW considered the matter so serious as to halt all shipments of new engines to Airbus, which is, upon information and belief, one of PW's largest customers.

33.    On March 16, 2018 PW President Robert Leduc addressed the grounding of the European airbus planes in a public meeting with financial analysts. Mr. Leduc admitted that the failures in production were due to a **company-wide breakdown in durability quality testing**. He admitted that:

> **PW did not get our durability testing done before we went into service.** We didn't. We didn't get [Extended Operations] certified for almost a year after we went into service...[PW] basically took the supplier's design at face value.

(Emphasis supplied).

34.    On April 6, 2018, at Tyndall Air Force Base, an F-22 Raptor—which is powered by the PW F119 engines that are the subject of Relator's Second Amended Complaint—was forced to make an emergency landing after its engine failed mid-flight. *Just one week later*, on April 16, 2018, another F-22 Raptor, employing an F119 engine, was forced to land *without landing gear* moments after its engine failed *mid-take-off*.

DM1\8903479.4

35.    The root cause analysis of those barely avoided in-flight disasters is, on information and belief, highly classified.

36.    In addition to submitting false claims to the United States, in violation of 31 U.S.C. §3730(h), Defendants summarily suspended and then later wrongfully terminated Relator within 24 hours of having advised his superiors of the flawed spraying process and the fraudulently manipulated test procedures taking place at the PW facility in Middletown, Connecticut.

## II.    JURISDICTION AND VENUE

37.    This action arises under the FCA to recover statutory treble damages, civil penalties, and any alternate remedies that may be available, on behalf of the United States of America arising out of the Defendants' violations of the FCA.

38.    Under § 3732 of the FCA, this Court has jurisdiction over actions brought under the FCA.  Furthermore, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

39.    This Court has personal jurisdiction over the Defendants and venue is proper in this District.  Pursuant to § 3732(a) of the FCA,: "any action under §3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant, can be found, resides, transacts business, or in which any act proscribed by §3729 occurred." Defendants reside in this District.  Moreover, at all times material hereto, Defendants have regularly conducted substantial business within this District.  In addition, the proscribed acts by Defendants are among those that are the subject of this action, occurred in this District.  Venue is additionally proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

DM1\8903479.4

### III.    FILING UNDER SEAL

40.     Under the FCA, and authority interpreting the FCA, this Second Amended

Complaint must be filed *in camera* and remain under seal and shall not be formally served upon

Defendants until the Court so orders. The Government may elect to intervene and proceed with

the action within sixty (60) days after the Government receives the Second Amended Complaint.

41.     As required by the FCA, Relator will voluntarily serve on the United States a

copy of the Second Amended Complaint and all other relevant information in the form of a

written disclosure statement provided to the United States Attorney General and the United

States Attorney for the District of Connecticut, containing information in his possession

pertaining to the allegations in the Complaint.

### IV.    PARTIES

42.     Relator is a citizen and a resident of Bolton, Connecticut.  Relator brings this

action on behalf of the United States.

43.     From September 2012 through November 2015, Relator worked as an

independent contractor and later a full-time employee for PW in its East Hartford, Connecticut

facility.  From September 2012 until April 2014, Relator worked for Rapid Global Business

Solutions, Inc. ("RGBSI"), an employment staffing service, retained by PW to provide engineers

and others to work on PW projects and contracts.  Relator provided automation and thermal

spray expertise and services to PW.  Relator soon became the "go-to" person at PW regarding

both thermal spray coatings issues and robotic programming.

44.     As a result of Relator's substantial expertise and experience in thermal spray

coatings and robotic programming as well as his trouble-shooting capabilities, PW soon began

recruiting the Relator.

DM1\8903479.4

45.    At the time of his recruitment, the Relator was directly working for RGBSI as a contractor.

46.    To overcome his resistance to working as a full-time PW employee, a company supervisor asked Relator "what it would take" for him to join PW.  After continued negotiations during which Relator revealed both verbally and in writing his independent, but nonfunctioning, consulting business, as well as a commercial property he owned in which he leased space to other businesses, Relator was offered and accepted a position as a PW staff engineer in April 2014.

47.    Despite having knowledge of the existence of his consulting business, Defendants did not require Relator to forgo that business as a condition of employment.

48.    Prior to working at and later for PW, Relator had extensive education, experience and expertise with thermal spraying.

49.    Both first as a consultant and full-time PW employee, Mr. Bonzani was frequently called upon to troubleshoot thermal spraying issues and problems for PW.

50.    After his hiring, PW invested significant time and cost to secure Secret Security Clearance for Relator.

51.    As a result of his employment and position with PW, Relator has first-hand knowledge of the business operations of PW, including:

      1.    its intentional and/or reckless disregard for basic product quality controls;

      2.    the intentionally faulty spray process utilized by PW in the manufacture of the F119 and F100 engines; and

      3.    the falsely manipulated test procedures used in the Middletown facility for the F119 engine.

