UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>EX. REL PETER J. BONZANI, JR,<br>    Plaintiff,<br><br>v.<br><br>UNITED TECHNOLOGIES<br>CORPORATION ET AL.,<br>    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL CASE NO.<br>3:16-CV-1730 (JCH)<br><br><br><br>APRIL 1, 2019 |

**RULING RE: DEFENDANTS' MOTION TO DISMISS THE THIRD
AMENDED COMPLAINT (DOC. NO. 84) AND PLAINTIFF'S
MOTION TO FILE SUR-REPLY IN OPPOSITION (DOC. NO 89)**

**I.   INTRODUCTION**

Plaintiff/Relator Peter J. Bonzani, Jr. ("Bonzani") filed suit, on behalf of the United States of America, under the False Claims Act, section 3729 et seq. of title 31 of the United States Code, against defendants United Technologies Corporation ("UTC") and Pratt and Whitney ("PW") (collectively "defendants"). See Third Amended Complaint (Doc. No. 83) ("TAC"). Pending before the court are the defendants' Motion to Dismiss the Third Amended Complaint (Doc. No. 84) ("MTD") and Bonzani's Motion to File a Sur-Reply in Opposition to the Motion to Dismiss (Doc. No. 89) ("Mot. Sur-Reply").

For the reasons stated below, the Motion to Dismiss is granted in part and denied in part, with leave to replead, and the Motion to file a Sur-Reply is granted.

**II.   FACTS[1]**

On January 1, 2008, the United States Air Force ("USAF") awarded Contract Award Identification Number FA861108C2896 ("the Contract") to PW. TAC ¶ 21. The

---

[1] The facts are taken from Bonzani's Third Amended Complaint (Doc. No. 83) ("TAC").

1

Contract is a "cost-plus" contract for the manufacture of the F119 engine, which are used in the production of the USAF's F-22 military jet. Id. ¶¶ 14, 22. As of the filing of the TAC, PW had been paid $3.7 billion pursuant to the Contract. Id. The Contract is subject to both the Federal Acquisition Regulation ("FAR") and the Defense Federal Acquisition Regulation Supplement ("DFARS"). Id. ¶ 23.

Critical parts for both the F-22 and the F-35 fighter jet engines, including the Integrally Bladed Rotors ("IBRs"), are manufactured at the PW plant in Middletown, Connecticut ("Middletown Plant"). Id. ¶ 31. During the manufacturing process, IBRs are spray-coated according to detailed specifications, in order to create a "knife edge seal" when the IBR rotates. Id. ¶ 33. A proper seal is critical to proper jet engine function. Id. ¶ 34. From 2012 through November 2015, all F-22 engine cores supplied to the USAF under the Contract were assembled at the Middletown Plant. Id. ¶ 35.

Bonzani was hired full-time by PW in 2012 "to assist in all aspects of robotic spray coating of military jet engine parts." Id. ¶ 20. In November 2015, Bonzani was ordered to conduct a "root cause analysis as to why . . . all test samples for the IBRs for the F119 jet engine were failing contractually required testing," when they had previously passed such testing. Id. ¶ 36. During the course of his inspection, Bonzani, along with another PW employee, determined that "the use of a wrongly sized spray gun whose spray plumes were unable to sufficiently coat the test piece" had resulted in improper coating the representative samples of IBRs used for testing purposes. Id. ¶¶ 39–43.[2] When Bonzani inquired as to whether any production or testing changes

---

[2] Because the quality testing process is inherently destructive, representative samples of IBRs, rather than the components actually used in construction of the engines, are tested. See TAC ¶¶ 38, 292.

2

had recently occurred, he was informed that a new test apparatus had recently been installed, and that samples began to fail testing after the change in test apparatus. Id. ¶¶ 45–46. A comparison of the old and new test apparatus revealed that the old apparatus could be manipulated to move samples closer to the spray gun, while the new, contractually compliant apparatus, could not be manipulated in the same manner. Id. ¶¶ 48–51.

When Bonzani inquired as to how previous tests had been successful, an employee at PW's Material Control Laboratory ("MCL"), the lab responsible for quality control testing of representative IBR samples, told Bonzani that employees had "cheated" in the past. Id. ¶¶ 58–59. The employee also told Bonzani that the "cheating" involved moving the IBR sample closer to the spray gun. Id. ¶¶ 59, 278. Bonzani informed the Production Coatings Engineer at the Middletown Plant of his findings. The engineer did not deny knowledge of the fraudulent testing, but rather responded that he had "inherited the problem." Id. ¶ 61.