52.    Relator brings this action based on direct and independent knowledge.  None of the actionable allegations set forth in this Complaint is based upon a public disclosure as set forth

in 31 U.S.C. §3730(e)(4). Notwithstanding the same, Relator is an original source of the facts alleged in this Complaint due to the first-hand knowledge he gained while working at PW. Prior to filing this Complaint, Relator voluntarily provided information regarding Defendants' conduct, faulty spray process, manipulated false testing and other information to the federal government.

53. Defendant UTC is incorporated under Delaware law. Its principal place of business is in Farmington, Connecticut.

54. UTC provides systems and services to the aerospace, construction and security industries and sells its services and products to commercial and governmental entities.

55. PW is a subsidiary or division of UTC with a principal place of business in East Hartford, Connecticut. PW manufactures and sells engines and engine parts to commercial and government military entities.

## V.   THE FALSE CLAIMS ACT

56. The FCA imposes liability upon any person who: (a)"knowingly presents or causes to be presented [to the government] a false or fraudulent claim for payment or approval"; or (b)"knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) and (B), as amended.

57. The FCA imposes liability not only for intentionally false or fraudulent conduct, but also where an individual "acts in deliberate ignorance of the truth or falsity of the information" or "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(ii) or (iii).

58. The FCA defines claim as (A) "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is

made to a contractor, grantee, or other recipient, if the money or property is to be spent or used

on the Government's behalf or to advance a Government program or interest, and if the United

States Government (I) provides or has provided any portion of the money or property requested

or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of

the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

59.    The FCA defines material as "having a natural tendency to influence or be

capable of influencing the payment or receipt of property or money." 31 U.S.C. § 3729(b)(4).

## VI.    HISTORY AND BACKGROUND OF THE PW F-119 ENGINE

60.    In April 1991, the United States Air Force chose PW's F119 engine, to be used in

the Air Force's F-22 Raptor Air Superiority Fighter ("F-22").

61.    The Air Force entered into a contract with PW to manufacture and supply F119

engines for use in the F-22.

62.    PW manufactured and produced engines under its original contract with the Air

Force for the F-22 engines through December 2012 at its plant in Middletown, Connecticut.

63.    Over the years since its initial Air Force contract award for the F119 engines, PW

has also been awarded follow-on Air Force contracts to provide additional engines, spare parts,

maintenance and other services for the F119 engine also performed by PW in Middletown,

Connecticut.  Defendant PW was awarded such a contract as recently as December 15, 2017.

64.    The Air Force contracts with PW for the F119 engine required PW to build to

print, which also calls out coating specifications and quality control procedures (including

durability testing).

65.    The Air Force contracts required PW to comply with all of its quality control

procedures and requirements.

11

66.    The F119 engine requires specially spray coated seals (known as knife edge seals) to join engine parts so as to contain (seal) the hot gases required to propel the jet aircraft from escaping.   Tight seals are essential to engine function, performance, engine wear and engine safety.

67.    Over time, an improperly coated seal will fail prematurely and without warning, which will allow those gases to escape, ultimately causing breakdown of engine parts, a release of debris and possibly explosion.

68.    The Part blueprint called out in the Air Force contracts with PW for the F119 engines calls out a Specification and in particular for this claim, Specification PWA53.

69.    In addition to the knife edge seals, another critical issue relevant to this particular claim involves the PWA 53-37/53-11 coating used on integrally bladed rotors ("IBRs") also employed in the F119 engine.

70.    Upon information and belief, the coating Specification also mandates that this is likely a Level 1 or 2 Key Part Characteristic ("KPC1 or KPC2") which specifies that the coatings are critical to the function of the plane.   Failure to follow process or procedure for the coatings can result in engine breakdown causing risk to the plane and its pilots.

71.    The Specification sets forth requirements for coating composition, powder qualifications, as well as other requirements and procedures such as processing procedures, and evaluation procedures.

72.    There is an Evaluation Procedure for coating (E53 in Material Control Lab).   It specifies the requirements for porosity, cracking, bond strength, interface and oxides among others.   The coating is a critical component of the knife edge seal.

73.     The durability of that coating is essential to the long term performance of the knife edge seal.

74.     Failure of knife edge seals was identified by PW in its root cause analysis of engine malfunction in the grounded airbus planes.

75.     Upon information and belief, from the commencement of the PW F119 contracts with the Air Force until late 2012, the PW facility in East Hartford performed the spray coating that was done on the IBRs for the F119 engine.

76.     In late 2012, the spray coating process that had previously been done on the IBRs for the F119 was moved from the PW East Hartford facility to the PW Middletown facility.

77.     Upon information and belief, the spray coating for the IBRs for the F119 was done at the PW Middletown facility from late 2012 through late November 2015 when Relator's root cause analysis of the spray coating performed at PW Middletown determined it to be substandard.