Bonzani informed two co-workers at PW's East Hartford location of his findings the next morning, on November 20, 2015. Id. ¶¶ 62–63. They responded that it was common knowledge that the Middletown Plant had been "taking short cuts on tests." Id. Bonzani also informed several members of PW management of his findings later that same morning. Id. ¶ 64. On the afternoon of the same day—November 20, 2015—Bonzani was interrogated, placed on probation, and escorted from PW's East Hartford facility. Id. ¶ 67. Ninety days later, his employment with PW was terminated. Id. ¶ 69.

3

## III.     LEGAL STANDARD

### A.     Rule 12(b)(6)

To withstand a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  The plausibility standard is not a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief.  Id.  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth.  Id.  However, when reviewing a motion to dismiss, the court must accept the factual allegations in the operative complaint as true and draw all reasonable inferences in the non-movant's favor.  See Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012).

### B.     Rule 9(b)

Qui tam complaints filed under the False Claims Act ("FCA") are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc., 865 F.3d 71, 81 (2d Cir. 2017).  Rule 9(b) requires that, in alleging fraud, a party must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  A complaint alleging fraud must ordinarily "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

Chorches, 865 F.3d at 81 (citation omitted).  However, allegations may be based on "information and belief when facts are peculiarly within the opposing party's knowledge." Id. at 81–82 (quoting Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990)). Where pleading is permitted on information and belief, the complaint must "adduce specific facts supporting a strong inference of fraud."  Id. at 82.

## IV.    DISCUSSION

### A.    The TAC fails to allege fraud with sufficient particularity

In Counts I and II, Bonzani alleges that the defendants violated the FCA by (1) knowingly or recklessly presenting, or causing to be presented, false or fraudulent claims for payment to the United States; and (2) making, using, or causing to be made or used, a false record or statement in seeking payment from the government. See 31 U.S.C. § 3729(a)(1)(A)–(B); TAC ¶¶ 447, 452.  Count I and Count II are based on allegations that the defendants presented requests for payment to the United States for jet engines which did not conform to contract, and falsely certified that their products complied with contractual requirements, despite the fact that the compliance testing of IBRs failed to meet contractual requirements.  TAC ¶¶ 448, 453.

While these claims are based on contractual noncompliance, Bonzani acknowledges that he does not have access to the Contract.  See id. ¶¶ 128–32 ("Relator has been unable, thus far, to obtain the contractual . . . records to date, despite his best efforts.")[3]  Nor does Bonzani identify a specific invoice (or series of invoices) alleged to be false or fraudulent.  Instead, Bonzani pleads "the precise

---

[3] Bonzani's proposed Sur-Reply notes he now has access to limited portions of the contract.  To the extent Bonzani argues that the inclusion of these contractual provisions in a sur-reply would remedy deficiencies in the TAC, the court notes that a sur-reply may not be used as a vehicle to amend the a complaint.

5

contractual language, and the identity of a specific invoice," on information and belief. Bonzani Mem. in Supp. at 14. He argues that both of those facts are peculiarly within PW's knowledge.

As to Bonzani's pleading of billing information based on information and belief, PW argues that the TAC fails to demonstrate that the billing information that would support allegations of false claims was "exclusively" within PW's control. Mem in. Supp. at 15. In particular, PW argues that the government has equal access to the billing information Bonzani seeks, and Bonzani should therefore be precluded from pleading the submission of claims on information and belief. Id. In Chorches, as here, the plaintiff alleged the submission of specific false claims on information and belief. The plaintiff alleged that he was "prohibited from making unauthorized entrances into the administrative building of [the defendant] . . . where all the billing was taking place," and that any relevant information as to billing was therefore peculiarly within the defendant's knowledge. See Chorches, 865 F.3d at 82. The Second Circuit concluded that that the plaintiff "was unable, without the benefit of discovery, to provide billing details for claims that [were] submitted to the government for reimbursement." Id.