78.     The PW facility at Middletown, Connecticut is presently the sole location for manufacture of the F119 jet engine *as well as* the only location in which spare and repair parts for F119 engines are produced.

## VII.    DEFENDANTS' QUALITY CONTROL PROCESSES

79.     Relator is personally familiar with at least two of Defendants' quality control processes: the "Production Ticket" ("P-Ticket") system managed by the PW Materials Control Lab ("MCL") and the Process Approval Records ("PARs") administered by the Engineering Source Approval ("ESA") unit within PW.

DM1\8903479.4

## A.    The P-Ticket System

80.    Mr. Bonzani and, upon information and belief, all other PW Manufacturing Engineers, are trained in and then required to utilize the MCL P-Ticket system.[2]

81.    P-Tickets and related records of production are required by the federal government to be retained for possible inspection.

82.    Under this system, representative production samples are supposed to be sent to the company's MCL for quality testing and evaluation. The results of that testing and observations about the hardware produced are recorded in actual P-Tickets.

83.    For thermal spray coating applications of the kind Relator was tasked with completing, such testing is supposed to occur as often as daily, but typically occurs on a weekly basis. MCL is also encouraged to witness testing if it has any concerns about production quality, or when a new part or production process is introduced to the manufacturing process.[3]

84.    The purpose of the P-Ticket system is to allow PW's MCL to evaluate production samples for quality compliance.

85.    A P-Ticket for coatings contains such information as sample material, specifications to follow, who made the sample (staff), shift, date and time, part numbers, program names (for robots or CNC), pertinent part work instruction operation numbers and any other MCL required information. P-Tickets also contain the spray parameters, which set up the

---

[2] Materials Control Lab is the quality control arm of PW. It evaluates samples for proper characteristics and certifies that they meet specifications. Example characteristics that MCL certifies are thickness, tensile strength, weld penetration, hardness, porosity and bond strength, as well as other qualities called out by contract.

[3] A First Article Inspection (FAI) is a process used when introducing a new part and/or process for a production component. The FAI involves documenting the performance results in detail for the process, *i.e.* dimensions and visual appearances. The FAI provides significant oversight into quality, engineering and other characteristics to vet the process for full production. All FAI's are retained as records and are required at introduction and any major changes to the manufacturing processes.

14

range of angles, standoff distances, gases, voltages, amperage, gun type, and other specific information about the part and its production.

86.    The MCL staff is then supposed to compare the manufactured hardware and P-Tickets it receives from PW's various production facilities to the particular product's specifications. Where there is a discrepancy between the two, a production failure should be recorded and the hardware removed from the manufacturing process. In this way, poor quality products are prevented from escaping PW facilities and entering use.

87.    On information and belief, the failed production practice and false testing observed by the Relator could not have occurred had the P-ticket system been implemented as dictated by the contractual requirements mandated by the United States Air Force and Department of Defense.

### B.    ESA & PAR TESTING

88.    Relator also had training and familiarity with the testing that was supposed to have been conducted by PW's Engineering Source Approval (ESA), the unit within PW that oversees quality control of newly manufactured parts.

89.    ESA procedures require PW plants to submit actual parts or representative samples of the hardware produced for testing and review by MCL and Quality Control.  When performing its function, the ESA oversees the tests and processing on these products, the results of which are recorded in Process Approval Records ("PAR").  The PAR is a record that verifies various aspects of production, including the chemical recipes used to prepare coatings to meet U.S. government contract specifications.

90.    The PAR also confirms that the spray geometries (*i.e.* the angle at which the spray gun is positioned relative to the hardware to be coated) are: (1) representative of the production hardware and (2) in-line with project specifications as defined by the U.S. government.

15

91.    A deliberately misaligned test sample with improper standoff distances and/or inappropriate spray recipe requires a PAR indicating a production failure. Production failures should have been—but were not—witnessed, discovered, and corrected by ESA in the preparation of the PARs in violation of the contractual requirements imposed by the United States Air Force.

92.    During Relator's tenure at PW, he submitted various PARs to qualify parts.

93.    Not once in over three years did ESA staff ever observe and certify that any parts produced by the Relator were being sprayed in accordance with the spray recipes and work instructions.

94.    Relator is similarly unware of any case in which an ESA staff member observed that spraying was done correctly at any PW facility.

95.    ESA staff signed off on the processes sight unseen, violating contractual requirements as well as the most basic standards of quality control.

## VIII.    ACTUAL QUALITY CONTROL FAILINGS OBSERVED

96.    In April 2014, Mr. Bonzani was recruited to join PW as a permanent employee. After four offers, he took this step reluctantly. [4] He accepted a position as Staff Engineer in the Advanced Coatings Department in Hot Section Module Center ("HSMC") North at PW's facility in East Hartford.