In Chorches, as in every FCA case, the government had access to billing data. Nonetheless, the Second Circuit concluded that it was sufficient, for the purpose of alleging facts on information and belief, for the plaintiff in Chorches to allege that he was barred from accessing billing data as part of his job duties. While the TAC is certainly less detailed than the complaint in Chorches, it alleges that Bonzani's position at PW was one in which he could not access billing information, and that he was suspended and terminated from PW almost immediately following his alleged discovery of

6

potentially fraudulent activity. TAC ¶¶ 130; 341–49. Bonzani therefore adequately alleged that he could not obtain the billing information either in the course of his duties, or thereafter in investigating any alleged fraud. He may plead the submission of specific false claims on information and belief.

The defendants further argue that the TAC is impermissibly speculative, insofar as it alleges that certain FAR and DFARS clauses "must be included in the contract;" that the contract includes a "higher level contract quality requirements;" and that the contract included specific standards governing the spray coating and testing of IBRs. See PW Mem. in Supp. at 8. Bonzani responds that PW "misconstrues the Rule 9(b) standard" by arguing that Bonzani must identify specific contractual terms or documents. See Bonzani Reply in Opp. (Doc. No. 87) at 13. Instead, Bonzani argues, the information that would support his claims regarding the contract terms is also peculiarly within the knowledge of the defendants.

Bonzani's proposed sur-reply makes clear, however, that he has gained access to relevant contract documents and terms—albeit to a limited extent—through requests to the government. See Bonzani Sur-Reply in Opposition (Doc. No. 89-1) at 7. Specifically, Bonzani states that the documents he received provide him with confirmation that certain FAR and DFARS provisions, as well as PW internal standards, were incorporated by explicit reference in the Contract. Id. Because Bonzani has possession of and access to those contract terms, they are not peculiarly within PW's knowledge and control. The contract terms, therefore, may not be alleged upon information and belief, and the TAC at this time fails to meet Rule 9(b)'s particularity requirement. See Wood ex rel. U.S. v. Applied Research Assocs., Inc., 328 F. App'x

7

744, 747 n.1 (2d Cir. 2009) (summary order) (declining to apply relaxed Rule 9(b) standard where plaintiff did not allege facts peculiarly within knowledge of defendants). Because Counts I and II of the TAC do not satisfy the heightened Rule 9(b) pleading standard, they are dismissed.[4]

While the defendants seek dismissal with prejudice, lamenting that the TAC is the fourth iteration of Bonzani's Complaint, the court notes that two of the three amendments to the Complaint were granted before the case was unsealed. The third amendment, which resulted in the TAC, was granted absent objection from PW. See PW Response to Motion for Leave to File a Third Amended Complaint (Doc. No. 81). In light of those facts, as well as the recent availability of at least some of the contractual documents at issue, the court will allow Bonzani to replead his Complaint. However, the grant of leave to replead is not a blank check to redraft the TAC. Any amendment to the Complaint shall be limited to the inclusion and incorporation of the contractual information Bonzani obtained from the government, in order to attempt to cure the shortcoming of the TAC with regard to Rule 9(b). Further amendments will be stricken. Because the Motion to Dismiss is granted as to Counts I and II, and the court grants Bonzani leave to incorporate the recently acquired contractual documents, Bonzani's Motion to File a Sur-Reply is granted.

---

[4] Because the court determines that dismissal with leave to replead is appropriate, on the basis of the TAC's failure to meet the standard to plead allegations on information and belief, it does not reach the defendants' argument that the TAC failed to adequately allege knowledge or materiality. See Mem. in Supp. at 23, 25.

8

B.     Count III Plausibly Alleges Retaliation

In Count III of the TAC, Bonzani alleges that PW fired him in retaliation for his engaging in protected activity under the FCA. See TAC ¶ 458. Section 3730(h) of title 31 of the United States Code prohibits employers from retaliating against employees for pursuing protected activity under the FCA. See 31 U.S.C. § 3730(h) (providing cause of action where employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an [FCA claim]" or in attempting to "stop 1 or more violations" of the FCA).