97.    Mr. Bonzani had been called upon multiple times to consult and assist on similar spray coating issues in multiple PW production facilities.

---

[4] Prior to joining the company full-time, Mr. Bonzani formed Aerospace Robotic Consultants, LLC ("ARC"). This entity was created to provide consulting services in connection with commercial spraying and coating. The company was only ever active in the records of the Connecticut Secretary of State. ARC never provided any actual consulting services. It had no customers or contracts, and never generated any income.

98.    While at PW, he received excellent evaluations for his performance on the job.

99.    During the course of his employment, Mr. Bonzani was consulted on at least four separate quality control failures occurring in different PW manufacturing sites.

### A.    San Antonio/Springdale Issue – April-May 2014

100.    In the spring of 2014, Mr. Bonzani uncovered evidence of product "escapes"—the release of malfunctioning hardware from the manufacturer to customers for use—from the PW facility in San Antonio, Texas over a period of nearly twenty years, which, upon information and belief, *have never been publicly reported or remediated.*

101.    Beginning in the early 1990s, PW had operated a maintenance plant for F100 engines in San Antonio, Texas. The plant repaired or replaced hundreds, if not thousands, of Middletown manufactured parts for United States Air Force planes.

102.    When the plant closed in 2013, the spraying and coating functions were transferred to the PW plant in Springdale, Arkansas. Not long after spraying began at Springdale, the engineers encountered serious issues passing test samples of the F100-220 outer combustor (P/N 4073523) through quality control testing.

103.    Relator was asked by Global Services Engineering ("GSE") staff to assist Springdale in investigating the problem.

104.    Relator was told that the engineers in Springdale were using the same spray parameters used in San Antonio.  He immediately determined that the spray coating recipe being used would not yield the passing samples that had been recorded in the company records and required by contract.

105.    Relator's inquiry determined that the long-running plant in San Antonio—and its successor, Springdale—did not employ a plasma spray gun with a large enough plume for spraying the narrow crevices of the jet engines repaired at those locations.  The coating stream

17

created by the Praxair SG100 gun used at those plants was incapable of reaching the inner diameter of the engine's outer combustor which is adjacent to the heat shields.

106.     The failure to spray all surfaces of the engine created faulty parts in countless new and recycled engines occurred over a *period of almost twenty years*.

107.     Upon information and belief, PW has done nothing to remediate the "escaped" hardware created by the San Antonio plant between 1993 and Relator's sounding of the alarm.

108.     Relator was shown each of the failed samples.

109.     Relator worked with the East Hartford Material Control Lab supervisor.  The inspected samples revealed the flaws of improper coating, insufficient coverage, lack of bond (non-adhering coating), porosity in the band coat, oxide stringers and voids (uncovered areas).

110.     Relator was never advised that remedial action had been taken.

111.     On information and belief, no report of the faulty parts or unreliable testing of those parts was made to the government.

112.     Relator reports that the spray-gun problem was so obvious that it could not have gone undetected. He explains that the escapes should have been discovered by the Repair Source Approval ("RSA"), a department within PW, that is similar to ESA, which provides quality control for parts returned for repairs.

113.     RSA should have observed the initial parts sprayed as part of the First Article Inspection Process, discussed previously.

114.     The use of the improper spray gun also should also have been caught by the inspectors preparing the PARs corresponding to the sprayed parts.

115.     Upon information and belief, to the extent that these records exist, they falsely certify compliance with the spraying specifications such as PWA 265.

116.   On or around May 1, 2014, Relator raised the issues of spray gun model and faulty parts with PW management. Person 1, Coatings Discipline Chief for GSE, questioned whether the required FAI and PAR observations had taken place and, if so, why such an obvious issue continued to occur.  There was no response.

117.   Relator advised that a different spray gun, the Praxair SG2700 gun, would have sufficient range and maneuverability to reach all areas of the product.

118.   This spray gun was employed at Springdale during the summer of 2014 upon Relator's suggestion and the problem samples then passed MCL approval.

119.   Mr. Bonzani complained about the quality breakdown to Person 1, Person 2, Person 3 and Person 4.  More explicitly, Relator stated that the parts sprayed in San Antonio for many years prior had not been sprayed properly.

120.   This improperly sprayed hardware "escaped" quality control and was now in engines on runways, or were currently sitting in customer inventory, waiting to be put into service.

**B.     Chengdu Issue, Early 2015**

121.    In early 2015, Mr. Bonzani was asked by a colleague at the PW MCL, Person 5, to analyze a series of suspect samples received by the MCL in Connecticut from a PW plant in Chengdu, China.  This analysis was part of a periodic review of production quality at remote sites by PW's central MCL.