On the date of his inspection at the PW Middletown facility, Bonzani informed the Business Unit Manager at the East Hartford facility of his findings regarding falsified test results. TAC ¶ 330. Bonzani also informed the Product Director, Operations Manager, and other staff at the Middletown facility of his findings. Id. ¶ 331. The following day, Bonzani informed the Product Director at the East Hartford facility and a manager at the MCL at the East Hartford facility of his findings. Id. ¶¶ 337; 340. That same day, Bonzani was ordered to report to a PW security office, where he was interrogated by three attorneys and the head of Government Security regarding his ownership of two businesses. Id. ¶¶ 342–45. Bonzani made clear that he had disclosed his ownership interest in the companies at the time he was hired. Id. ¶ 344. He also noted that he had not made any profits from the companies, and that he was willing to substantiate the lack of any income. Id. ¶ 346. Nonetheless, Bonzani was escorted out of the facility, suspended, and then terminated 90 days later. Id. ¶¶ 347–48, 352.

The Second Circuit "has yet to articulate a test for deciding when a plaintiff has set forth a claim for retaliation under section 3730(h)." Chorches, 865 F.3d at 95.

9

However, district courts in this Circuit have "have generally required a plaintiff to show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." Id. Moreover, the Second Circuit has explained that:

> Congress amended the FCA in 2009 to broaden the universe of protected conduct under § 3730(h), at least with respect to 'efforts to stop' FCA violations. The purpose of the amendment was to make clear that it covers retaliation against not only those who actually file a qui tam action, but also against those who plan to file a qui tam that never gets filed, who blow the whistle internally or externally without the filing of a qui tam action, or who refuse to participate in the wrongdoing. Thus, it is enough to show that a plaintiff's investigation reasonably could have led to an FCA action.

Dhaliwal v. Salix Pharm., Ltd., 752 F. App'x 99, 100 (2d Cir. 2019) (summary order) (internal citations, quotations, and alterations omitted).

Bonzani alleged that he informed multiple management-level PW employees of his findings regarding falsified test results, including telling management at the Middletown facility that "the test rig being used was defective and was being manipulated in order to pass quality assurance tests." TAC ¶ 310. His complaints also referenced "cheating," "funny business," "false testing," and "contractually improper spray procedures." Id. ¶¶ 330–31, 338, 340. Though Bonzani does not allege that he explicitly raised concerns about a violation of the FCA, a reasonable inference could be drawn that, by informing PW management that quality testing was being manipulated to pass quality assurance tests, and that PW employees had been "cheating" and conducting "false" and "contractually improper" testing, Bonzani put PW on notice that he had uncovered a potential fraud with FCA implications. The court concludes that Bonzani plausibly alleged he engaged in protected activity, and that the employer was aware of his protected activity.

10

Furthermore, the TAC plausibly alleges that Bonzani's protected activity was the reason for the adverse employment action against him.  Bonzani alleged that he was brought into an interrogation room just one day after discovering potentially fraudulent activity, and on the same day that he raised concerns with multiple members of PW management about the same.  Bonzani was interrogated regarding businesses he had disclosed to PW both orally and in writing, prior to beginning his employment.  The businesses were not raised as a concern until immediately after Bonzani engaged in the protected activity of internal reporting.  The TAC plausibly alleges that the stated basis for his termination—conflict of interest—was pretextual, and that the real reason for his termination was his internal reporting of potential FCA violations.  See Plotzker v. Kips Bay Endoscopy Ctr., LLC, No. 12 CIV. 9255 (GBD), 2017 WL 4326061, at *7 (S.D.N.Y. Sept. 8, 2017), aff'd sub nom. Plotzker v. Kips Bay Anesthesia, P.C., 745 F. App'x 436 (2d Cir. 2018) (noting that "the Second Circuit has implicitly endorsed the application of the McDonnell Douglas framework to Section 3730(h) claims").  Because Bonzani has plausibly alleged a claim for retaliation, the Motion to Dismiss is denied as to Count III.

## V. CONCLUSION

For the reasons stated above, the defendants' Motion to Dismiss the Third Amended Complaint (Doc. No. 84) is **GRANTED** as to Counts I and II, with leave to replead, and **DENIED** as to Count III.  Bonzani's Motion to File a Sur-Reply in Opposition to the Motion to Dismiss (Doc. No. 89) is **GRANTED**.  Bonzani shall file any amended complaint no later than April 15, 2019.  Any amendments shall be limited to the matters described above.  See supra at 8.  Failure to file an amended complaint will result in the dismissal of Counts I and II with prejudice.

**SO ORDERED.**

Dated at New Haven, Connecticut this 1st day of April 2019.

              /s/ Janet C. Hall
              Janet C. Hall
              United States District Judge