122.   Relator's analysis of the P-Ticket samples determined that the bond coat layer was well outside contract specifications for interface, porosity, and oxide contamination.[5] Person 5 concurred with Relator's findings.  Person 5 also admitted to Relator that these precise

---

[5] Interface is the area where the coating is bonded to the substrate material, porosity is the volume fraction of pores in the coating and oxide contamination is when the metal is "rusted" or oxidized where it should not be.

DM1\8903479.4

samples—and more—going back months and likely years—had passed quality control checks in China.  In each instance, the substandard coatings at issue had: (1) been applied to knife edge seals; (2) passed final inspection, and (3) been delivered to the customers.

123.    These unacceptable improperly sprayed coatings from Chengdu created multiple product quality escapes.

124.    These types of samples should have been recorded as production failures.

125.    A record of those reviews, along with the accompanying prior samples and P-Tickets created in Chengdu, are required to be maintained and had to have been falsely certified by Chengdu MCL staff.

126.    Relator's observations of substandard production quality were reported to GSE and MCL supervisors at the highest level of PW.

127.    Relator's supervisors were informed that the flawed coatings had been in production for at least a year.

128.    Upon information and belief, no corrective action was taken.

129.    Although Relator cannot be certain on which airplane engines the Chengdu knife edge seals were being used, he does know that knife edge seal issues have recently grounded PW1100G engines as reported in recent news articles.

130.    These grounded engines were likely produced in Chengdu, along with legacy engine programs such as the JT9D, which have been used on some military purposed 747s as well as some other commercial airplanes repurposed for military use.

## C.    East Hartford Issue, Summer 2015

131.    Robert Leduc's March 2018 admission concerning PW's failure to employ proper durability testing relates directly to issues raised by Mr. Bonzani in the summer of 2015 and later at Middletown on November 19, 2015.

20

132.    While at East Hartford in the summer of 2015, Mr. Bonzani approached Quality Engineer Person 6 about coating flaws Mr. Bonzani observed at the PW plant in East Hartford.

133.    Mr. Bonzani is constrained by the classified nature of the program from describing the precise nature of the problem identified and the alarms he raised.  It suffices to say, for purposes of this Second Amended Complaint, that flaws appeared in coatings.

134.    Person 6 admitted that the coatings did not stand up to contractual requirements for durability – just as Mr. Bonzani suspected.  Furthermore, Person 6 advised that management was aware of the issue.

135.    Nothing was done, in violation of the company's contractual duty to investigate and report the flaws.

136.    Person 6 conveyed his disappointment that the issue was not being properly addressed, and that he had previously raised it to management.

137.    Had these parts gone through and passed the required durability testing, the problem would have been obvious.

**D.    Middletown Issue, November 2015 – No Such Thing as a Coincidence**

138.    On November 19, 2015, Relator was called from his post at the PW plant in East Hartford to deal with a spray coating problem in the PW facility at Middletown, Connecticut.

139.     He was advised by Person 7, Product Director, that although the seals at-issue had previously passed quality control testing, they were no longer able to do so.  The staff in Middletown was unable to rectify the problem or determine the cause for the failures.

140.    These particular knife edge seals were to be used in the production of the F119 engines used in the F-22 Raptor Fighter—the same engine that was recently the subject of two nearly fatal malfunctions at Naval Air Station Fallon and Tyndall Air Force Base.

DM1\8903479.4

141.    On April 6, 2018, an F-22 flying out of Tyndall Air Force Base, in Florida, suffered an in-flight shut down.  The engine for that plane was built at Middletown, Connecticut.

142.    On April 13, 2018, an F-22 flying out of Naval Air Station Fallon, in Nevada, was forced to make a belly landing (*i.e.* directly on the airframe—without landing gear) due to engine failure.  That jet's engine had also been constructed at Middletown, Connecticut.

143.    F-135 hardware was also processed at Middletown to be used in the Joint Strike Fighter (JSF) F-35 Lightning II.

144.    On inspection, Mr. Bonzani immediately saw that the **knife edge seals** could have previously passed inspection only through the use of a worn out and intentionally manipulated test rig.  The carefully constructed test rig allowed Middletown staff to modify testing parameters.

145.    The manipulated rig allowed for a more favorable spray distance of 6 inches instead of the specified 3.5 inches.

146.    The manipulated rig also set a more favorable incidence angle in order to produce acceptable sample test results.

147.    As a result of the manipulated test, the quality of actual production parts could not be determined.

148.    Proper durability testing could not be performed at the longer distance.

149.    Due to the compromised test apparatus, the test pieces were invalid.  Their use and subsequent certification for fitness should never have occurred.

150.    Relator reviewed samples with Middletown Materials Control Lab staff.  The knife edge samples showed improper coverage, lack of bond, and heavy oxides under microscope (dull, porous finish).

22

151.    After any prolonged use of the engine, these substandard knife edge seals are likely to prematurely degrade and compromise engine life, fuel economy, thrust and effectiveness.

152.    At worst, the failure of the seal could easily cause catastrophic engine failure of the type experienced at NAS Fallon or Tyndall AFB.  A failed seal will release hard metal and ceramic debris throughout the engine at great velocity, not unlike shrapnel.

153.    Not only did Mr. Bonzani discover the failed test rig, he spotted the reason for the flawed parts passing into production: Pratt engineers were using a spray gun of too large a diameter.  As a result, sprayed coating did not sufficiently reach all parts of the seal.

154.    Mr. Bonzani reported his findings in the late afternoon of November 19, 2015. Mr. Bonzani informed staff and management in both the Middletown and East Hartford facilities including but not limited to PW management: Person 7, Person 8, Person 9, Person 10, and Person 11.

155.    The next day, November 20, 2015, at around 1:00 p.m. he was suspended and escorted from the East Hartford facility, as described in greater detail in Part X.

156.    Despite Mr. Bonzani's suspension, immediately following his report, PW again attempted to conduct the thermal spraying of the knife edge seals at the Middletown facility. PW continued, however, to use the same spray apparatus that was the subject of Mr. Bonzani's whistleblowing.  Not surprisingly, the parts could not pass a *legitimate* quality control test.

### E.    Definition of Insanity – Doing the Same Thing Over and Over and Expecting Different Results

157.    Ultimately, PW Middletown disposed of the original spray equipment, but continued to employ the same model SG-100 gun, somehow expecting a result different from

that predicted by Mr. Bonzani. It purchased entirely new spray equipment from Praxair Surface Technologies.

158.    PW could not produce samples that passed appropriate quality control tests with which, upon information and belief, had not been tampered with in the same manner as the old rigging. After time, PW surrendered this aspect of production to outside vendors.

159.    In late 2017, PW's expert from East Hartford admitted to being unable to assist Middletown in spraying specific parts successfully. He noted that Middletown had been spraying improperly, using a gun with too small a spray plume and an improper undocumented orifice change, since at least 1993. He confirmed Mr. Bonzani's November, 2015 observations and reports.

160.    According to the expert, at some point in time in 1993, Middletown staff had altered the spray systems themselves. Staff failed to record the process changes and requalify all spray parameters for coatings. Relator fears that as much as **twenty-two years'** worth of suspect hardware—obvious product quality "escapes"—have been put into service.

161.    Relator has first-hand knowledge that as recently as March, 2018, PW still had no independent ability to spray knife edge seals on the F119 hardware in Middletown, despite years of work on this problem by PW's top coatings employees.

162.    On April 30 2018, the Relator was in conversation with a veteran Praxair employee who had recently been working at PW installing new spray equipment. In an unprompted conversation, he advised Mr. Bonzani that PW continued to: spray IBRs at the wrong 6 inch distance; use a plasma spray gun that had too small a spray plume; and was still "scamming on samples". The substandard samples had been sent out to other PW facilities in East Hartford, CT and North Berwick, ME with the hope that the samples might pass there.

163.    It is only with its recent admissions, that PW MCL requires a much higher level of oversight and quality scrutiny for all suppliers specifically and particularly for coatings. Vendors are no longer allowed to outsource the coatings analysis to third party laboratories. All coating analysis must be completed in-house and the processing and staff are required to be certified by PW MCL.

164.    In June, 2018, Relator learned that sometime earlier in the spring of 2018, PW finally acknowledged the insanity of continued use of the same wrongly sized spray gun and purchased a different model, similar to that previously recommended by Mr. Bonzani.

165.    During the course of the Relator's tenure at PW, he frequently referred to the ASM handbook or manual, a multi-volume reference, produced by the American Section of the International Society of Materials Testing.

166.    The ASM manual is universally recognized as setting the standards for proper material spray techniques and the processing of spray coatings.

167.    It is often the case that the slightest deviations from ASM directions cause the release of escaped substandard product as observed and predicted by Mr. Bonzani.

168.    Mr. Bonzani's observation of substandard samples sprayed from a distance of six inches is predicted on pages 61 and 85 of the ASM manual. The manual dictates a proper spray standoff distance, which in the case of the SG-100 is approximately 3.5 inches. That proximity can only be achieved within the confines of a PW jet engine through the use of a proper model spray gun, like the one recommended by Mr. Bonzani.

DM1\8903479.4

## IX.    RECENT PW ADMISSIONS AND ENGINE FAILURES CONFIRM THE RELATOR'S ALLEGATIONS OF FRAUD – COINCIDENCE?

169.    Defendant PW's President Robert LeDuc's admission on March 16, 2018 that PW was not conducting durability testing confirmed the complaints, claims, and reports that Mr. Bonzani made during his more than three years at Defendant PW.

170.    PW's February press release admitting the defects in the knife edge seals of the high-pressure compressor PW 1100G-JM engine used to power the Airbus A320 NEO plane allowed Relator to make the connection between the failed samples from Chengdu, the lack of quality controls he observed in product from the various PW facilities in the United States and the compromised tests and products in Middletown.

171.    It is now clear that the very same process that had failed to take place, as witnessed by Mr. Bonzani in East Hartford and Middletown, had failed to take place elsewhere.

172.    A common denominator between what Mr. Bonzani observed and Mr. Leduc admitted was PW's continued failure to produce properly manufactured knife edge seals – a critical component to jet engine propulsion that appears in all jet engines.

173.    On information and belief, it is more than coincidental that both military and commercial engines built by PW have experienced engine failure so close in time.

174.    Moreover, the fact that that type of premature part failure (knife edge seals) is so pervasive to all jet engines is, itself, a prime indicator of a collapse of quality control in chemical recipe and spray techniques – two areas of Relator's academic training and technical experience.[6]

---

[6] Mr. Bonzani holds four college degrees and received his Masters of Science in Metallurgy and Materials Engineering at the University of Connecticut in 2004. His thesis was specifically on thermal spray and the effect of altering processing parameters and the effect on coating properties. He holds multiple domestic and international patents, is a published author, has given conference lectures, all of which are specifically in coatings and is considered an industry expert.

X.    **IMMEDIATELY FOLLOWING RELATOR'S REPORT OF MISFEASANCE, HE IS SUSPENDED.  THERE IS NO SUCH AS A COINCIDENCE!**

175.    The day following his trip to the PW Middletown facility on November 19, 2015, Relator was abruptly and without prior warning or notice suspended by Defendants and escorted from the PW East Hartford premises.  Ninety days thereafter Relator was advised by telephone that he was being terminated.

176.    At approximately 5:00 p.m. on November 19, 2015, following Relator's review and assessment of the false testing at the PW Middletown facility, Relator called the Business Unit Manager at the PW East Hartford facility to inform him of the manipulated false testing and the contractually improper spray procedures that had been performed at the Middletown facility from late 2012 through November 2015.  This same information was again relayed to the Business Unit Manager during a meeting in the East Hartford facility in the morning of November 20, 2015.

177.    On November 19, 2015, following Relator's review and assessment of the failed testing at the PW Middletown facility, during a meeting in the Middletown facility, Relator informed the Product Director, the Operations Manager, as well as other engineers and staff at the Middletown facility of the manipulated false testing and the contractually improper spray procedures.

178.    On the morning of November 20, 2015, during the annual meeting of Relator's work group at the East Harford facility, Relator also informed other PW East Hartford engineers and East Hartford MCL personnel that there was cheating and other improper procedures taking place at the PW Middletown facility.

179.    Later that same morning, November 20, 2015, during the course of a phone conversation, Relator advised the Product Director of the PW East Hartford facility that there

were issues, problems and a lack of expertise at the Middletown facility. He advised that the spraying had to be moved from Middletown due to a disregard of contractually mandated test procedures.

180.    In the late afternoon of November 20, 2015, less than twenty-four hours after Relator witnessed and reported the falsely manipulated testing and improper test procedures taking place at Middletown, he was summoned to the Security Office at PW. PW's Chief of Government Security Compliance and three in-house counsel were present.

181.    Relator was then advised that it had been brought to Defendants' attention that Relator owned two businesses. Relator replied that his business interest had been disclosed to PW at the time of his hire both verbally and in writing. The two businesses were his ownership of real estate property and a non-functioning consulting business.

182.    Relator was then questioned for several hours about his businesses. Relator advised that he was not pursuing and had not pursued his consulting business since he took the position with PW. He offered to provide, and in fact did provide, his tax returns to show that no income was earned for the business at any time and that no work was ever performed by the company before or since he started with PW. Relator further advised that the other business only involved his ownership of a building in which he leased space to various commercial tenants.

183.    Following the questioning, Relator's laptops were confiscated. He was escorted from the premises in front of his colleagues. Relator was advised that he would be contacted as needed. Relator was ordered not to contact anyone from or at PW.

184.    Up to the time of his initial suspension, Mr. Bonzani had been receiving PW's highest performance reviews. More specifically, his supervisor noted:

> "Hands down, Peter is a great addition to our team. He is often sought after for technical advice. This was evident with his

> support of Aftermarket, Surface Treat and Combustion Business Units.  There are only a handful of folks in country that can match the technical skills and knowledge that Peter embodies."

(Person 11 4/14/2014).

185.    There was no contact whatsoever from Defendants until ninety days later when Relator received a phone call and was told he was terminated.  Defendants then conducted a security de-briefing over the telephone.

186.    Within one day of Relator's wrongful termination, Defendants made false and defaming statements to numerous PW employees regarding Relator's termination, which led to the same defamatory information being made available to other entities and companies, thereby preventing Relator from securing other employment.

187.    Said defamatory statements also caused Relator to suffer extreme emotional distress and angst, as well as significantly harming Relator's reputation.

188.    Upon information and belief, following Relator's wrongful termination, Defendants made false statements to the United States regarding Relator's Security Clearance, thereby further damaging Relator's reputation and preventing Relator from securing other employment requiring Security Clearance.

### COUNT 1

### Violation of the False Claims Act – Presentation of False Claims

189.    Relator realleges and incorporates paragraphs 1-188 of this Second Amended Complaint as if fully set forth herein.

190.    In performing the acts described above, Defendants, through their own acts or through the acts of their officers, employees or agents, knowingly and/or recklessly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

29

191.    These claims were false and fraudulent because Defendants made claims for payments knowing that they had supplied engines to the Government that did not conform to contractual requirements and had falsely manipulated test results.

192.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments that would otherwise have not been paid and/or were ineligible for payment, which resulted in its being damaged in an amount to be determined.

193.    By reason of Defendants' wrongful conduct, the United States has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

(1)    Three times the amount of actual damages which the United States has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $10,781 and not more than $21,562 for each false claim which Defendants presented or caused to be presented to the United States;

(3)    Pre- and post-judgment interest; and

(4)    All costs incurred in bringing this action.

To the Relator:

(1)    The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs;

(4)    Should the government elect to seek an alternate remedy, the maximum allowed pursuant to § 3730(c)(5); and

(5)    Such further relief as this Court deems equitable and just.

30

## COUNT II

### Violation of False Claims Act – False Statements

194.    Relator realleges and incorporates paragraphs 1- 188 of this Second Amended

Complaint as if fully set forth herein.

195.    In performing the acts described above, Defendants through their own acts or

through the acts of their officers, agents or employees, knowingly made, used, or caused to be

made or used, a false record or statement to get false or fraudulent claims paid or approved by

the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

196.    Such records or statements include the false certifications alleged herein.

197.    The United States, unaware of the foregoing circumstances and conduct of the

Defendants, made payments which resulted in its being damaged in an amount to be determined.

198.    By reason of each Defendants' wrongful conduct, the United States has been

damaged by the payment of false and fraudulent claims.

WHEREFORE, Relator respectfully requests this Court to award the following damages

to the following parties and against the Defendants:

To the United States:

(1)    Three times the amount of actual damages which the United States has sustained
as a result of Defendants' conduct;

(2)    A civil penalty of not less than $10,781 and not more than $21,562 for each false
record or statement Defendants made to get false or fraudulent claims paid or
approved by the Government;

(3)    Pre- and post-judgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to § 3730(d) of the False Claims Act
and/or any other applicable provision of law;

31

(2)     Reimbursement for reasonable expenses which Relator incurred in connection
with this action;

(3)     An award of reasonable attorney's fees and costs;

(4)     Should the government elect to seek an alternate remedy, the maximum allowed
pursuant to § 3730(c)(5); and

(5)     Such further relief as this Court deems equitable and just.

## COUNT III

### Retaliation and Violation of 31 U.S.C. § 3730

199.    Relator realleges and incorporates paragraphs 1-188 of this Second Amended
Complaint as if fully set forth here.

200.    At all times material hereto, Defendants were an employer covered by 31 U.S.C.
§ 3730(h). Section 3730(h) precludes retaliation, suspension, threats, harassment and other
discriminatory conduct against employees who investigate, provide testimony or assistance in
any action filed or to be filed under the FCA or make any efforts to stop one or more violations
of the FCA.

201.    The termination of Relator's employment and harassment as set forth above were
in violation of 31 U.S.C.§ 3730(h).

202.    As a direct and proximate result of the termination, retaliation and harassment by
Defendants, Relator suffered and incurred and continues to suffer and incur loss of compensation
and other benefits, harm and damage to reputation and emotional distress.

203.    Defendants' conduct was and is malicious, fraudulent and oppressive in violation
of public policy and in violation of 31 U.S.C. § 3730(h).

WHEREFORE, Relator requests that judgment be entered against Defendants in his favor
and that he be awarded any and all relief pursuant to 31 U.S.C. § 3730(h) including, but not
limited to:

32

a.    Two times the amount of back pay;

b.    Interest on back pay;

c.    Any and all other compensatory and special damages;

d.    All litigation costs and reasonable attorney's fees;

e.    Punitive damages; and

f.    Any and such further relief that this Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Relator demands a jury trial on all claims alleged herein.

Respectfully submitted,

DUANE MORRIS LLP

Michael M. Mustokoff, Esquire
mmustokoff@duanemorris.com
Brett M. Feldman, Esquire
bmfeldman@duanemorris.com
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1810

AETON LAW PARTNERS

N. Kane Bennett, Esquire
nkb@aetonlaw.com
101 Centerpoint Drive, #105
Middletown, CT  06457
(860) 724-2163

Attorneys for Plaintiff/Relator