**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. PETER J. BONZANI, JR., | : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. <u>16-cv-1730</u> |
| v. | : : | *JURY TRIAL DEMANDED* |
| UNITED TECHNOLOGIES CORPORATION and PRATT & WHITNEY | : : : : | |
| Defendants. | : : | |

**FOURTH AMENDED COMPLAINT FOR DAMAGES AND OTHER
<u>RELIEF UNDER THE FALSE CLAIMS ACT</u>**

Pursuant to 31 U.S.C. § 3730(b)(1), Relator, Peter J. Bonzani, Jr. ("Relator"), on behalf of the United States of America, brings this amended civil action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").   In support of this Fourth Amended Complaint,[1] Relator alleges as follows:

1.      This case arises from the serial false certifications of compliance with government-mandated quality-control testing requirements by Defendants, United Technologies Corporation ("UTC") and Pratt & Whitney ("PW") (collectively, Defendants). The result of those false certifications was the payment of billions of dollars of false claims by the United States, while the Defendants knowingly and deliberately exposed United States military aircraft and pilots to substantial—and wholly unnecessary—risk.

---

[1] Relator brings this Fourth Amended Complaint pursuant to Judge Hall's April 1, 2019 Order.  (ECF 95). A redline comparison of the Fourth Amended Complaint and the Third Amended Complaint is attached hereto as Exhibit C.

2.      Defendants submitted a series of false requests for payment under Contract Award ID# FA861108C2896 and its related contracts, including Contract Award ID# FA861109C2901, (collectively referred to herein as the "Contract") during a period from at least 2012 through November, 2015, when they falsely claimed that test samples for Integrally Bladed Rotors ("IBRs") in the engine cores of F119 engines had passed quality controls as required by the Contract pursuant to applicable Federal Acquisition Regulations ("FAR") provisions (including specifically, but not limited to, FAR 48 C.F.R. §§ 46.302 & 52.246–2(2008)) mandating contractual compliance with those controls.[2]   A true and correct copy of certain sections of Contract Award ID# FA861108C2896 as provided to Relator by the government is attached hereto as Exhibit A.  A true and correct copy of certain sections of Contract Award ID# FA861109C2901 as provided to Relator by the government is attached hereto as Exhibit B.

3.      Over the period from January 1, 2008 to the present the United States paid $3.7 billion to PW, exceeding the original contract price by $1.3 billion.

4.      The Contract required Defendants to provide and maintain an inspection and reporting system acceptable to the Government and tender to the Government only supplies that have been inspected in accordance with the inspection system and have been found by Defendants to be in conformity with contract requirements (FAR 52.246-02; FAR 52.246-04; FAR 52.246-05).  *See* Ex. A at 180; Ex. B at 7.[3]

5.      The Contract also required Defendants to perform under the Contract according to a Higher-Level Contract Quality Requirement (FAR 52.246-11).  *See* Ex. A at 180; Ex. B at

---

[2] Unless otherwise noted, all citations in this complaint are to the Code of Federal Regulations as in effect on January 1, 2008, the date on which Defendants entered into Contract Award ID# FA861108C2896.

[3] All citations to specific pages refer to the pagination found in the bottom right hand corner of the contracts.

7.  The Higher-Level Contract Quality Requirement incorporated the Pratt & Whitney Quality Manual (the "PW Manual") by reference, thus requiring Defendants to perform in accordance with the standards and processes set forth in the PW Manual.  *See id*.

6.  The Contract required Defendants to submit a Material Inspection Receiving Report ("MIRR") with each delivery of supplies to the government (48 C.F.R. §§ 246.370, 252.246-7000, 252.232-7003). *See* Ex. A at 180, 247; Ex. B at 7, 26; *infra* ¶¶ 181-185. Defendants submitted its false claims in a series using a Material Inspection Receiving Reports (a DD Form 250 or the electronic equivalent, the WAWF).  48 C.F.R. §§ 246.370, 252.246-7000, 252.232-7003. *See infra* ¶¶ 181-185.

7.  The Form 250 requires the claimant to certify that the "listed items" in the shipment "conform to contract, except as noted herein or on supporting documents."

8.  The false claims certified that the spray-coated Integrally Bladed Rotor ("IBR"), which creates a "knife edge seal" and is a critical component of the F119 engine, conformed to contract.[4]

9.  Due to the importance of the IBR's coating and seal to the efficient function of the F119 engine, any falsehood regarding its suitability is material to any claim for payment.

10.  Of all PW employees, Relator was <u>the</u> PW expert called upon to travel to PW's Middletown, Connecticut plant when production of F119 engines under the Contract was halted due to the failure of spray-coated IBRs to pass inspection.

---

[4] The F119 engine core contains nine different IBRs in sequential "stages" of increasing pressure and criticality.  Each and every IBR is a critical component.  Every reference to IBRs in this Complaint refers to the ninth stage IBR – the most critical and subject to the highest pressures – that are required to be spray-coated and tested according to the requirements described herein.

11.     On several occasions, identified PW employees *admitted* to the Relator that samples had previously passed inspection for some time solely due to an eroded test apparatus that was fatally compromised and deliberately altered to allow substandard samples to appear to meet quality control requirements.

12.     In addition to submitting false claims to the United States, in violation of 31 U.S.C. §3730(h), Defendants summarily suspended Relator within 24 hours, and then exactly 90 days later wrongfully terminated him, after Relator advised his superiors of the flawed spraying process and the fraudulently manipulated test procedures taking place at the PW facility in Middletown, Connecticut.

13.     Production of the F119 could resume only after the coating process was subcontracted out to another company on or about December 2015, allowing testing to legitimately be certified.

14.     In March, 2018 and later in July, 2018, Robert LeDuc, President of PW, described the failure of knife edge seals on commercial aircraft as due to a complete failure to do durability testing.  (*See infra* ¶¶ 87-89).

15.     LeDuc was also quoted in *Forbes Magazine* in July, 2018, as describing conditions in the PW Middletown plant during the time period relevant to this Complaint as being characterized by selective data release and employees as "being afraid to share bad news".  (*See infra* ¶ 90).

I.      **INTRODUCTION AND BACKGROUND**

16.     As set forth herein, this case arises from the Defendants' knowing employment and concealment of a defective spray coating process through the fraudulent testing of a critical

4

engine component for the F119 engine used in the Air Force's F-22 Raptor, coupled with false certifications to the United States Air Force about those fraudulent tests.

17.     Defendants have submitted false claims for payment and have made or used false records and certifications to obtain payment from the government in violation of the FCA.

18.     But for those false certifications of compliance with contract, the United States would not have made payment on delivery of F119 engines during the period between 2012-2015.

19.     As a result of Defendants' intentional and/or reckless conduct, engines supplied by Defendants to the United States military are at risk for premature wear, poor performance and possible catastrophic engine failures.

20.     Defendants have had knowledge of their reliance on flawed spray coating techniques concealed by falsified tests for every F119 engine supplied to the United States Air Force from at least 2012 through late 2015.

A.     **The Contract and Its Terms**

21.     The Relator, Peter Bonzani, is an industry-wide recognized expert in robotics and material science, specifically in the field of coatings.  Mr. Bonzani holds numerous academic degrees, is a published author, and holds multiple patents.[5]  He was hired full time by PW in 2012 to assist in all aspects of robotic spray coating of military jet engine parts.

22.     He brings this complaint of false certification in violation of 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), and 3730(h).

---

[5] Mr. Bonzani holds four college degrees and received his Masters of Science in Metallurgy and Materials Engineering at the University of Connecticut in 2004.  His thesis was specifically on thermal spray and the effect of altering processing parameters and the effect on coating properties.  He holds multiple domestic and international patents, is a published author, has given conference lectures, all of which are specifically in coatings and is considered an industry expert.

23.     On January 1, 2008, Contract Award ID# FA861108C2896 was awarded by the U.S. Air Force to PW for the production and long-term sustainment of F-22 engines. *See* Ex. A.

24.     In addition, the U.S. Air Force awarded to PW multiple contracts related to Contract Award ID# FA861108C2896, including awarding to PW Contract Award ID# FA861109C290 on November 26, 2008.  See Ex. B.

25.     The Contract is a "cost-plus" contract for the manufacture of F-22 engines for the United States Air Force, for which $3.7 Billion has been paid to PW.

26.     The Contract is governed by FAR and DFARS regulations that dictate certain contractual obligations and clauses be incorporated into this Contract.

27.     Those contractual provisions include FAR provisions regarding quality control and testing that *must* be included in the Contract, as well as certain DFARS provisions.

28.     Examples of these quality control and testing requirements in the Contract include FAR 52.246-02; FAR 52.246-04; FAR 52.246-05.  See Ex. A at 180; Ex. B at 7.

29.     The Contract incorporates the Pratt & Whitney Quality Management System Manual (the "PW Manual") as the "higher-level contract quality requirement" mandated by FAR 46.202–4, 46.203, and 46.311. See Ex. A at 180; Ex. B at 7.

30.     The PW Manual dictates:

   a.  the requirement that every part must be manufactured and tested according to a standardized quality control process, i.e., the "Work Instructions" and specifications, including PWA53 and PWA370;

b.  the precise manner according to which each manufacturing and testing process for

each part must be created, verified, and documented, i.e., through the Engineering

Source Approval process per PWA370, *see infra* ¶ 162 at n.6;

c.  the requirement that those documented processes (i.e. the Work Instructions) be

followed in the manufacture and testing of each part manufactured by PW; and

d.  that failure to adhere to the standards in the PW Manual, including the failure to

adhere to the documented processes contained in the Work Instructions, (i.e.

variations, non-conformances, or escapes) **must be reported and corrected** as

set out in the PW Manual, the Contract, and PWA300 and PWA370.

31.    By incorporating the PW Manual as the higher-level contract quality

requirement, the Contract therefore requires PW to manufacture and test all F119 engine parts,

including the IBRs, in accordance with the corresponding Work Instructions.

32.    Relator has, and was required to have, extensive personal knowledge of the PW

Manual and Work Instructions created thereunder. He has worked with the PW Manual for

over 10 years, both at PW and at Praxair, a long-time supplier for PW.  Relator was among

those employees who had daily access to the PW Manual on his work computer, and who were

expected to make constant reference to the PW Manual and Work Instructions created

thereunder as they performed their job responsibilities.

33.    In order to comply with contractual provisions, including FAR and DFARS, PW

must adhere to approved testing specifications, which are set forth in the Work Plan and Work

Instructions, for each part comprising the F119 engine.

34.    Pursuant to DFARS provisions at *infra* ¶¶ 181-183 the Contract requires PW to

submit a Material Inspection Receiving Report ("MIRR"), in the form of a DD Form 250 or its

electronic equivalent (the WAWF) as part of, and before, any invoice (claim) may be submitted to the government.  *See* Ex. A at 180; Ex. B at 7 (incorporating DFARS 252.246-7000).

35.     In relevant part, the Form 250 states: "ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents."

36.     The MIRR is prepared by the contractor and represents that the engine parts conform to contract.  *See* 48 C.F.R., Ch. 2, Appx. F-103(c).

### B.     Relator Uncovers The Fraudulent Scheme

37.     For *every* F119 engine that PW manufactured during the period from at least 2012 through 2015 and supplied to the Government – and for which PW submitted a request for payment under the Contract – PW falsely certified that they conformed to contract because PW falsified contractually-required testing of a critical component.

38.     The PW F119 engine core shares commonality with the engines and parts for both the Air Force's F-22 Raptor fighter jet and the F-35 fighter jet engine (the F135).

39.     Critical parts for both the F-22 and F-35 engine core—including, specifically the Integrally Bladed Rotors ("IBRs")— are manufactured at the PW plant at Middletown, Connecticut.

40.     From at least 2012 through at least November 2015, *every* F22 engine core supplied to the Government under the Contract was assembled at the Middletown facility.

41.     IBRs are spray-coated according to detailed specifications in order to create a "knife edge seal" as the IBR rotates.

42.     The proper sealing of these engine parts is critical to the engine function of jet fighter aircraft as these planes are designed to fly at higher pressures, lower bypass ratios, hotter temperatures, and within tighter tolerances compared to most commercial engines.

43.     From at least 2012 through at least November 2015, *every* IBR for *every* F22 engine manufactured for the Government under the Contract was spray-coated at the Middletown facility.

### 1.     Testing Failures and Production Halted on F-22 Engine Core

44.     In November, 2015, Relator, Peter Bonzani, a recognized PW expert in spray coating technology, was ordered by his supervisors and top PW management to leave his regular PW assignment at the company's East Hartford facility to do a root cause analysis as to why suddenly all test samples for the IBRs for the F119 jet engine were failing contractually-required testing.

45.     As a result of this sudden testing failure, production of the F119 engines had been halted entirely.

46.     Due to the complicated and costly nature of these jet engines and their components, the actual IBR itself cannot be effectively tested, due to the fact that testing is destructive in nature.  As a result, the Contract requires adherence to the PW Manual, which in turn mandates adherence to the specific manufacturing and testing processes contained in the Work Instructions, which call for representative sample pieces to be sprayed under strictly-specified conditions designed to duplicate the production spray-coating applied to the production component (the IBR).  The sample piece is then tested by the Material Control Laboratory (MCL) at PW.

47.    On November 19, 2015, Mr. Bonzani and Employee #1 went to PW Middletown to determine the cause for what appeared to be a sudden and supposedly inexplicable test failure causing a total shutdown in production.

### 2.    Mr. Bonzani Uncovers the Fraud

48.    On his first inspection, Mr. Bonzani witnessed first-hand several defects in the spray-coating techniques, processes and procedures being used for the IBRs being manufactured for the Government under the Contract.

49.    During the course of his November 19th visit, Mr. Bonzani identified the cause of the improper coating as the use of a wrongly sized spray gun whose spray plumes were unable to sufficiently coat the test piece in a contractually compliant test rig configuration.

50.    The same spray gun type and model had been used at PW since at least 2012.

51.    The reasons that these spray techniques, processes and procedures would cause failed tests of the IBR were readily apparent to Mr. Bonzani and Employee #1.

52.    Mr. Bonzani and Employee #1 then determined how tests could have successfully passed prior to the shutdown with the defective techniques, processes, and procedures in use.

53.    As part of their inquiry, Mr. Bonzani, as witnessed by Employee #1, inquired as to whether any changes had been made to the production or testing.

54.    Mr. Bonzani and Employee #1 were informed by Employee #3 that new test apparatus had recently been put into use.  The new test equipment complied with the contract's Work Instructions.  Immediately after using the contractually compliant test apparatus, testing failed. Production was stopped with the failed tests.

55.    Mr. Bonzani and Employee #1 were shown the old test apparatus.

56.     Inspection of the test apparatus immediately revealed that the old apparatus could be manipulated in such a way as to allow for samples to be sprayed for testing that were not representative of IBR production spray-coating.

57.     The old apparatus was worn and did not mimic the geometry of the actual production hardware.

58.     The old apparatus also had a pin removed from the sample holder, thereby permitting  the sample piece to be intentionally manipulated and moved closer to the spray gun than the distance required by the contractually-mandated Work Instructions and specifications.

59.     The replacement apparatus had a sample holder that was in proper serviceable condition that had both pins in the sample holder. It did not permit the same movement of the sample piece closer to the spray gun.   The new test apparatus was <u>therefore, not subject to the</u> <u>same manipulation necessary to pass quality control</u>.

60.     Inspection of the old test apparatus, together with the spray techniques, processes and procedures in use for the spray-coating of the IBR, revealed that the IBR samples were able to pass quality testing in the past solely because the tests were not performed according to the contractually required quality control requirements specified in the Work Instructions.

61.     The test sample pieces had been moved much closer to, and at a different angle from, the spray nozzle, in order to pass tests.

62.     Moving the test sample piece closer to, and at a different angle from, the spray nozzle than specified in the Work Instructions, means that the sample test would not accurately mimic production, and gave the appearance that samples had passed tests, despite those tests not having been performed according to the contractually-required test specifications in the

Work Instructions for the IBR.  Such manipulated testing did not accurately reflect the production environment and did not create a representative sample.

63.     The newly deployed apparatus prevented the same manipulation of the test specifications.  The new apparatus therefore required sample tests to be conducted according to the Work Instruction specifications as mandated by contract through applicable FAR and DFARS provisions and the PW Manual.

64.     Testing according to the specifications had exposed the faulty testing and production of the IBR spray coating that had occurred since at least 2012.

65.     It was clear to Mr. Bonzani and Employee #1 that the ability to manipulate the old test holder but not the new test holder was the difference between samples passing the failing quality control.

### 3.     Mr. Bonzani Reports the Fraud, and PW Management Admits Its Knowledge

66.     Mr. Bonzani's observations were first confirmed by the admission of Employee #2, an employee in the Material Control Laboratory responsible for conducting tests on the sample pieces.

67.     Relator asked Employee #2 "How did they pass all these years?"  When confronted about how those parts had passed previously, Employee #2 memorably stated "They cheated."  Employee #2 then described how easily the cheating had taken place, by moving the sample closer to the spray gun.

68.     That afternoon of November 19th, at about 5:00 p.m., Mr. Bonzani also advised Employee #3 and three other supervisors, Employee #4, Employee #5, and Employee #6 of his assessment that the cause for what appeared to be sudden testing failures was that all of the tests were falsified previously and should have failed.

12

69.     Employee #3, the production coatings engineer at PW's Middletown facility did not deny that the past tests had been falsified.  His response implied that he already knew of the real reason for the test failures – the past falsification of all the tests – when confronted by Mr. Bonzani's determination, stating that:  "It's not my fault.  I inherited the problem."[6]

70.     In East Hartford the next morning, November 20, 2015, Mr. Bonzani told several co-workers (Employees #8 and #9) that there was "cheating on testing" taking place at Middletown.  They were dismayed, agreed with Mr. Bonzani's assessment, but not surprised.

71.     The same employees (Employees #8 and #9) admitted to Mr. Bonzani that it was common knowledge that taking short-cuts on tests was a common occurrence at that location for some time.

72.     Later in the morning on November 20, 2015, Mr. Bonzani advised several members of the management team (Employees #6 and #10) of his findings that the apparent sudden testing failure was not caused by a change in production techniques, processes, or procedures, but that it was the result of staff in Middletown knowingly cheating on the samples in the past by moving the test pieces closer to the spray gun.

73.     A member of the management team, Employee #7, asked Mr. Bonzani whether the spray-coating manufacture (production and testing) of the IBRs for the F-22 engines could be moved to the East Hartford where it might be properly achieved due to more readily available expertise, such as Relator and Employee #1.

74.     Mr. Bonzani confirmed to Employee #7 that the spray-coating could be moved to East Hartford, and Employee #7, a member of the management team, asked for his availability over the upcoming weekend to help facilitate that move.

---

[6] Employee #3's explanation was later echoed by a PW union representative in July, 2018. *See infra,* ¶ 91.

### 4.    PW Conceals the Fraud and Immediately Removes Mr. Bonzani

75.     Sometime in the afternoon of November 20, 2015, Mr. Bonzani was interrogated, then placed on probation and escorted from the East Hartford facility.  Exactly ninety days later, his PW employment was formally terminated.

76.     PW gave Mr. Bonzani no opportunity to defend his job and in fact did not contact him at all during the 90-day suspension, other than to confirm that PW had received his tax returns.

77.     Instead of following Mr. Bonzani's advice, attempts to spray-coat the IBRs and sample tests continued unsuccessfully at Middletown using the same technique after the purchase of new equipment of the same type and variety that had been previously in use.

78.     The new test apparatus continued, however, to present an obstacle to PW's continued outright cheating on the tests in order to pass the samples.

79.     The samples continued not to pass testing; production remained halted in Middletown during the month of December, 2015.

80.     After one month of unsuccessful sampling and stalled production, in or around December 2015, PW delegated spray coating to another company, Praxair Surface Technologies.  Production of the F119 engine continued thereafter.

### 5.    Other Incidents and Admissions Reveal a Culture of Disregard for Testing at PW & Whitney

81.     Since the filing of the first Complaint under seal, several in-flight mishaps have occurred in the PW jet engines of the Airbus A320 engine; in F-22 fighter jets and F-35 fighter engines.  All of these engines were built and inspected before release in Middletown, Connecticut.

14

82.     In March, 2018, more than 40 Airbus commercial aircraft, also built at Middletown, were grounded due to failed knife edge seals.

83.     The PW11000G engines used on the Airbus A320NEO were built and inspected by the same group of Middletown employees as those previously identified.

84.      Based on his conversation with other employees and direct analysis of actual samples, Mr. Bonzani learned that the same flawed process, *i.e.* use of the wrong spray gun, that he had observed at Middletown was used at the PW plant in San Antonio, Texas in spraying the thermal barrier coating of the outer combustor of F100 engines built between 1992 and 2014.

85.     In the case of the A320 engine built at Middletown, the failed parts were knife edge seals occurring on a different engine part, the jet engine turbine.

86.     On March 16, 2018, PW President, Robert LeDuc, addressed the grounding of the Middletown built European airbus planes in a public meeting with financial analysts.  Mr. LeDuc admitted that the failures in production were due to a "company-wide breakdown in durability quality testing".

87.     Mr. Leduc, addressing a quality system failure for engines assembled in Middletown further admitted that: "PW did not get our durability testing done before we went into service.  We didn't.  We didn't get [Extended Operations] certified for almost a year after we went into service… [PW] basically took the supplier's design at face value."  (Emphasis supplied).

88.     Mr. LeDuc did not explain what pressures or corporate culture breakdowns would cause jet engines to be released without doing <u>any</u> and/or inadequate durability testing.

89.     On July 12, 2018, an article concerning the PW Middletown plant appeared in *Forbes* magazine, entitled "PW Struggles to Get its Dream Engine Program Humming".  The article described President LeDuc's efforts to "transform the company's culture" beginning in February, 2016, just two months after Mr. Bonzani's departure.

90.     In the same article, Mr. LeDuc stated why cultural reform was necessary.  He is quoted as "sensing they [the employees] were afraid to share bad news".  He opined, "People were very reluctant to give you the full story about anything".  LeDuc is also quoted as describing the process as "selective data release".

91.     The July 18, 2018 *Forbes* article also quoted a Dave Durbin, head of Machinist Local 700 at PW Middletown.  He describes the supervisors as often "not wanting to hear about problems".  He claims the focus of management was "get the engine out at all costs".  He says that the Middletown workers responded, "If they don't care, why should I?"

## II.    THE PARTIES

92.     Relator is a citizen and a resident of Bolton, Connecticut.  Relator brings this action on behalf of the United States.

93.     From September 2012 through November 2015, Relator worked as an independent contractor and later a full-time employee for PW in its East Hartford, Connecticut facility.  From September 2012 until April 2014, Relator worked for Rapid Global Business Solutions, Inc. ("RGBSI"), an employment staffing service, retained by PW to provide engineers and others to work on PW projects and contracts.  Relator provided automation and thermal spray expertise and services to PW.  Relator soon became the "go-to" person for PW regarding thermal spray coatings issues and robotic programming issues, otherwise incapable of being solved with company resources.

16

94.     Before working for RGBSI, Relator worked from March 2011 to May 2012 for Praxair Surface Technologies, which has been a long-time supplier to PW.  During his tenure at Praxair, Relator used and became personally and extensively familiar with the PW Manual that is incorporated into the Contract.  Relator now has nearly ten years of intimate knowledge and experience with the PW Manual.

95.     As a result of Relator's substantial expertise and experience in thermal spray coatings and robotic programming as well as his trouble-shooting capabilities, PW heavily recruited the Relator.

96.     At the time of his recruitment, the Relator was employed by RGBSI as an independent contractor.

97.     To overcome his resistance to working as a full-time PW employee, a company supervisor asked Relator "what it would take" for him to join PW.  After continued negotiations during which Relator revealed both verbally and in writing his independent, but nonfunctioning, consulting business, as well as a commercial property he owned in which he leased space to other businesses, Relator was offered and accepted a position as a PW staff engineer in April 2014.

98.     Despite having knowledge of the existence of his consulting business and real estate holdings, Defendants did not require Relator to forgo those businesses as a condition of his PW employment.

99.     Prior to working at and later for PW, Relator had extensive formal education, experience and expertise with thermal spraying.

100.    Relator holds multiple degrees in Chemical Engineering, Metallurgy and Materials Engineering and Language.

101.    First as a consultant and then as a full-time PW employee, Mr. Bonzani was frequently called upon to troubleshoot thermal spraying issues and problems for PW.

102.    After his hiring, PW invested significant time and expense to secure Secret Security Clearance for Relator.

103.    As a result of his employment and position with PW, Relator has first-hand knowledge of the business operations of PW, including:

  1.    Its intentional and/or reckless disregard for basic FAR and DFARS product quality controls;

  2.    The intentionally faulty spray process utilized by PW in the manufacture of the F119;

  3.    The falsely manipulated test procedures used in the Middletown facility for the F119 engine; and

  4.    The admitted concealment and misrepresentations of those falsified tests for every F119 engine provided to the Government from at least 2012 through at least 2015, pursuant to a long-term sustainment contract for the F-22 fighter jet.

104.    In addition, as a result of Relator's employment with Praxair, RGBSI, and PW, Relator has extensive first-hand knowledge of the PW Manual, which is incorporated into the Contract, and the roles performed by each of the PW employees to whom he had reported the issues.

105.    Relator brings this action based on direct and independent knowledge.  None of the actionable allegations set forth in this Complaint is based upon a public disclosure as set forth in 31 U.S.C. §3730(e)(4).  Notwithstanding the same, Relator is an original source of the facts alleged in this Complaint due to the first-hand knowledge he gained while working at PW.  Prior to filing this Complaint, Relator voluntarily provided information regarding Defendants' conduct, faulty spray process, manipulated false testing and other information to the federal government.

18

106.    Defendant UTC is incorporated under Delaware law.  Its principal place of business is in Farmington, Connecticut.

107.    UTC provides systems and services to the aerospace, construction and security industries and sells its services and products to commercial and governmental entities.

108.    PW is a subsidiary or division of UTC with a principal place of business in East Hartford, Connecticut.  PW manufactures and sells engines and engine parts to commercial and government military entities.

## III.    <u>JURISDICTION AND VENUE</u>

109.    This action arises under the FCA to recover statutory treble damages, civil penalties, and any alternate remedies that may be available, on behalf of the United States of America arising out of the Defendants' violations of the FCA.

110.    Under § 3732 of the FCA, this Court has jurisdiction over actions brought under the FCA.  Furthermore, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

111.    This Court has personal jurisdiction over the Defendants and venue is proper in this District.  Pursuant to § 3732(a) of the FCA: "any action under §3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant, can be found, resides, transacts business, or in which any act proscribed by §3729 occurred."  Defendants reside in this District.  Moreover, at all times material hereto, Defendants have regularly conducted substantial business within this District.  In addition, the proscribed acts by Defendants that are the subject of this action occurred in this District.  Venue is additionally proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## IV.   THE CONTRACT, ITS TERMS GOVERNING TESTING, CERTIFICATIONS, AND CLAIMS FOR PAYMENT

### A.   HISTORY AND BACKGROUND OF THE PW F119 ENGINE

112.   PW has received numerous contracts to provide jet engines to the United States Air Force.

113.   Those contracts include the production of PW's F119 engine for use in the Air Force's F-22 fighter jet.

114.   The F-22 has also become a major asset in the Air Forces of a number of other countries friendly to the United States.

115.   In April 1991, the United States Air Force chose PW's F119 engine, to be used in the Air Force's F-22 Raptor Air Superiority Fighter ("F-22").

116.   All F119 engines manufactured by PW Middletown are used in United States Military Aircraft.

117.   Specifically, all F119 engines manufactured by PW are used in the United States Air Force's and Navy's F-22 fighter jets.

118.   The engine core of the F119 engine includes Integrally Bladed Rotors (IBRs). The engine core for the F119 engine, including the IBR uses identical specifications, parts, manufacturing processes, test processes, and personnel is virtually identical as the F135 engine manufactured by PW.

119.   The F135 engine manufactured by PW is used in the United States' military F-35 fighter jets and as part of the Foreign Military Sales Program for the F-35.

120.   PW assembled and produced engines under its initial contract with the Air Force for the F-22 engines through December 2012 at its plant in Middletown, Connecticut.

20

121.    Over the years since its initial Air Force contract award for the F119 engines, PW has also been awarded follow-on Air Force contracts to provide additional engines, spare parts, maintenance and other services for the F119 engine also performed by PW in Middletown, Connecticut.  Defendant PW was awarded such a contract as recently as December 15, 2017.

122.    By incorporating the PW Manual as the higher-level contract quality requirement, the Contract requires PW to adhere to production and testing specifications and quality control procedures for each part making up the F119 engine (*including testing and reporting*) contained in the Work Instructions for each part.

123.    Of absolute necessity, the Contract requires PW to comply with all of its quality control procedures and requirements as set forth in the applicable FAR and DFARS provisions. *See* Ex. A at 180; Ex. B at 7; FAR at *infra* ¶¶ 154–158. *See also infra* ¶¶ 162–168.

124.    It is the obligation of every responsible United States Regulatory Contractor to be knowledgeable of and adhere to all applicable regulatory and contractual obligations applicable to any supplies sold to the United States.

125.    The F119 engine requires that the IBR be specially spray coated, so that its blades will seal as it rotates (the IBR coating creating what are known as knife edge seals). The special spray coat is required to allow the IBR to rotate while trapping (sealing) the hot gases required to propel the jet aircraft.  Correct spraying to ensure accurate knife-edge seals is essential to engine function, performance, wear and safety.

126.    Over time, an improperly coated seal will fail prematurely and without warning, allowing those gases to escape, ultimately causing breakdown of engine parts, imbalances

resulting in vibrations that can cause in flight shut downs due to combustion instabilities, a release of debris, with a possibility of catastrophic failure.

127.   Failure to follow process or procedure for the coatings can result in engine breakdown causing risk to the plane and its pilots.

128.   The Air Force Contract Part Blueprint for the F119 engines manufactured by PW calls out a specification for each part and process. Relator has first-hand knowledge that Specification PWA53 and more specifically, PWA 53-37/53-11, applies to the spray-coating of the IBRs.

129.   The content of the Spray Recipe (dictated by the Specification) determines the requirements for spray distance, angle, coating composition, powder qualifications, as well as other requirements and procedures such as processing procedures, and quality control and testing procedures.

   a.   The PW Manual dictates the process for developing the Spray Recipe, requires that PW document the Spray Recipe, requires that PW adhere to the Spray Recipe, and requires that PW document and correct any deviation from the Spray Recipe.

130.   Additionally, an Evaluation Procedure for coating (E53 in Materials Control Lab) specifies the requirements for porosity, cracking, bond strength, interface and oxides among others.

   a.   E53 is a section of the PW Manual that sets out the applicable evaluation requirements, which PW was contractually required to follow.

131.   The coating is a "key part characteristic" (and is identified as such on the Part Blueprint), and is critical for engine functioning (because it is critical to create the knife-edge

seal).  The material characteristics of that coating are essential to the durability and long-term performance of the knife edge seal and the engine as a whole.

132.    Beginning in or around late 2012, the spray coating process on the IBRs for the F119 was moved from the PW East Hartford facility to the PW Middletown facility.

133.    The spray coating for the IBRs for the F119 was done at the PW Middletown facility from late 2012 through at least late November 2015, when Mr. Bonzani identified the falsified testing and the spray coating performed at PW Middletown as being substandard.

134.    Mr. Bonzani was able to make this determination based on his first-hand knowledge that during the entire period from late 2012 through late November 2015, the spray procedures and equipment, including the use of the same Praxair SG-100 plasma spray gun, was constant.

135.    All of the IBRs for the F119  engine cores provided to the Air Force under the Contract are and were, at all times relevant to this Complaint (and until the fraud was uncovered as described herein) coated and tested at PW's Middletown facilities, many by persons identified by number in this Complaint.

136.    The PW facility at Middletown, Connecticut is, and was at all times relevant to this Complaint, the sole location for assembly of the F119 jet engine *as well as* the only location in which OEM spare and repair parts for F119 engines are assembled.

**A.      DESPITE BEING UNABLE TO OBTAIN THE PAYMENT RECORDS, THE CONTRACT SECTIONS PROVIDED BY THE GOVERNMENT SET FORTH THE APPLICABLE FAR AND DFARS TESTING AND CERTIFICATION PROVISIONS  OF WHICH PW HAS FALSELY CERTIFIED ITS COMPLIANCE.**

137.    Fraudulent testing and false certifications by PW about that testing have most likely given rise to the submission of false claims in connection with PW's performance under

a number of government contracts for the manufacture of F119 engines (and F135 engines, which share a common core and IBR part and specifications).

### 1.   Relator's Efforts To Obtain the Contract and Related Documents, and Defendants' Efforts to Prevent Their Discovery.

138.   Relator has undertaken substantial effort to obtain contractual documents and payment records relating to the Contract and other contracts for the manufacture of F119 (and F135) engines.

139.   Those efforts include:

a.   Searches of publicly-available government databases.  Relator has been able to locate relevant contract numbers for the F119 contracts.  The relevant contractual documents and other related documents, however, are not themselves publicly available.

b.   Relator has, nevertheless, submitted numerous FOIA Requests for contracts, and related requests for proposals, bids, invoices and applications for payment submitted by Defendants, including specifically, such documents relating to: (1) Contract Award ID# FA861108C2896 and (2) Contract Award ID# FA861109C2901.  Relator has received only documents to date.

c.   Relator has requested the contracts from Defendants.  Relator, through his counsel, agreed, in part, to Defendants' requested stay of discovery (Docket No. 68), subject to Defendants providing Relator with contractual and related documents for Contract Award ID# FA861108C2896. Defendants have declined to provide to Relator the attachments and related contractual documents, including the PW Manual and Work Instructions.

d.  On November 8, 2018, Relator's counsel was directed by the United States
    Attorney's Office for the District of Connecticut to seek the assistance of Mr.
    Rogelio Fernandez, Associate General Counsel to the United States Air Force, to
    obtain the contract(s) that are the subject of this Complaint.

e.  On November 8, 2018, a written request was sent to Mr. Fernandez seeking his
    assistance.

f.  Late afternoon on November 21, 2018, Mr. Fernandez and Mr. K. Drew Ayers—
    Acquisition Fraud Counsel to the United States Air Force—responded regarding
    their willingness to discuss counsel's request for at least one of the relevant
    contracts.

g.  At 9:00 a.m. on November 26, 2018, Relator's counsel spoke with Mr. Fernandez
    and Mr. Ayers about providing Relator with contractual documents.  Mr.
    Fernandez and Mr. Ayers stated that the government's position is that, because
    PW has possession of the contract, it is therefore not within the government's
    exclusive control and Relator must seek the contract through the ordinary course
    of discovery.

h.  Mr. Fernandez and Mr. Ayers also stated that FOIA Requests are unsuitable for
    obtaining the contracts and related documents at the pleading stage—or even
    later—because of the lengthy review and redaction process that will necessarily
    take place before any responsive documents are released.

i.  In February 2019, Mr. Fernandez and Mr. Ayers provided to Relator lightly
    redacted copies of Sections E, G, H, and I of both Contract Award ID#
    FA861108C2896 and Contract Award ID# FA861109C2901. *See* Ex. A, Ex. B.

140.     Relator did not, as part of his technical and troubleshooting role with PW, have access to contractual and related payment records in the ordinary course of his duties.

141.     Relator's immediate suspension and removal from the premises and termination by Defendants as part of Defendants' concealment and furtherance of their fraud precluded Mr. Bonzani from obtaining contractual and claim documentation after he uncovered and reported the fraud to upper management at East Hartford.

142.     Defendants have exclusive access to all of the other contractual documentation and to the claim and payment documentation, and Relator has been unable, thus far, to obtain the other contractual, claim and payment records to date, despite his best efforts –and because of Defendants efforts to prevent him from doing so.

143.     On January 1, 2008, the United States Air Force, through the Air Force Materiel Command operating out of the Wright Patterson Air Force Base, awarded UTC a Cost-Plus Fixed Fee Contract (Contract Award ID# FA861108C2896) for the "F119 Engine Long Term Sustainment Program for the Raptor Engine (Spare)," with an expected completion date of December 31, 2020.

144.     Under Contract Award ID# FA861108C2896 and related contracts such as Contract Award ID# FA861109C2901, *each and every engine provided to the Government* included an IBR that was manufactured with fraudulent testing, and about which PW falsely certified to the contrary.

145.     Under the Contract, the USAF has paid at least $3.7 Billion dollars to UTC for the manufacture of F119 engines by PW for F22 fighter jets.

146.     On November 26, 2008, the U.S. Air Force awarded Contract Award ID# FA861109C2901 to PW, which was also for the production and maintenance of F119 engines.

### 2.      Applicable Regulatory Contractual Provisions

147.     Every contract between government suppliers and the United States Department of Defense obligates suppliers to meet certain necessary standards of quality and inspection before making a claim for payment.

148.     The Contract incorporates Federal Acquisition Regulations ("FAR") and Defense Federal Acquisition Regulation Supplements ("DFARS") provisions that require PW to test the engine components in the IBRs, to certify the engines conformed to contract upon submission for payment to the United States Government, and to report and correct contractual noncompliance.

149.     The FAR and DFARS provisions that create such contractual obligations include those set forth herein.

### a.      Minimum Quality Control and Inspection Requiring Testing of the IBR Spray-Coating Consistent with PW Work Instructions

150.     FAR 46.105 (48 C.F.R. § 46.105) (emphasis added) sets forth basic, minimum contractor responsibilities for Government contractors, including PW under the Contract. Those minimal contractual requirements required by regulation are as follows:

 *(a) The contractor is responsible for carrying out its obligations under the contract by--*

(1) Controlling the quality of supplies or services;

(*2) Tendering to the Government for acceptance only those supplies or services that conform to contract requirements;*

(3) Ensuring that vendors or suppliers of raw materials, parts, components, subassemblies, etc., have an acceptable quality control system; and

(4) Maintaining substantiating evidence, when required by the contract, that the supplies or services conform to contract quality requirements, and furnishing such information to the Government as required.

***(b) The contractor may be required to provide and maintain an inspection system or program for the control of quality that is acceptable to the Government.***

***(c) The control of quality by the contractor may relate to, but is not limited to--***

    ***(1) Manufacturing processes, to ensure that the product is produced to, and meets, the contract's technical requirements;***

    (2) Drawings, specifications, and engineering changes, to ensure that manufacturing methods and operations meet the contract's technical requirements;

    ***(3) Testing and examination, to ensure that practices and equipment provide the means for optimum evaluation of the characteristics subject to inspection;***

    (4) Reliability and maintainability assessment (life, endurance, and continued readiness);

    (5) Fabrication and delivery of products, to ensure that only conforming products are tendered to the Government;

    (6) Technical documentation, including drawings, specifications, handbooks, manuals, and other technical publications;

    (7) Preservation, packaging, packing, and marking; and

    (8) Procedures and processes for services to ensure that services meet contract performance requirements.

***(d) The contractor is responsible for performing all inspections and test required by the contract except those specifically reserved for performance by the Government (see 46.201(c))***.

    151.    FAR 46.201 (48 C.F.R. § 46.201) requires that every contract include quality requirements in the form of inspection and testing requirements for the contractor.  The provision states, in its entirety as follows:

***(a) The contracting officer shall include in the solicitation and contract the appropriate quality requirements.*** The type and extent of contract quality requirements needed depends on the particular acquisition and may range from inspection at time of acceptance to a requirement for the contractor's implementation of a comprehensive program for controlling quality.

(b) As feasible, solicitations and contracts may provide for alternative, but substantially equivalent, inspection methods to obtain wide competition and low

cost. The contracting officer may also authorize contractor-recommended alternatives when in the Government's interest and approved by the activity responsible for technical requirements.

(c) Although contracts generally make contractors responsible for performing inspection before tendering supplies to the Government, there are situations in which contracts will provide for specialized inspections to be performed solely by the Government. Among situations of this kind are—

> (1) Tests that require use of specialized test equipment or facilities not ordinarily available in suppliers' plants or commercial laboratories (e.g., ballistic testing of ammunition, unusual environmental tests, and simulated service tests); and

> (2) Contracts that require Government testing for first article approval (see subpart 9.3).

(d) Except as otherwise specified by the contract, required contractor testing may be performed in the contractor's or subcontractor's laboratory or testing facility, or in any other laboratory or testing facility acceptable to the Government.

152.    The Government relies upon contractors to conduct adequate testing and quality control.

153.    Contractors must, therefore, satisfy minimum inspection requirements.  FAR 46.202–3 (48 C.F.R. § 46.202-3) governs minimum "standard inspection requirements" and their purpose.  The FAR provision states in its entirety that:

 (a) Standard inspection requirements are contained in the clauses prescribed in 46.302 through 46.308, and in the product and service specifications that are included in solicitations and contracts.

(b) The clauses referred to in (a) above—

> **(1) Require the contractor to provide and maintain an inspection system that is acceptable to the Government;**

> (2) Give the Government the right to make inspections and tests while work is in process; and

> **(3) Require the contractor to keep complete, and make available to the Government, records of its inspection work.**

154.    As referenced and directed by FAR 46.202-3, FAR Provision 46.302 (48 C.F.R. § 46.302) directs that all fixed-price supply contracts (like the Contract identified in this Complaint) *must* include, at a minimum, the specified inspection  clause for *all* fixed-price supply contracts ("[t]he contracting officer shall insert the clause at 52.246–2, Inspection of Supplies—Fixed-Price, in solicitations and contracts for supplies, or services that involve the furnishing of supplies, when a fixed-price contract is contemplated").

155.    As provided in the Contract, PW's compliance with FAR 52.246-2 is required. *See* Ex. A at 180; Ex. B at 7.  FAR 52.246–2 (emphasis added) states in most relevant part, as follows:

As prescribed in 46.302, insert the following clause:

Inspection of Supplies—Fixed-Price (Aug. 2001)

(a) Definition. "Supplies," as used in this clause, includes but is not limited to raw materials, components, intermediate assemblies, end products, and lots of supplies.

(b) ***The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and shall tender to the Government for acceptance only supplies that have been inspected in accordance with the inspection system and have been found by the Contractor to be in conformity with contract requirements***. As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome. These records shall be kept complete and made available to the Government during contract performance and for as long afterwards as the contract requires. The Government may perform reviews and evaluations as reasonably necessary to ascertain compliance with this paragraph. These reviews and evaluations shall be conducted in a manner that will not unduly delay the contract work. The right of review, whether exercised or not, does not relieve the Contractor of the obligations under the contract.*     *          *

(f) The Government has the right either to reject or to require correction of nonconforming supplies. ***Supplies are nonconforming when they are defective in material or workmanship or are otherwise not in conformity with contract requirements***. The Government may reject nonconforming supplies with or without disposition instructions.

30

(g) The Contractor shall remove supplies rejected or required to be corrected. However, the Contracting Officer may require or permit correction in place, promptly after notice, by and at the expense of the Contractor. The Contractor shall not tender for acceptance corrected or rejected supplies without disclosing the former rejection or requirement for correction, and, when required, shall disclose the corrective action taken.

(h) If the Contractor fails to promptly remove, replace, or correct rejected supplies that are required to be removed or to be replaced or corrected, the Government may either

> (1) by contract or otherwise, remove, replace, or correct the supplies and charge the cost to the Contractor or
>
> (2) terminate the contract for default.
>
> Unless the Contractor corrects or replaces the supplies within the delivery schedule, the Contracting Officer may require their delivery and make an equitable price reduction. Failure to agree to a price reduction shall be a dispute.

*      *      *

(k) Inspections and tests by the Government do not relieve the Contractor of responsibility for defects or other failures to meet contract requirements discovered before acceptance. Acceptance shall be conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract.

*      *      *

156.    In addition, the Contract requires PW to comply with FAR 52.246-04.  *See* Ex.

A at 180.  FAR 52.246-04 (emphasis added) states, in most relevant part, as follows:

As prescribed in 46.304, insert the following clause:

Inspection of Services -- Fixed-Price (Aug. 1996)

(a) Definition: "Services," as used in this clause, includes services performed, workmanship, and material furnished or utilized in the performance of services.

(b) ***The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.***

*      *      *

31

(f) If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may --

>   (1) By contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service; or

>   (2) Terminate the contract for default.

>   157.   The Contract also requires PW to comply with FAR 52.246-05.  *See* Ex. A at

180.  FAR 52.246-05 (emphasis added) states, in most relevant part, as follows:

As prescribed in 46.305, insert the following clause in solicitations and contracts for services, or supplies that involve the furnishing of services, when a cost-reimbursement contract is contemplated:

Inspection of Services -- Cost-Reimbursement (Apr 1984)

(a) Definition. "Services," as used in this clause, includes services performed, workmanship, and material furnished or used in performing services.

(b) ***The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires***.

>   *       *       *

(e) If the Contractor fails to promptly perform the services again or take the action necessary to ensure future performance in conformity with contract requirements, the Government may --

>   (1) By contract or otherwise, perform the services and reduce any fee payable by an amount that is equitable under the circumstances; or

>   (2) Terminate the contract for default.

>   158.   The FAR provisions are explicit in defining government requirements for

quality assurance and control, testing, remediation and reporting – and that adherence to these

standards are material to the contract.

159.    The Contract includes these minimum inspection standards by incorporating these regulations by reference.  *See* Ex. A at 180; Ex. B at 7.

160.    Requiring PW to conduct testing according to an "inspection system" that is approved by the government permits the government to rely upon the representations of testing by PW.

### b.    Additional Higher-Level Quality Standards Apply to the Contract

161.    In addition to the minimum standards that are included in the Contract, the Contract also includes additional "higher-level contract quality requirements."  48 C.F.R. 46.202–4; *See* Ex. A at 180; Ex. B at 7.

162.    FAR 46.202–4 (emphasis added) mandates that:

*(a) Requiring compliance with higher-level quality standards is necessary in solicitations and contracts for complex or critical items (see 46.203(b) and (c)) or when the technical requirements of the contract require—*

> *(1) Control of such things as work operations, in-process controls, and inspection; or*[7]
>
> *(2) Attention to such factors as organization, planning, work instructions, documentation control, and advanced metrology.*

(b) When the contracting officer, in consultation with technical personnel, finds it is in the Government's interest to require that higher-level quality standards be maintained, the contracting officer shall use the clause prescribed at 46.311. The contracting officer shall indicate in the clause which higher-level quality standards will satisfy the Government's requirement. Examples of higher-level quality standards are ISO 9001, 9002, or 9003; ANSI/ISO/ASQ Q9001–2000; ANSI/ASQC Q9001, Q9002, or Q9003; QS-9000; AS-9000; ANSI/ASQC E4; and ANSI/ASME NQA–1.[8]

---

[7] Effective December 26, 2014, 48 C.F.R. § 46.2024(a)(1) also lists design and testing.

[8] PW publicly represents that its Quality Systems meet such standard as those identified in the FAR provisions, including that "PW & Whitney Measurement Systems' Quality Management System was developed to meet all pertinent requirements of the international standard ISO/IEC 17025:2005.  PW & Whitney's quality system has been accredited by A2LA (cert# 2629.01) since 2008 … Prior to 2008, PW & Whitney was accredited to meet

163.    FAR 46.203 (48 C.F.R. § 46.203) sets out criteria for determining the applicable

quality requirements, and states as follows:

> The extent of contract quality requirements, including contractor inspection,
> required under a contract shall usually be based upon the classification of the
> contract item (supply or service) as determined by its technical description, its
> complexity, and the criticality of its application.
>
> (a) Technical description. Contract items may be technically classified as—
>
>> (1) Commercial (described in commercial catalogs, drawings, or industrial
>> standards; see part 2); or
>>
>> (2) **Military–Federal (described in Government drawings and
>> specifications).**
>
> (b) Complexity.
>
>> (1) **Complex items have quality characteristics, not wholly visible in the
>> end item, for which contractual conformance must be established
>> progressively through precise measurements, tests, and controls applied
>> during purchasing, manufacturing, performance, assembly, and
>> functional operation either as an individual item or in conjunction with
>> other items.**
>>
>> (2) Noncomplex items have quality characteristics for which simple
>> measurement and test of the end item are sufficient to determine
>> conformance to contract requirements.
>
> (c) Criticality.
>
>> (1) **A critical application of an item is one in which the failure of the item
>> could injure personnel or jeopardize a vital agency mission.** A critical item

---

the requirements of ISO-9001." https://www.PWandwhitney.com/Content/Quality_System.asp (last accessed
November 1, 2018, 3:08 p.m.) (*ISO/IEC 17025:2005, General requirements for the competence of testing and
calibration laboratories*)

These testing standards that PW represents it meets, "specify the general requirements for the competence to carry
out tests and/or calibrations, including sampling." ISO/IEC 17025:2005 https://www.iso.org/standard/39883.html
(last accessed November 1, 2018, 3:10 p.m.)

Additionally, all PWA53 coatings (for the IBRs that are the subject of this Complaint) are subject to PWA370: ESA
Approval and in addition are designated "Key Part Characteristics" (KPC) critical to engine function.

may be either peculiar, meaning it has only one application, or common, meaning it has multiple applications.

(2) A noncritical application is any other application. Noncritical items may also be either peculiar or common.

164. When a contract meets the criteria described above, the FAR (48 C.F.R. § 46.311) requires the inclusion of a specific contractual clause and the identification of the additional quality standards. FAR 46.311 states as follows:

The contracting officer shall insert the clause at 52.246–11, Higher–Level Contract Quality Requirement, in solicitations and contracts when the inclusion of a higher-level contract quality requirement is appropriate (see 46.202–4).

165. The Contract incorporates by reference FAR 52.246–11 (48 C.F.R. § 52.246–11), "Higher–Level Contract Quality Requirements." *See* Ex. A at 180;  Ex. B at 7. FAR 52.246–11 states as follows:

As prescribed in 46.311, insert the following clause:

Higher–Level Contract Quality Requirement (FEB 1999)

The Contractor shall comply with the higher-level quality standard selected below. [If more than one standard is listed, the offeror shall indicate its selection by checking the appropriate block.]

[Contracting Officer insert the title, number, date, and tailoring (if any) of the higher-level quality standards.]

166. The Contract then incorporates the PW Manual as the "Higher-Level Contract Quality Requirement" with which PW must comply.

167. Relator has nearly ten years of personal, first-hand experience and knowledge with the PW Manual.  During Relator's tenure with PW, and while working for PW suppliers and subcontractors, Relator referred to the Manual on a near-daily basis.  The PW Manual is located on every workstation and computer at PW.

168.    The PW Manual requires that the Work Instructions be created, sets forth the processes required for creating the Work Instructions, requires adherence to the Work Instructions, and requires corrective action for any deviation from the Work Instructions.

169.    IBRs are complex, and spray-coating the IBRs to create a knife edge seal is complex.

170.    The coatings at issue in this Complaint are designated in Work Instructions as a Key Part Characteristics ("KPC") critical to engine function.

171.    By virtue of its function, coating the IBR to create a quality knife edge seal is critical to engine performance (and, therefore, is also material to the Contract).

172.    The IBRs that are the subject of this complaint were used in the F119 engine, which is only used for Military use (the F22 fighter Jet engine).

173.    The complexity, criticality, and military-only use of the F119 engine, together with the sudden cessation of production of F119 engines upon the failure of sample testing in November 2015, are consistent with the PW Manual's requirement that PW adhere to the specific standards in the Work Instructions governing the spray techniques, methods, materials, and equipment for the spray-coating – and sample testing – of the IBR for the F119 engine core.

### c.    The Contract Includes Minimum Mandatory Quality Control Standards that Require Adherence to Proper IBR Spray-Coating Testing

174.    Under the quality control FAR provisions incorporated in the Contract, PW has a basic and fundamental contractual obligation to adhere to the testing specifications and procedures for set forth in PW's Work Instructions for each part for the Part Blueprint of the F119 engine manufactured for the Government under the Contract.

36

175. The testing specifications and procedures set forth in the Work Instructions for testing each part – including, and in particular the spray-coating of the IBR – comprise the process that is approved by the Government under the FAR and provide the basis upon which the Government relies upon PW's testing and certification of conformance with contract. *See supra* ¶¶ 154-157. *See also supra* ¶¶ 162-166.

176. The plain language of the FAR alone requires conformance to the testing processes approved by the Government. *See supra* ¶¶ 154-157. *See also supra* ¶¶ 162-166.

177. The incorporation of the FAR into the Contract, together with the sudden cessation of production of F119 engines upon the failure of sample testing in November 2015, places it beyond doubt that successful compliance with the testing specifications for the spray-coating of the IBR is and was contractually required.

### 3. Contractual and Regulatory Provisions Requiring Specific Certifications in Connections with Specific Claims Submitted by PW

178. The Contract required PW to certify compliance with the Contract when submitting claims to the Government for the engines it delivered.

179. It is inarguable that PW was paid billions of dollars for deliveries pursuant to Contract Award ID# FA861108C2896.

180. Those claims submitted to the Government were accompanied by representations and certifications that the engines and their testing conformed to contract.

181. DFARS provision 246.370 (48 C.F.R. § 246.370) requires the preparation and submission of a "Material Inspection and Receiving Report" ("MIRR") by defense contractors providing "separate and distinct deliverables" (here of F119 engines for the F-22 fighter jet), with limited inapplicable exceptions.

182. DFARS Provision 246.370 states (emphasis added) as follows:

37

(a) Use the clause at 252.246–7000, Material Inspection and Receiving Report, in solicitations and contracts when there will be separate and distinct deliverables, even if the deliverables are not separately priced.

(b) When contract administration is retained by the contracting office, the clause at 252.246–7000, Material Inspection and Receiving Report, is not required for—

(1) Contracts awarded using simplified acquisition procedures;

(2) Negotiated subsistence contracts;

(3) Contracts for fresh milk and related fresh dairy products;

(4) Contracts for which the deliverable is a scientific or technical report;

(5) Research and development contracts not requiring the delivery of separately priced end items;

(6) Base, post, camp, or station contracts;

(7) Contracts in overseas areas when the preparation and distribution of the DD Form 250, Material Inspection and Receiving Report, by the contractor would not be practicable. In these cases, arrange for the contractor to provide the information necessary for the contracting office to prepare the DD Form 250;

(8) Contracts for services when hardware is not acquired as an item in the contract; and

(9) Indefinite delivery type contracts placed by central contracting offices which authorize only base, post, camp, or station activities to issue orders.

183.    The Contract incorporates by reference DFARS 252.256–7000 (48 C.F.R.

§ 252.246–7000), which requires that PW submit the MIRR  either in physical (DD Form 250) or electronic (WAWF) form. *See* Ex. A at 180; Ex. B at 7.  DFARS 252.246-7000 (48 C.F.R.

§ 252.246–7000) requires:

As prescribed in 246.370, use the following clause:

Material Inspection and Receiving Report (MAR 2003)

(a) ***At the time of each delivery of supplies or services under this contract, the Contractor shall prepare and furnish to the Government a material inspection and receiving report in the manner and to the extent required by Appendix F***, Material Inspection and Receiving Report, of the Defense FAR Supplement.

(b) Contractor submission of the material inspection and receiving information required by Appendix F of the Defense FAR Supplement by using the Wide Area WorkFlow–Receipt and Acceptance (WAWF–RA) electronic form (see paragraph (b)(1) of the clause at 252.232–7003) fulfills the requirement for a material inspection and receiving report (DD Form 250).

184.   The Contract also incorporates DFARS 252.232-7003 (48 C.F.R. § 252.232–7003), which governs the electronic submission of payment requests and MIRR forms. Ex. A at 247; Ex. B at 26. DFARS 252.232–7003 states:

As prescribed in 232.7004, use the following clause:

Electronic Submission of Payment Requests (MAR 2007)

(a) Definitions. As used in this clause—

(1) Contract financing payment and invoice payment have the meanings given in section 32.001 of the Federal Acquisition Regulation.

(2) Electronic form means any automated system that transmits information electronically from the initiating system to all affected systems. Facsimile, e-mail, and scanned documents are not acceptable electronic forms for submission of payment requests. However, scanned documents are acceptable when they are part of a submission of a payment request made using one of the electronic forms provided for in paragraph (b) of this clause.

(3) Payment request means any request for contract financing payment or invoice payment submitted by the Contractor under this contract.

*(b) Except as provided in paragraph (c) of this clause, the Contractor shall submit payment requests using one of the following electronic formats:*

(1) Wide Area WorkFlow–Receipt and Acceptance (WAWF–RA). Information regarding WAWF–RA is available on the Internet at https://wawf.eb.mil.

(2) Web Invoicing System (WInS). Information regarding WInS is available on the Internet at https://ecweb.dfas.mil.

(3) American National Standards Institute (ANSI) X.12 electronic data interchange (EDI) formats.

(i) Information regarding EDI formats is available on the Internet at http://www.X12.org.

(ii) EDI implementation guides are available on the Internet at http://www.dod.mil/dfas/contractorpay/electroniccommerce.html.

(4) Another electronic form authorized by the Contracting Officer.

(c) The Contractor may submit a payment request in a non-electronic form only when—

(1) DoD is unable to receive a payment request in electronic form; or

(2) The Contracting Officer administering the contract for payment has determined, in writing, that electronic submission would be unduly burdensome to the Contractor. In such cases, the Contractor shall include a copy of the Contracting Officer's determination with each request for payment.

(2) DoD makes payment for commercial transportation services provided under a Government rate tender or a contract for transportation services using a DoD–approved electronic third party payment system or other exempted vendor payment/invoicing system (e.g., PowerTrack, Transportation Financial Management System, and Cargo and Billing System);

(d) The Contractor shall submit any non-electronic payment requests using the method or methods specified in Section G of the contract.

(e) In addition to the requirements of this clause, the Contractor shall meet the requirements of the appropriate payment clauses in this contract when submitting payments requests.

185.    The Contract therefore required PW to submit a MIRR in either the form of a DD Form 250 or an electronic WAWF, as part of its claim for, and as a prerequisite for, payment from the Government for the F119 engines provided to the United States Air Force under the Contract.

186.    PW was required to prepare and submit the information in the MIRR according to the "Appendix F" instructions.  48 C.F.R., Ch. 2, Appx. F.

187.    Section F-101 of Appendix F (48 C.F.R., Ch. 2, Appx. F-101) sets forth the "General" instructions for the MIRR, in relevant, part as follows:

This appendix contains procedures and instructions for the use, preparation, and distribution of the material inspection and receiving report (MIRR) (DD Form 250

40

series) and commercial shipping/packing lists used to document Government contract quality assurance.[9]

188.    Section F-102 of Appendix F (48 C.F.R., Ch. 2, Appx. F-102) sets forth the

"Applicability" of the MIRR, in relevant, part as follows:

(a) The provisions of this appendix apply to supplies or services acquired by DoD when the clause at 252.246–7000, Material Inspection and Receiving Report, is included in the contract. If the contract contains the clause at FAR 52.213–1, Fast Payment Procedure, the contractor may elect not to prepare a DD Form 250.

189.    Section F-103 of Appendix F (48 C.F.R, Ch. 2, Appx. F-103) sets forth the

"General" instructions for the MIRR, in relevant, part as follows:.

(a)  ***The DD Form 250 is a multipurpose report used***—

(1)  ***To provide evidence of Government contract quality assurance*** at origin or destination;

(2)  To provide evidence of acceptance at origin or destination;

*** 

(6)  ***As a contractor invoice***; and

(7)  As commercial invoice support.

*** 

(c) The contractor prepares the MIRR, except for entries that an authorized Government representative is required to complete. The ***contractor shall furnish sufficient copies of the completed form, as directed by the Government representative.***

190.    Section F-of Appendix F (48 C.F.R, Ch. 2, Appx. F-301) sets forth the

preparation instructions for the MIRR, and direct the Contractor to note any exceptions to

---

[9] Through a series of amendments since January 2008, Appendix F now provides instructions for preparing and submitting both the DD Form 250 and its electronic equivalent, the WAWF. The current version of 48 C.F.R., Ch. 2., Appx. F-101(b) notes that "The use of the DD Form 250 series documents is on an exception basis (see DFARS 232.7002(a)) because use of the WAWF RR is now required by most DoD contracts."

conformance with contract prior to submission to the Government as evidence of quality

assurance and as a claim for payment.

191.    Section F-301 of Appendix F (48 C.F.R, Ch. 2, Appx. F-301) sets forth those

preparation instructions for the DD Form 250 , in relevant, part as follows:

(21) Block 21 -- CONTRACT QUALITY ASSURANCE (CQA).

(i) The words "conform to contract" contained in the printed statements in Blocks 21a and 21b relate to quality and to the quantity of the items on the report. Do not modify the statements. Enter notes taking exception in Block 16 or on attached supporting documents with an appropriate block cross-reference.

192.    In September 2011, Section F-301 of Appendix F (48 C.F.R, Ch. 2, Appx. F-

301) was amended to provide similar preparation instructions for the electronic MIRR (the

WAWF), in relevant, part as follows:

(20)   CONTRACT QUALITY ASSURANCE (CQA).

(i)  The words "conform to contract" contained in the text above the signature block in the WAWF RR Header Tab relate to quality and to the quantity of the items on the report. Enter notes taking exception in Misc. Info Tab comment field or on attached supporting documents with an appropriate block cross-reference.

193.    **Therefore, according to the DFARS provisions incorporated into the Contract and Appendix providing instructions, PW was required to have certified as part of its claim for payment that the F119 engines provided to the Government "conformed to contract."**

**4.      Additional Certifications of Conformance With Contract Are Required in the Contract.**

194.    In addition to the certification of conformance with contract submitted as part of

PW's MIRR in connection with its claim for payment under the Contract, PW was required to

and did make additional certifications in the form of a "Certificate of Conformance" provided

to the Government.

195.     FAR 46.504 (48 C.F.R. § 46.504) sets forth the circumstances in which the Government will permit the use of a certificate of conformance by a contractor in lieu of "source inspection" by the government.  The FAR provision states those circumstances, in full, as follows:

> *A certificate of conformance (see 46.315) may be used in certain instances instead of source inspection (whether the contract calls for acceptance at source or destination) at the discretion of the contracting officer if the following conditions apply:*
>
> (a) *Acceptance on the basis of a contractor's certificate of conformance is in the Government's interest.*
>
> (b)(1) Small losses would be incurred in the event of a defect; or
>
>> *(2) Because of the contractor's reputation or past performance, it is likely that the supplies or services furnished will be acceptable and any defective work would be replaced, corrected, or repaired without contest*. In no case shall the Government's right to inspect supplies under the inspection provisions of the contract be prejudiced.

196.     FAR Provision 46.315 (48 C.F.R. § 46.315) states that *"[t]he contracting officer shall insert the clause at 52.246–15, Certificate of Conformance*, in solicitations and contracts for supplies or services when the conditions in 46.504 apply.

197.     The Contract incorporates FAR Provision 48 C.F.R. 52.246–15 (48 C.F.R. § 52.246–15), *see* Ex. A at 180, which sets forth the contractual provision to be included in such conditions, and states as follows:

> As prescribed in 46.315, insert the following clause in solicitations and contracts for supplies or services when the conditions in 46.504 apply:
>
> Certificate of Conformance (APR 1984)
>
> (a) When authorized in writing by the cognizant Contract Administration Office (CAO), *the Contractor shall ship with a Certificate of Conformance any supplies for which the contract would otherwise require inspection at source.* In no case shall the Government's right to inspect supplies under the inspection provisions of this contract be prejudiced. Shipments of such supplies will not be made under this

contract until use of the Certificate of Conformance has been authorized in writing by the CAO, or inspection and acceptance have occurred.

(b) *The Contractor's signed certificate shall be attached to or included on the top copy of the inspection or receiving report* distributed to the payment office or attached to the CAO copy when contract administration (Block 10 of the DD Form 250) is performed by the Defense Contract Administration Services. *In addition, a copy of the signed certificate shall also be attached to or entered on copies of the inspection or receiving report accompanying the shipment.*

(c) The Government has the right to reject defective supplies or services within a reasonable time after delivery by written notification to the Contractor. The Contractor shall in such event promptly replace, correct, or repair the rejected supplies or services at the Contractor's expense.

(d) The certificate shall read as follows:

---

*"I CERTIFY THAT ON _____ [INSERT DATE], THE _____ [INSERT CONTRACTOR'S NAME] FURNISHED THE SUPPLIES OR SERVICES CALLED FOR BY CONTRACT NO. _____ VIA _____ [CARRIER] ON _____ [IDENTIFY THE BILL OF LADING OR SHIPPING DOCUMENT] IN ACCORDANCE WITH ALL APPLICABLE REQUIREMENTS. I FURTHER CERTIFY THAT THE SUPPLIES OR SERVICES ARE OF THE QUALITY SPECIFIED AND CONFORM IN ALL RESPECTS WITH THE CONTRACT REQUIREMENTS, INCLUDING SPECIFICATIONS, DRAWINGS, PRESERVATION, PACKAGING, PACKING, MARKING REQUIREMENTS, AND PHYSICAL ITEM IDENTIFICATION (PART NUMBER), AND ARE IN THE QUANTITY SHOWN ON THIS OR ON THE ATTACHED ACCEPTANCE DOCUMENT."*

*DATE OF EXECUTION: _____*

*SIGNATURE: _____*

*TITLE: _____*

---

198.    Relator has first-hand knowledge of the required use of certificates of conformance for PW contracts for military aircraft.

199.    Because of the **indisputable** complexity of the F119 engines that require testing of individual parts and processes – including the spray-coating of the IBR in the engine core – and because of PW's lengthy history as a government contractor, and in particular in the

44

manufacture of the F119 Engine, **the Contract required, and PW had to have submitted, certificates of conformance**.

200.    As described herein in detail, Defendants have violated their contractual obligations, including those required by the FAR and DFARS provisions identified herein.

201.    As described herein in detail, Defendants have failed to satisfy their contractual requirements with the United States Air Force because of the fraudulent testing (from at least 2012 through 2015) on the spray-coating for *every* IBR in *every* engine manufactured and sold to the Government under the Contract, and the attendant false certifications by PW to the Government that the engines conformed to contract.

202.    The Government would have rejected PW's nonconforming F119 engines had PW not falsely certified that they conformed to contract.

203.    FAR 46.102 (48 C.F.R. § 46.102) governing quality assurance, directs agencies, in relevant part, to require that contractors and the supplies provided by contractors meet the following:

> *FAR Agencies shall ensure that --*
>
> (a) *Contracts include inspection and other quality requirements, including warranty clauses when appropriate, that are determined necessary to protect the Government's interest*;
>
> (b) *Supplies or services tendered by contractors meet contract requirements;*
>
> (c) Government contract quality assurance is conducted before acceptance (except as otherwise provided in this part), by or under the direction of Government personnel;
>
> (d) No contract precludes the Government from performing inspection;
>
> (e) *Nonconforming supplies or services are rejected, except as otherwise provided in 46.407*;

204.    FAR 46.407 (48 C.F.R. § 46.407) directs the Government to reject

nonconforming supplies, as follows:

(a) *The contracting officer should reject supplies or services not conforming in all respects to contract requirements (see 46.102).* In those instances where deviation from this policy is found to be in the Government's interest, such supplies or services may be accepted only as authorized in this section.

(b) The contracting officer ordinarily must give the contractor an opportunity to correct or replace nonconforming supplies or services when this can be accomplished within the required delivery schedule. Unless the contract specifies otherwise (as may be the case in some cost-reimbursement contracts), correction or replacement must be without additional cost to the Government. Subparagraph (e)(2) of the clause at 52.246–2, Inspection of Supplies—Fixed–Price, reserves to the Government the right to charge the contractor the cost of Government reinspection and retests because of prior rejection.

(c)(1) *In situations not covered by paragraph (b) of this section, the contracting officer ordinarily must reject supplies or services when the nonconformance is critical or major or the supplies or services are otherwise incomplete*. However, there may be circumstances (e.g., reasons of economy or urgency) when the contracting officer determines acceptance or conditional acceptance of supplies or services is in the best interest of the Government. The contracting officer must make this determination based upon—

> (i) **Advice of the technical activity that the item is safe to use and will perform its intended purpose**;

> (ii) Information regarding the nature and extent of the nonconformance or otherwise incomplete supplies or services;

> (iii) A request from the contractor for acceptance of the nonconforming or otherwise incomplete supplies or services (if feasible);

> (iv) A recommendation for acceptance, conditional acceptance, or rejection, with supporting rationale; and

> (v) The contract adjustment considered appropriate, including any adjustment offered by the contractor.

(2) The cognizant contract administration office, or other Government activity directly involved, must furnish this data to the contracting officer in writing, except that in urgent cases it may be furnished orally and later confirmed in writing. Before making a decision to accept, the contracting officer must obtain the concurrence of the activity responsible for the

technical requirements of the contract and, where health factors are involved, of the responsible health official of the agency concerned.

(d) If the nonconformance is minor, the cognizant contract administration office may make the determination to accept or reject, except where this authority is withheld by the contracting office of the contracting activity. To assist in making this determination, the contract administration office may establish a joint contractor-contract administrative office review group. Acceptance of supplies and services with critical or major nonconformances is outside the scope of the review group.

(e) **The contracting officer must discourage the repeated tender of nonconforming supplies or services, including those with only minor nonconformances, by appropriate action, such as rejection and documenting the contractor's performance record.**

(f) When supplies or services are accepted with critical or major nonconformances as authorized in paragraph (c) of this section, the contracting officer must modify the contract to provide for an equitable price reduction or other consideration. In the case of conditional acceptance, amounts withheld from payments generally should be at least sufficient to cover the estimated cost and related profit to correct deficiencies and complete unfinished work. The contracting officer must document in the contract file the basis for the amounts withheld. For services, the contracting officer can consider identifying the value of the individual work requirements or tasks (subdivisions) that may be subject to price or fee reduction. This value may be used to determine an equitable adjustment for nonconforming services. However, when supplies or services involving minor nonconformances are accepted, the contract need not be modified unless it appears that the savings to the contractor in fabricating the nonconforming supplies or performing the nonconforming services will exceed the cost to the Government of processing the modification.

(g) Notices of rejection must include the reasons for rejection and be furnished promptly to the contractor. Promptness in giving this notice is essential because, if timely nature of rejection is not furnished, acceptance may in certain cases be implied as a matter of law. The notice must be in writing if—

(1) The supplies or services have been rejected at a place other than the contractor's plant;

(2) The contractor persists in offering nonconforming supplies or services for acceptance; or

(3) Delivery or performance was late without excusable cause.

### 5.   PW Has Had an Affirmative Obligation to Notify the Air Force of the Failure of the Tests.

205.   PW has also had an affirmative legal, contractual and **moral** obligation to notify the Government of non-conformance —specifically the test failures of the IBR spray-coating—of the F119 engines provided to the Air Force under the Contract due to the criticality of that process to engine performance and pilot safety.

206.   The Contract incorporates by reference DFARS Provision 252.246-7003 (48 C.F.R. § 252.246-7003), which required PW to provide notification, "not later than 72 hours, after discovering or acquiring credible information concerning nonconformances and deficiencies" for parts which could have a safety impact.  *See* Ex. A at 247, Ex. B at 26.

207.   As described herein, the testing of the spray-coating of the IBR is essential to ensure a knife-edge seal and avoid catastrophic engine failure.

208.   PW has also had an affirmative legal and contractual obligation to notify the Government of the fraudulent testing, and subsequent false certifications, described in this complaint.

209.   The Contract also incorporated by reference FAR 52.203-13 (48 C.F.R. § 52.203-13), which required PW to timely notify the Contracting Officer as soon as it learned of "credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed" fraud or a violation of the False Claims Act. *See* Ex. A at 239; Ex. B at 22.

210.   The Contract required PW to "inform the Government of known Shortfalls in engine performance" at "the time of engine acceptance," and required all shortfalls and variances to be recorded in the DD Form 250.  Ex. A at 234; Ex. B at 16.

211.   For variances from the specifications, the Contract allows the Government to withhold payment based on, among other things, the cost of satisfactorily completing testing

and any "loss of value to the Government due to reduced item reliability" and "increased life cycle cost."  Ex. A at 235, Ex. B at 17.

212.   The Contract also incorporates by reference FAR 52.249-8, which allows the government to terminate the Contract in whole or in part if, for example, PW fails to perform ***any*** of the provisions of the Contract.  *See* Ex. A at 244; Ex. B at 25.

### B.   THE CONTRACT AT ISSUE: LONG–TERM SUSTAINMENT CONTRACT FOR THE F-22 FIGHTER JET

213.   The IBRs were manufactured in Middletown at all relevant time periods to provide F119 engines to the Air Force for the F-22 fighter jet include, specifically, to fulfill the Contract.

214.   That Contract allocated $2.4 Billion for PW to provide F119 engines to the USAF for the overhaul and maintenance of the United States' F-22 Fleet.

215.   PW has provided engines to the United States Air Force for a total cost of $3.7 billion paid by the United States Government for those engines.

216.   The Contract contains and incorporates numerous obligations that PW manufacture the engine – and each component part – according to rigorous production and testing specifications and processes.

217.   Those obligations specifically require PW to submit claims for, and provide to the Government, engines that conformed to the contract. *See* FAR at *supra* ¶¶ 181–185, 195–199, 203-204.

218.   Among PW's contractual obligations is the requirement that it have an inspection system that has been approved by the government. *See* FAR at *supra* ¶¶ 153–157. *See also supra* ¶¶ 162-166.

219.    The inspection system is supposed to assure the government that the engines supplied to the Air Force conform to contract.

220.    Upon delivery of each and every engine to the United States Air Force pursuant to the contract, PW prepared and submitted a Material Inspection Receiving Report, either in the form of a DD Form 250 or the WAWF electronic equivalent, certifying that the engines conformed to the contract.

221.    In order to satisfy its obligation for quality control in the manufacturing of the F119 engines for the USAF under the Contract, PW was required to comply with the PW Manual. *See* Ex. A at 180, Ex. B at 7.

222.    As required by the PW Manual, PW developed "Work Instructions" for each part of the F119 engine. The PW requires PW to develop the Work Instructions according to the specific process contained in the PW Manual.

223.    Those Work Instructions were developed according to well-established and contractually-mandated processes dictated by the PW Manual for ensuring that engines are manufactured in conformance with contract.

224.    Work Instructions are developed according to a government-approved process involving approval of PW's Material Control Laboratory and Production Engineers.

225.    Relator has first-hand knowledge and experience in the process that PW uses to develop Work Instructions.

226.    Therefore, for each part in the blueprint of the engine specified to be produced by PW pursuant to the Contract, PW was contractually required to memorialize a manufacturing and a testing specification and procedure by creating Work Instructions.

227. Compliance with PW's work instructions, including testing specifications, is essential to PW's compliance with FAR and the Contract, which incorporates the PW Manual. *See supra* ¶¶ 153–157. *See also supra* ¶¶ 162-166.

228. Adherence to PW's work instructions, including testing specifications, is required under the terms of the Contract.

229. Such adherence permits on-site government inspectors to, if an audit is called for, compare records of testing with the work instruction specifications and processes, thereby ensuring that the engines conform to contract.

### C. DEFENDANTS' CONTRACTUALLY-REQUIRED QUALITY CONTROL PROCESSES

230. Relator has been trained in, and is therefore personally familiar with at least two of Defendants' quality control processes: the "Production Ticket" ("P-Ticket") system managed by the PW Materials Control Lab ("MCL")[10] as well as the Process Approval Records ("PARs") administered by the Engineering Source Approval ("ESA") unit within PW.

231. The PW Manual—which is incorporated into the Contract—establishes the P-Ticket, PAR and ESA quality control processes and requires PW to follow them.

232. PW's P-Ticket and PAR and ESA quality control processes are set forth in the PW Manual, and are therefore part of the government-approved testing processes that are required to be followed under the Contract to ensure that Work Specifications for testing and production are adhered to, including, pursuant to 48 C.F.R. §§ 46.303 and 52.246–3, *see supra* ¶¶ 153–157. *See also supra* ¶¶ 162-166.

---

[10] Materials Control Lab is the quality control arm of PW.  It evaluates samples for proper characteristics and certifies that they meet specifications.  Example characteristics that MCL certifies are thickness, tensile strength, weld penetration, hardness, porosity and bond strength, as well as other qualities called out by contract.

1.     **The MCL P-Ticket system**

233.    The P-Ticket system is set forth in Section E of the PW Manual, which is incorporated into the Contract.

234.    P-Tickets and related records of production are required by the federal government to be retained for possible inspection.

235.    Under the P-Ticket system, representative production samples are required by contract to be sent to the company's MCL for quality testing and evaluation. The results of that testing and observations about the hardware produced are recorded in actual P-Tickets.

236.    For thermal spray coating applications of the kind Relator was tasked with completing, such testing is supposed to occur as often as daily, but typically occurs on a weekly basis.

237.    MCL is encouraged to witness testing if it has any concerns about production quality, or when a new part or production process is introduced to the manufacturing process.[11]

238.    The principal purpose of the P-Ticket system is to allow PW's MCL to evaluate production samples for quality compliance.

239.    A P-Ticket for coatings contains such information as sample material, specifications to follow, who made the sample (staff), shift, date and time, part numbers, program names (for robots or CNC), pertinent part work instruction operation numbers and any other MCL required information.

---

[11] A First Article Inspection (FAI) is a process used when introducing a new part and/or process for a production component. The FAI involves documenting the performance results in detail for the process, *i.e.* dimensions and visual appearances. The FAI provides significant oversight into quality, engineering and other characteristics to vet the process for full production. All FAI's are retained as records and are required at introduction and any major changes to the manufacturing processes.

240.    Critical to Relator's complaint, P-Tickets contain reference to the spray parameters, which establish the range of angles, standoff distances, gases, voltages, amperage, gun type, and other specific information about the part and its production.

241.    The MCL staff is required to compare the manufactured hardware or test sample and P-Tickets it receives from PW's various production facilities to the particular product's specifications.

242.    Employee #3 was one of the PW employees responsible for preparing the P-Tickets at Middletown for the spray testing. Upon information and belief, based on Relator's knowledge of the P-Ticket system, the PW employees who completed the contractually required MIRR would rely on information in the P-Tickets, including information from Employee #3.

243.    Any discrepancy between the test sample and a product's specifications, a production failure must be recorded.

244.    Following discovery of the discrepancy, the deviating hardware is removed from the manufacturing process. In this way, poor quality products are prevented from escaping PW facilities and entering use.

245.    Based upon the failed production practice and false testing observed by the Relator, the IBR sample tests could not have passed testing if the P-ticket system been implemented as dictated by the contractual requirements mandated by the United States Air Force and Department of Defense.

## 2.    ESA & PAR TESTING

246.    Based upon his near ten years of first-hand experience with the PW Manual, Relator also was trained in and had familiarity with the testing that was supposed to have been conducted by PW's Engineering Source Approval (ESA), the unit within PW that oversees quality control of newly manufactured parts.

247.    ESA procedures require PW plants to submit actual parts or representative samples of the hardware produced for testing and review by MCL and Quality Control.  When performing its function, the ESA oversees the tests and processing on these products, the results of which are recorded in Process Approval Records ("PAR").  The PAR is a record that verifies various aspects of production, including the chemical recipes used to prepare coatings to meet U.S. government contract specifications.

248.    The PAR also confirms that the spray geometries (*i.e.* the angle at which the spray gun is positioned relative to the hardware to be coated) are: (1) representative of the production hardware and (2) in-line with project specifications as defined by the U.S. government.

249.    A deliberately misaligned test sample with improper standoff distances and/or inappropriate spray recipe requires a PAR indicating a production failure.

250.    Because, from at least 2012 until Mr. Bonzani discovered and reported the fraud in 2015, the IBR sample tests deliberately misaligned test sample with improper standoff distances, those tests should have resulted in a PAR indicating a production failure.

251.    Oversight and certification of proper test specifications, including the alignment of test samples and proper standoff distances should have been observed, recorded and corrected by MCL, and, in particular, Employee #3, prior to Mr. Bonzani discovering and reporting the fraud in November, 2015.

252.    Under the PW Manual, the deliberately misaligned test samples with improper standoff distances were contractually required to have been witnessed, discovered, and corrected by ESA, and in particular, Employees #23 and #24, in the preparation of the PARs at least as early as 2012, but were not, even though the MCL was aware of the "cheating" on the testing.

253.     As described, below, however PW's corporate culture of studied indifference to testing obligations and procedures infected the PAR testing process, on which the Government must rely.

254.     During Relator's tenure at PW, he submitted various PARs to qualify parts.

255.     *Not once* in over three years did ESA staff ever observe and certify that any parts produced by the Relator were being sprayed in accordance with the spray recipes and work instructions.

256.     Relator is similarly unaware of any case in which an ESA staff member observed that spraying was done correctly at any PW facility.

257.     ESA staff regularly and routinely signed off on the processes sight unseen, violating contractual requirements as well as the most basic standards of quality control.

**V.      THE SCHEME TO DEFRAUD THE UNITED STATES THROUGH FALSE CERTIFICATIONS OF TESTING FOR *EVERY* F-22 ENGINE MANUFACTURED FOR THE UNITED STATES GOVERNMENT FROM AT LEAST 2012 THROUGH 2015**

**A.      RELATOR UNCOVERS THE FRAUD**

258.     On November 19, 2015, Relator was called from his post at the PW plant in East Hartford to deal with a spray coating problem in the PW facility at Middletown, Connecticut.

259.     Relator was informed by Employee #6, Business Unit Manager at East Hartford, that Employee #7 had tasked Relator to go to assist in Middletown on November 19, 2015 on a coatings problem.

260.     Employee #6 informed Relator that Employee #7 was asked by his superior, Employee #12 (also located at East Hartford) to direct Relator to assess the cause of the test

failures, and that Employee #12 had made the request to direct Relator to assess the cause of the test failures at the behest of unidentified management "at the VP level."

261.    Mr. Bonzani was informed by management and engineering personnel at the PW East Hartford plant that production engine cores in Middletown had been halted and that problem solution was critical to production.

262.    Relator was given background on the problem by his superiors.  Relator was informed that suddenly the Middletown facility could not pass a test piece for a knife-edge seals with PWA 53-37/53-11 coating used on IBRs for the F119 engine.

263.    Relator was informed that the Middletown facility had claimed to have passed samples for the prior three years on those parts.

264.    Relator was informed that the spray-coating of those parts for the F119 engine was performed in Middletown from November 2012, after having been moved from East Hartford.  Relator was directed to identify any changes in the process that might cause the apparent sudden failure in testing, so that production might resume.

265.    Relator was informed that, although the IBR sample tests had previously passed quality control testing, they were no longer able to do so.  No one in Middletown was able to rectify the problem or determine the cause for the failures.

266.    The problem was considered to be difficult to solve.  The specifications in the work instructions for production and testing of the spraying of the IBRs had not changed.

267.    Mr. Bonzani was therefore asked to go to the Middletown facility to determine whether there had been any change in the equipment or materials used for the IBR spray production techniques that might have caused the sample test pieces to fail this critical testing.

268.    Mr. Bonzani went to Middletown that day, as directed.

269.    Relator took with him a less experienced engineer, Employee #1, from the East Hartford location, as part of Relator's role in mentoring that employee in the trouble-shooting role.

270.    When Relator and Employee #1 arrived in Middletown, they were brought to the Materials Control Lab (MCL).

271.    They asked to see the samples that were failing.

272.    The MCL staff were defensive and would not show Relator and his colleague the results at that time.

273.    The MCL staff told Relator and his colleague to return to the MCL in an hour.

274.    Relator and his colleague went to inspect the spray booth setup with Employee # 3, the Acting Thermal Spray Engineer at the Middletown facility.

275.    When he arrived at the spray booth, Relator observed spray techniques that were improper.  He identified those techniques as being responsible for failed testing of pieces produced according to the test specifications.

276.    The equipment was a well-worn self-contained spray system, utilizing an Allen Bradley style manipulator with a Praxair SG-100 plasma gun.

277.    Mr. Bonzani was informed that no changes had been made, however, to the spray techniques, materials or equipment from 2012 through to the date of his troubleshooting.

278.    Based upon his observations and review of the information and equipment made available to Mr. Bonzani, the materials, equipment and techniques being used could not have produced a coating that could have passed testing according to the required work instructions, which PW is contractually required to follow consistent with the PW Manual.

279.    Mr. Bonzani sought to determine how testing could have passed previously for the duration of the manufacture of engines.

280.    Relator pressed Employee #3 whether anything about the spraying of the IBRs and/or testing had changed.

281.    Employee # 3 informed Mr. Bonzani that the production team had recently obtained a new test rig.

282.    Mr. Bonzani requested access to the old test rig.

283.    Relator asked Employee # 3 to see, and was shown, the old test apparatus.

284.    Comparison of the old and new test rig revealed that the old test rig was capable of being manipulated in a way that readily permitted intentional movement of the sample piece closer to the spray nozzle.

285.    On inspection, Mr. Bonzani immediately saw that the IBR sample tests could have previously passed inspection only through the use of the compromised and intentionally manipulated test rig.  The carefully constructed test rig allowed Middletown staff to modify testing parameters.

286.     The manipulated rig allowed for a more favorable spray distance of 3.5 inches instead of the six-plus inches dictated by geometry.

287.    The manipulated rig also set a more favorable incidence angle in order to produce acceptable sample test results.

288.    Mr. Bonzani determined that the cause for the recent test failure and production stoppage was not a new error.

289.    Rather, Mr. Bonzani determined that the test failure and production stoppage was the result of spray techniques, equipment and materials that should have resulted in failed

tests and stoppage of production for the entire duration of the production of F119 engines for the F-22 dating back to November, 2012.

290.    Relator quickly determined that the "plume" of the spray gun—that is, the outer-bounds of its effectiveness—being used was too short to reach the inner crevices of the engine component to create a knife edge seals.[12]

291.    Relator was informed that the same spray gun model had been used the entire time.

292.    Mr. Bonzani also determined that this defect had been hidden by the use of a test rig that, until it was replaced immediately preceding the work stoppage, was capable of being intentionally manipulated by PW staff.

293.    By manipulating the old test rig to move the sample piece closer to the spray nozzle, the production team was only then able to submit test samples that appeared to have the correct spray coating characteristics and qualities.

294.    Those sample pieces, however, did not accurately reflect the required characteristics and qualities created by the spray conditions of production as called for in work instructions and contract.  Because of the prior test manipulation, the samples were not Representative Samples of the production hardware.

295.    Therefore, defects arising in samples sprayed with the new test rig reflect defects in each-and-every IBR produced by PW and provided to and paid for by the government from 2012 until the work stoppage.

---

[12] To better understand the concept of a spray gun's plume, one might analogize to the use of spray paint to cover a wall or fence. The effectiveness of the painting will be impacted by the distance the painter is holding the can to the wall—too far away, and the surface of the fence will not be evenly coated.  Plasma guns work in much the same way. A plasma gun that is used to spray at a distance greater than the optimal distance will deposit an inferior coating that will not have the durability of a properly sprayed part.

296.     It was only after several hours that the MCL staff relented, and admitted to Relator and his Employee #1 how their previous samples had seemed to pass muster.

297.     Relator reviewed samples with Middletown Materials Control Lab staff who agreed that the knife edge samples showed improper coverage, lack of bond, and heavy oxides under microscope (dull, porous finish).

298.     Relator pressed the entire MCL staff to explain how tests could have possibly passed previously.

299.     Mr. Bonzani confirmed his assessment with MCL staff.

300.     Mr. Bonzani bluntly inquired of the MCL staff:  "how did they pass all these years?"

301.     When pressed directly, Employee # 2, a member of the MCL staff, informed Relator that in order to pass tests previously since spray-coating of the IBR had been conducted at Middletown beginning in late 2012, that they had "cheated in the past" by "moving the sample closer" to the thermal spray gun.

302.     MCL staff admitted that samples had been passed as being production worthy by use of a well-worn test rig manipulated to give a positive result.

303.     MCL staff therefore admitted to having known that the prior tests only passed inspection because the production team falsified the tests by changing the distance of the sample piece to the nozzle.

304.     Due to the compromised test apparatus, the test pieces were invalid.  Their use and subsequent certification for fitness occurred in violation of the FAR and DFAR regulations, and the processes required by the PW Manual, incorporated into and required by the Contract.

305.     After any prolonged use an engine, bearing these substandard knife edge seals will, over time, prematurely degrade and compromise engine life, fuel economy, thrust and effectiveness.

306.     At worst, the failure of the seal could easily cause catastrophic engine failure of the type experienced at NAS Fallon or Tyndall AFB.  A failed seal can release hard metal and ceramic debris throughout the engine at great velocity, not unlike shrapnel.

**B.     THE NATURE OF THE FRAUDULENT TESTING OF THE IBRS, FALSE CERTIFICATIONS OF CONFORMANCE WITH CONTRACT, AND SUBMISSIONS OF CLAIMS**

307.     The IBR is an expensive and complex component of the F119 engine.

308.     When the IBR is manufactured – including being sprayed to create the critical knife-edge seals well inside the turbine – the part itself cannot be readily or feasibly tested.

309.     Testing the coatings on the IBRs would require damaging or destroying the IBR.

310.     Any defect in the spray coating would therefore be hidden.

311.     Defects in spraying of the type observed by Relator are unlikely to be revealed on initial engine performance testing.  It is far more probable that they reveal themselves only over time due to engine wear, thus making them far more dangerous to flight safety.

312.     As a result of the manipulated test, the quality of actual production parts could not be determined, because they cannot be tested themselves. In validating thermal spray coating results, representative samples are routinely used.  Sample testing is used because testing the actual IBR would destroy the part.

313.     A part specific coating test validates that the specific part being sprayed is being coated properly to specification.

314.    There are two options for testing samples, the first is to coat and sacrifice an actual part.  This method is employed typically with high volume, low cost parts.  This is cost prohibitive in the case of more complex components such as IBRs.

315.    The proper sampling procedure is set forth in the PW Manual, which is incorporated into the Contract. *See* Ex. A at 180, Ex. B at 7.

316.    For complex and costly parts like an IBR, a representative sample is sprayed in a manner designed to duplicate the part geometry in question.  This would encompass the shape of the area to be coated and any surrounding areas that could impact the coatings.  These representative samples must be sprayed exactly as though they were actual engine parts in order to verify proper spray quality requirements are being met, including but not limited to same geometry, robot program and distances.

317.    Testing for conformance with contractual specifications of spraying of the IBR is therefore accomplished by use of a sample piece comprised of the sample material.  The sample piece is placed into a test apparatus – a "rig," and is then coated with material in conditions and according to strict specifications set forth in the Work Instructions, according to the process approved by the government pursuant to the FAR and is designed to mimic or reproduce the production environment. *See supra* ¶¶ 153–157. *See also supra* ¶¶ 162-166.

318.    The material is placed a specified distance from the spray nozzle, at a specified angle, and with a specified nozzle and material used.

319.    This test sample piece therefore serves as a proxy for the IBR itself to test whether the IBR meets technical specifications.

320.    For this reason, any defect in the test sample means that the actual IBR produced under those same conditions must possess the same defect.

321.   The fraudulent sample testing of the IBRs, means that a representative sample was not actually used as called for by the Work Instructions, and required by FAR 48 C.F.R. §§ 46.302 and 52.246–2, *see supra* ¶¶ 153–157. *See also supra* ¶¶ 162-166.

322.   The Contract requires adherence to the PW Manual, which, in turn, requires that the Work Instructions be created, sets forth the processes required for creating the Work Instructions, requires adherence to the Work Instructions, and requires corrective action for any deviation from the Work Instructions.

323.   For an engine to conform with contract on Form DD250, each part in the engine – including the IBR – must have been produced and tested according to the strict specifications of the work instructions.

324.   The IBRs for the engine cores in the F119 engines for the Contract Award ID# FA861108C2896 long-term sustainment contract were sprayed and tested in PW's Middletown facility from at least as early as 2012.

325.   Clear evidence exists – not limited to the admissions of PW personnel—that PW falsified sample testing for every IBR placed into an engine core for the entirety of that time-period.

326.   Therefore PW placed faulty IBRs into every engine core placed into every F119 engine provided to the United States Government under the Contract.

327.   Every engine provided to the Government under this contract contained an IBR that was manufactured in violation of PW's work instructions for testing and production, which, in turn, was in violation of the higher-level quality requirement in the Contract.

328.   Every engine provided to the government under this contract was falsely certified as being compliant with testing and reporting requirements obligated by the Contract.

329.    Every engine provided to the Government under this Contract therefore violated the government approved testing processes required under FAR 48 C.F.R. §§ 46.302 and 52.246–2, *see supra* ¶¶ 153–157. *See also supra* ¶¶ 162-166.

330.    Every engine provided to the Government under the Contract also violated the higher-level quality requirements set forth in the PW Manual.

331.    For every engine provided to the Government under the Contract that was manufactured at the Middletown facility from 2102 through 2015 PW submitted a claim in the form of a DD Form 250 or its electronic equivalent that falsely stated that the engines conformed to contract.

332.    PW has received no less than $3.7 Billion from the United States Air Force under the Contract as a result of its false certifications of conformance with contract.

## C.    RELATOR REPORTS THE FRAUD

333.    Not only did Mr. Bonzani discover the failed test rig, he identified and reported the reason for the flawed parts passing into production: PW engineers were using a spray gun of too large a diameter and too short of a plume.  As a result, sprayed coating did not sufficiently reach all parts of the seal.

334.    Mr. Bonzani reported his findings the day he discovered them (November 19, 2015).  Mr. Bonzani informed staff and management in both the Middletown and East Hartford facilities including, but not limited to, PW management.

335.    Relator informed Employee # 6, one of his superiors, directly in a phone call at approximately 5:00 p.m. on November 19, 2015 of the results of his assessment – engineering staff in Middletown were "scamming," *i.e.*, falsifying tests.

336.    Relator informed the Manager at Middletown (Employee # 5), and the Product Director at Middletown (Employee # 4) that the test rig being used was defective and was being manipulated in order to pass quality assurance tests.

337.    Relator informed Employee # 6 that there was "funny business" regarding the mounting of the samples, according to the MCL staff.

338.    Relator informed Employee # 6 of why the spray-coating was not passing tests (that the gun to work distance was too far, helium was too difficult to work with for 53-37 and that the previous sample holder was not proper or representative).

339.    Relator confronted Employee # 3 about the cheating on the tests reported by the MCL staff.  Employee # 3 did not deny the cheating.  To the contrary, he appeared to acknowledge awareness of the defect, but that he was "stuck with it" from a previous engineer.

340.    Relator also informed Employee # 14, Staff Engineer at East Hartford that the Middletown facility of the defective testing and the problems with the spray-coating.

341.    The next day, November 20, 2015, Relator informed many others in East Hartford of the falsified testing and spray-coating problems with the IBR in Middletown.

342.    The following morning after going to Middletown, Relator attended a previously scheduled Annual Staff Meeting in East Hartford.

343.    At the meeting, Relator informed other co-workers, Employee #8 and Employee # 9, that the Middletown facility was cheating on the test samples.

344.    Both co-workers agreed with Relator's assessment of the reasons that test samples were failing absent the use of the old defective test apparatus that was subject to manipulation.  Both co-workers acknowledged a company-wide "common knowledge" about

the Middletown facility having a reputation for quality problems, including an inability to pass test samples.

345.    While at the annual staff meeting, Employee #7 called Relator for an update. Relator suggested to Employee #7 that the spray-coating of the IBR should be moved to East Hartford in order to resume production.

346.    Relator informed Employee #7 about the cheating on the tests previously, informing him that there was "funny business" with the testing.

347.    Employee # 7 did not respond to the Relator's allegations.  Instead, he asked how rapidly PW could move the spray- coating of the IBRs to East Hartford in order to resume production.

348.    Employee # 7 asked the Relator how long it would take to begin spray-coating of the IBRs in East Hartford and resume production.  Relator informed him that he estimated approximately four days.  Employee # 7 asked Relator if he could work the weekend, given how critical this was to production.  Relator agreed to do so.

349.    Relator spoke to Employee # 13, MCL Staff in East Hartford, around mid-day. Relator informed that employee that the Middletown facility had been cheating on the IBR spray-coating sample testing.

350.    Immediately thereafter, at around 1:00 p.m., Relator was suspended and escorted from the East Hartford facility, as described in greater detail in Part IV.A.

351.    Despite Mr. Bonzani's suspension, immediately following his report, PW again attempted to conduct the thermal spraying of the knife-edge seals at the Middletown facility. Although new spray equipment was purchased, PW continued, however, to use the same spray gun (SG100) and testing apparatus that caused the test failures after replacement of the old test

apparatus.  Not surprisingly, the parts could not pass a *legitimate* quality control test even using the new spray apparatus.

## VI. DEFENDANTS ONGOING CONCEALMENT OF, AND CONTINUED FAILURE TO DISCLOSE, THE FRAUDULENT TESTING FOR *EVERY* F-22 ENGINE MANUFACTURED FOR THE UNITED STATES GOVERNMENT FROM AT LEAST 2012 THROUGH 2015.

352.    When Mr. Bonzani uncovered the fraudulent testing and reported to management at East Hartford that false testing had been occurring since at least as early as 2012, Defendants promptly sealed Relator off from the company.  He was isolated.

353.    To prevent Mr. Bonzani from learning any more facts about the fraud, and to seek to continue to hide that PW had been fraudulently testing a critical component of the engine core since at least 2012, Defendants took steps to retaliate against and silence Mr. Bonzani, as described below.

354.    Based upon PW's reaction to Mr. Bonzani reporting the fraud, including taking immediate steps to prevent Mr. Bonzani from learning more about the fraud, Mr. Bonzani avers that PW did not inform the Government that it had learned of falsified testing.  Instead, as described below, PW continued to conceal the fraud.

### A. *IMMEDIATELY* FOLLOWING RELATOR'S REPORT OF MISFEASANCE, HE WAS ESCORTED FROM THE PREMISES, SUSPENDED, AND TERMINATED

355.    On November 20, 2105 – the day following his trip to the PW Middletown facility on November 19, 2015— Relator was abruptly and without prior warning or notice suspended by Defendants and escorted from the PW East Hartford premises.  Ninety days thereafter Relator was advised by telephone that he was terminated.

356.    At approximately 5:00 p.m. on November 19, 2015, following Relator's review and assessment of the false testing at the PW Middletown facility, Relator called Employee #

6, the Business Unit Manager at the PW East Hartford facility to inform him of the manipulated false testing and the contractually improper spray procedures that had been performed at the Middletown facility from late 2012 through November 2015. This same information was again relayed to the Business Unit Manager during a meeting in the East Hartford facility in the morning of November 20, 2015.

357.    On November 19, 2015, following Relator's review and assessment of the failed testing at the PW Middletown facility, during a meeting in the Middletown facility, Relator informed the Product Director, the Operations Manager, as well as other engineers and staff at the Middletown facility of the manipulated false testing and the contractually improper spray procedures.

358.    As supervising managers of a well-established government contractor, the persons to whom the Relator reported the false testing, they were well aware of the FCA implications of the evidence that the Relator presented.

359.    These managers understood that the Relator had reported that false claims had been made as to quality testing results in order for production of the F119 engine to continue and for PW to be paid on the submission of claims for payment on the delivery of those engines.

360.    The following morning, Relator attended a previously scheduled Annual Staff Meeting in East Hartford.

361.    At the meeting, Relator informed other co-workers, Employee # 8 and Employee # 9, that the Middletown facility was cheating on the test samples.

362.    Both co-workers agreed with Relator's assessment of the reason that test samples were failing absent the use of the old defective test apparatus. Both co-workers

acknowledged a company-wide "common knowledge" about the Middletown facility having a reputation for quality problems, including an inability to pass samples.

363.    Later that same morning, while still at the annual staff meeting, Employee # 7, the Product Director at East Hartford, called Relator for an update. Relator suggested to that manager that the spray-coating of the IBR should be moved to East Hartford in order to resume production.  Relator advised that the spraying had to be moved from Middletown due to a disregard of contractually mandated test procedures.

364.    Relator informed Employee # 7 about the cheating on the tests previously, informing him that there was "funny business" with the testing.  Employee # 7, however, was most interested determining how rapidly PW could move the spray-coating of the IBRs to East Hartford in order to resume production.

365.    Employee # 7 asked the Relator how long it would take to begin spray-coating of the IBRs in East Hartford and resume production.  Relator informed Employee # 7 that he estimated approximately four days.  He asked Relator if he could work the weekend, given how critical this was to production.  Relator agreed to do so.

366.    Relator spoke to Employee # 13, MCL Staff in East Hartford, around mid-day. Relator informed that manager that the Middletown facility had been cheating on the IBR spray-coating sample testing.

367.    Shortly thereafter, during the staff meeting, Employee # 6 received a call and informed Relator that he was to report to the Secure Security office in M-Building immediately.

368.    Relator left the staff meeting, and was seated in a room with the Head of Government Security Compliance and three attorneys for PW.

369.     Relator was informed by the Head of Government security and the three PW attorneys that it had been brought to their attention that Relator owned two businesses.

370.     Relator informed the Head of Government Security and the three attorneys for PW that he had disclosed his ownership of business at the time of hire, both orally and writing.

371.     Relator was interrogated for over an hour concerning his ownership of two businesses. The two businesses were his ownership of real estate property and a non-functioning consulting business that had never billed a single client.

372.     Relator advised that he was not pursuing and had not pursued his consulting business since he took the position with PW.  He offered to provide, and in fact did provide, his tax returns to show that no income was earned for the business at any time and that no work was ever performed by the company before or since he started with PW.  Relator further advised that the other business only involved his ownership of a building in which he leased space to various commercial tenants.

373.     Relator was then escorted to his desk, had his laptops confiscated by security, and was immediately escorted out of the facility.

374.     Relator was informed that he was not permitted to collect, and was prohibited from collecting, even his personal belongings.  Relator was informed by security that PW would contact him as needed.

375.     He was escorted from the premises in front of his colleagues.  Relator was advised that he would be contacted as needed.  Relator was ordered not to contact anyone from or at PW.

376.     Up to the time of his initial suspension, Mr. Bonzani had been receiving PW's highest performance reviews.  More specifically, his supervisor noted:

> "Hands down, Peter is a great addition to our team.  He is often sought after for technical advice.  This was evident with his support of Aftermarket, Surface Treat and Combustion Business Units.  There are only a handful of folks in country that can match the technical skills and knowledge that Peter embodies."

(Employee #10, 4/14/2014).

377.    There was no contact whatsoever from Defendants until ninety days later when Relator received a phone call and was told he was terminated.  Defendants then conducted a security de-briefing over the telephone.

378.    Within one day of Relator's wrongful termination, Defendants made false and defaming statements to numerous PW employees regarding Relator's termination, which led to the same defamatory information being made available to other entities and companies, thereby preventing Relator from securing other employment.

379.    Said defamatory statements also caused Relator to suffer extreme emotional distress and angst, as well as significantly harming Relator's reputation and ability to provide for his family.

380.    Upon information and belief, based upon conversations with Employee #16 following Relator's wrongful termination, Defendants made false statements to the United States regarding Relator's Security Clearance, thereby further damaging Relator's reputation and preventing Relator from securing other employment requiring Security Clearance.

### B.    NO LONGER ABLE TO CHEAT ON TESTING IN THE SAME WAY, PRODUCTION RESUMED ONLY AFTER PW OUTSOURCED SPRAY COATING, AND PRODUCTION RESUMED AT PW ONLY AFTER PW MADE CHANGES TO SPRAY METHODS AND EQUIPMENT CONSISTENT WITH MR. BONZANI'S RECOMMENDATIONS

381.    Immediately following the Relator's November 19, 2015 report, PW Middletown disposed of the original spray equipment, but continued to employ the same model

71

SG-100 gun, somehow expecting a result different from that predicted by Mr. Bonzani.  It purchased entirely new spray equipment from Praxair Surface Technologies.

382.   In December 2015 while suspended, Relator complained to an employee of PW that the MCL at PW had admitted to cheating on tests, and that PW had failed to act.

383.   PW could not produce samples that passed appropriate quality control tests in the same manner as the old rigging.  After time, PW surrendered this aspect of production to outside vendors.

384.   In late 2017, another PW coatings thermal spray expert, Employee # 17, from East Hartford admitted to being unable to assist Middletown in spraying specific parts successfully for the past two years.  He noted that Middletown had been spraying improperly, using a gun with too small a spray plume and an improper undocumented orifice change, since at least 1993.   He confirmed Mr. Bonzani's November, 2015 observations and reports.

385.   According to Employee # 17, at some point in time in 1993, Middletown staff had altered the spray systems themselves.  Staff failed to record the process changes and requalify all spray parameters for coatings.  Relator fears that as much as twenty-two years' worth of suspect hardware—obvious product quality "escapes"—have been put into service.

386.   Relator has first-hand knowledge that as recently as March, 2018, PW still had no independent ability to spray knife edge seals on the F119 hardware in Middletown, despite years of work on this problem by PW's top coatings employees.

387.   On April 30, 2018, the Relator was in conversation with an outside third party, Employee # 18, who had recently been working at PW installing new spray equipment.

388.   In an unprompted conversation, the Praxair employee advised Mr. Bonzani that PW continued to: spray IBRs at the wrong 6 inch (or more) distance; use a plasma spray gun

that had too small a spray plume; and was still "scamming on samples".  The substandard samples had been sent out to other PW facilities in East Hartford, CT and North Berwick, ME with the hope that the samples might pass there.

389.    It is only with its recent admissions by Robert LeDuc, that PW MCL now requires a much higher level of oversight and quality scrutiny for all suppliers specifically and particularly for coatings.  Apparently, selective data release is no longer the rule.  Vendors are no longer allowed to outsource the coatings analysis to third party laboratories. All coating analysis must be completed in-house and the processing and staff are required to be certified by PW MCL.

390.    In June, 2018, Relator learned from Employee #19 that sometime earlier in the spring of 2018, PW finally acknowledged the insanity of continued use of the same wrongly sized spray gun and purchased a different model spray gun – a previously recommended corrective action by Mr. Bonzani three years earlier.

391.    During the course of the Relator's tenure at PW, he frequently referred to the ASM handbook or manual, a multi-volume reference, produced by the American Section of the International Society of Materials Testing.

392.    The ASM manual is universally recognized as setting the standards for proper material spray techniques and the processing of spray coatings.

393.    It is often the case that the slightest deviations from ASM directions cause the release of escaped substandard product as observed and predicted by Mr. Bonzani.

394.    Mr. Bonzani's observation of substandard samples sprayed from a distance of six inches is predicted on pages 61 and 85 of the ASM manual.  The manual dictates a proper spray standoff distance, which in the case of the SG-100 is approximately 3.5 inches.  That

proximity can only be achieved within the confines of a PW jet engine through the use of a proper model spray gun, like the one recommended by Mr. Bonzani.

## VII.   PW SUBMITTED FALSE CERTIFICATIONS OF TESTING AND DID NOT REPORT THE FALSE TESTING AFTER IT WAS UNCOVERED

395.   Because PW took steps to escort Mr. Bonzani from the premises immediately after reporting the scope of the historical fraud to PW management in East Hartford, Mr. Bonzani was prevented by PW from gathering additional facts about the false certifications made by PW.

396.   Based upon: (1)  the sudden cessation of production in November 2015 with the use of the new test rig that could not be manipulated in the same manner as it had been since 2012; (2) the admission that PW had been cheating; and (3) PW's immediate steps to prevent Mr. Bonzani from learning more about the fraud, Mr. Bonzani avers that it is implausible that PW did not falsely certify that the engines and each part conformed to contract.

397.   For those same reasons, Mr. Bonzani avers that PW falsely certified, between at least as early as 2012 through the date that production shut down in 2015 that the IBRs had been sample tested according to the Work Instructions, which PW must follow to comply with the Contract's higher-level quality requirements.

398.   For the same reasons, Mr. Bonzani avers that PW falsely certified that testing pursuant to FAR 48 C.F.R. §§ 46.302 and 52.246–2 had been conducted. *See supra* ¶¶ 153– 157. *See also supra* ¶¶ 162-166.

399.   Although all engines produced by PW under this Contract did not conform to the Contract, PW falsely certified that they did on the MIRR (Form 250 or WAWF) submitted to the Government.

## VIII.   DEFENDANTS' CORPORATE CULTURE OF FALSE TESTING COMPANY-WIDE

400.    In April 2014, Mr. Bonzani was heavily recruited to join PW as a permanent employee.  After four offers, he took this step reluctantly. [13] He accepted a position as Staff Engineer in the Advanced Coatings Department in Hot Section Module Center ("HSMC") North at PW's facility in East Hartford.

401.    Prior to April, 2014, Mr. Bonzani had been called upon multiple times to consult and assist on similar spray coating issues in multiple PW production facilities.

402.    While at PW, he received excellent evaluations for his performance on the job.

403.    During the course of his employment, Mr. Bonzani was consulted on at least four separate quality control failures occurring in different PW manufacturing sites.

404.    "Durability testing" is generally understood to be a subset of reliability testing. Reliability is intended to identify mechanical problems before they occur in the field.  It seeks to prevent unexpected interruptions in service and is tested in an actual use environment.

405.    The generally accepted definition of durability testing is a performance test performed over time under various conditions.

406.    Durability testing is intended to determine reliability over time.

407.    Durability testing requires the use of prequalified samples.  Selection of appropriate samples and perfection of the simulated testing environment is critical to the quality of the durability test.

---

[13] Prior to joining the company full-time, Mr. Bonzani formed Aerospace Robotic Consultants, LLC ("ARC").  This entity was created to provide consulting services in connection with commercial spraying and coating. The company was only ever active in the records of the Connecticut Secretary of State. ARC never provided any actual consulting services. It had no customers or contracts, and never generated any income.

408.     During the three plus years that Relator, Peter Bonzani, worked at PW, he observed numerous examples of flawed durability testing and deliberately flawed selection of test samples.

409.     As a result of those substandard processes, substandard engine parts were permitted to "escape" into production.

410.     Corporate President, Robert Leduc, admitted that PW's deliberately compromised durability testing and failed oversight were directly related to the recent premature breakdown of PW commercial engines in Europe and India.

411.     Upon information and belief, PW produced engine parts for U.S. military customers using the same or similar intentionally manipulated and/or recklessly inadequate durability testing procedures.

412.     Upon information and belief, these failures in durability testing have either been concealed or falsified in PW's production records.

413.     Upon information and belief, these failures of durability testing and quality control oversight were contributing factors in the catastrophic failures of two military jets in April 2018 powered by F119 engines.

414.     F119 engines and their repair parts used in maintenance were built at Defendants' plant in Middletown, Connecticut.

415.     The flawed testing also deliberately concealed inadequate spray techniques at other PW locations.

416.     Based on official reports made to Mr. Bonzani, the very same flawed spray techniques and inappropriate equipment was employed at the PW facility in San Antonio.  F100 engines sprayed at the San Antonio PW facility between 1992 and 2014 are also at risk for

premature wear and inflight shut down.  Those engines are now also subject to premature wear and possible in-flight catastrophic failure as their parts are stressed in use over time.

417.    Unlike Middletown, where it was knife edge seals being sprayed, in San Antonio, it was a different coating and jet engine part, the outer combustor coated with thermal barrier coating, that was sprayed using the wrong equipment resulting in substandard coating.

418.    The hazards posed by Defendants' intentional and/or reckless conduct are neither hypothetical nor hyperbolic.

419.    On February 9, 2018, Defendant PW issued a press release, acknowledging defects in the knife edge seals of the high pressure compressor PW 1100G-JM engine used to power the Airbus 320 NEO plane.

420.    Subsequently, the U.S. Federal Aviation Administration, the European Aviation Safety Agency, and the Indian Directorate-General of Civil Aviation each issued air-worthiness directives, or their equivalents, concerning these engines.  These directives warned that PW's engines were prone to in-flight shutdown.

421.    PW considered the matter so serious as to halt all shipments of new engines to Airbus, which is one of PW's largest customers.

422.    On March 16, 2018 PW President, Robert Leduc, addressed the grounding of the European airbus planes in a public meeting with financial analysts. Mr. Leduc admitted that the failures in production were due to a ***company-wide breakdown in durability quality testing***. He admitted that:

> ***PW did not get our durability testing done before we went into service.*** We didn't. We didn't get [Extended Operations] certified for almost a year after we went into service…[PW] basically took the supplier's design at face value.

(Emphasis added).

423.    On April 6, 2018, at Tyndall Air Force Base, an F-22 Raptor—which is powered by the PW F119 engines that are the subject of Relator's Second Amended Complaint—was forced to make an emergency landing after its engine failed mid-flight. *Just one week later*, on April 16, 2018, another F22 Raptor, employing an F119 engine, was forced to land *without landing gear* moments after its engine failed *mid-take-off*.

424.    The root cause analysis of those barely avoided in-flight disasters is, on information and belief, highly classified.

A.    San Antonio/Springdale Issue – April-May 2014

425.    In the spring of 2014, Mr. Bonzani uncovered evidence of product "escapes"—the release of malfunctioning hardware from the manufacturer to customers for use—from the PW facility in San Antonio, Texas over a period of nearly twenty years, which, upon information and belief, *have never been publicly reported or remediated*.

426.    Beginning in the early 1990s, PW had operated a maintenance plant for F100 engines in San Antonio, Texas. The plant repaired or replaced hundreds, if not thousands, of Middletown manufactured parts for United States Air Force planes.

427.    When the plant closed in 2013, the spraying and coating functions were transferred to the PW plant in Springdale, Arkansas. Not long after spraying began at Springdale, the engineers encountered serious issues passing test samples of the F100-220 outer combustor (P/N 4073523) through quality control testing.

428.    Relator was told that the engineers in Springdale were using the same spray parameters used in San Antonio.  He immediately determined that the spray coating recipe being used would not yield the passing samples that had been recorded in the company records and required by contract.

429.    Relator's inquiry determined that the long-running plant in San Antonio—and its successor, Springdale—did not employ a plasma spray gun with a large enough plume for spraying the narrow crevices of the jet engines repaired at those locations.  The coating stream created by the Praxair SG100 gun used at those plants was incapable of reaching the inner diameter of the engine's  outer combustor which is adjacent to the heat shields.

430.    The failure to spray all surfaces of the engine created faulty parts in countless new and recycled engines occurred over a *period of almost twenty years*.

431.    Upon information and belief, PW has done nothing to remediate the "escaped" hardware created by the San Antonio plant between 1993 and Relator's sounding of the alarm.

432.    Relator was shown each of the failed samples.

433.    Relator worked with the East Hartford Material Control Lab supervisor, Employee # 13.  The inspected samples revealed the flaws of improper coating, insufficient coverage, lack of bond (non-adhering coating), porosity in the band coat, oxide stringers and voids (uncovered areas).

434.    Relator has never been advised that remedial action had been taken.

435.    On information and belief, no report of the faulty parts or unreliable testing of those parts was made to the government and other governments under the Foreign Military Sales Program (FMSP).

436.    Relator reports that the spray-gun problem was so obvious that it could not have gone undetected. He explains that the escapes should have been discovered by the Repair Source Approval ("RSA"), a department within PW, that is similar to ESA, which provides quality control for parts returned for repairs.

437.   RSA should have observed the initial parts sprayed as part of the First Article Inspection Process, discussed previously.

438.   The use of the improper spray gun also should also have been identified by the inspectors preparing the PARs corresponding to the sprayed parts.

439.   Upon information and belief, to the extent that these records exist, they falsely certify compliance with the spraying specifications such as PWA 265.

440.   On or around May 1, 2014, Relator raised the issues of spray gun model and faulty parts with PW management. Employee 20, Coatings Discipline Chief for GSE, questioned whether the required FAI and PAR observations had taken place and, if so, why such an obvious issue continued to occur.  There was no response.

441.   Relator advised that a different spray gun, the Praxair SG2700 gun, would have sufficient range and maneuverability to reach all areas of the product.

442.   This spray gun was employed at Springdale during the summer of 2014 upon Relator's suggestion and the problem samples then passed MCL approval.

443.   Mr. Bonzani complained about the quality breakdown to Employees #21, 8, and 13.  More explicitly, Relator stated that the parts sprayed in San Antonio for many years prior had not been sprayed properly.

444.   This improperly sprayed hardware "escaped" quality control and was then and now in engines on runways, or are currently sitting in customer inventory, waiting to be put into service.

### B.    Chengdu Issue, Early 2015

445.    In early 2015, Mr. Bonzani was asked by a colleague at the PW MCL, Employee #13, to analyze a series of suspect samples received by the MCL in Connecticut

from a PW plant in Chengdu, China.  This analysis was part of a periodic review of production

quality at remote sites by PW's central MCL.

446.    Relator's analysis of the P-Ticket samples determined that the bond coat layer

was well outside contract specifications for interface, porosity, and oxide contamination.[14]

Employee # 13 concurred with Relator's findings.  Employee # 13 also admitted to Relator that

these precise samples—and more—going back months and likely years—had passed quality

control checks in China.  In each instance, the substandard coatings at issue had: (1) been

applied to knife edge seals; (2) passed final inspection, and (3) been delivered to the customers.

447.    These unacceptable improperly sprayed coatings from Chengdu created

multiple product quality escapes.

448.    These types of samples should have been recorded as production failures.

449.    A record of those reviews, along with the accompanying prior samples and P-

Tickets created in Chengdu, are required to be maintained and had to have been falsely

certified by Chengdu MCL staff.

450.    Relator's observations of substandard production quality were reported to GSE

and MCL supervisors at the highest level of PW.

451.    Relator's supervisors were informed that the flawed coatings had been in

production for at least a year.

452.    Upon information and belief, no corrective action was taken.

---

[14] Interface is the area where the coating is bonded to the substrate material, porosity is the volume fraction
of pores in the coating and oxide contamination is when the metal is "rusted" or oxidized where it should not be.

453.    Although Relator cannot be certain on which airplane engines the Chengdu knife edge seals were being used, he does know that knife edge seal issues have recently grounded PW1100G engines as reported in recent news articles.

454.    These grounded engines were likely produced in Chengdu, along with legacy engine programs such as the JT9D, which have been used on some military purposed 747s as well as some other commercial airplanes repurposed for military use.

### C.    East Hartford Issue, Summer 2015

455.    Robert Leduc's March 2018 admission concerning PW's failure to employ proper durability testing relates directly to issues raised by Mr. Bonzani in the summer of 2015 and later at Middletown on November 19, 2015.

456.    While at East Hartford in the summer of 2015, Mr. Bonzani approached a PW Quality Engineer, Employee #22, about coating flaws Mr. Bonzani observed at the PW plant in East Hartford.

457.    Mr. Bonzani is constrained by the classified nature of the program from describing the precise nature of the problem identified and the alarms he raised.  It suffices to say, for purposes of this Second Amended Complaint, that flaws appeared in coatings.

458.    Employee # 22 admitted that the coatings did not stand up to contractual requirements for durability – just as Mr. Bonzani suspected.  Furthermore, Person 6 advised that management was aware of the issue.

459.    Nothing was done, in violation of the company's contractual duty to investigate and report the flaws.

460.    Employee # 22 conveyed his disappointment that the issue was not being properly addressed, and that he had previously raised it to management.

461.    Had these parts gone through and passed the required durability testing, the problem would have been obvious.

### D.    RECENT PW ADMISSIONS AND ENGINE FAILURES CONFIRM THE RELATOR'S ALLEGATIONS OF FRAUD

462.    Defendant PW's President, Robert LeDuc's, admission on March 16, 2018 that PW was not conducting durability testing confirmed the complaints, claims, and reports that Mr. Bonzani made during his more than three years at Defendant PW.

463.    PW's February press release admitting the defects in the knife edge seals of the high-pressure compressor PW 1100G-JM engine used to power the Airbus A320 NEO plane allowed Relator to make the connection between the failed samples from Chengdu, the lack of quality controls he observed in product from the various PW facilities in the United States and the compromised tests and products in Middletown.

464.    It is now clear that the very same process that had failed to take place, as witnessed by Mr. Bonzani in East Hartford and Middletown, had failed to take place elsewhere.

465.    A common denominator between what Mr. Bonzani observed and Mr. Leduc admitted was PW's continued failure to produce properly manufactured knife edge seals – a critical component to jet engine propulsion that appears in all jet engines.

466.    On information and belief, it is more than coincidental that both military and commercial engines built by PW have experienced engine failure so close in time.

467.    Moreover, the fact that that type of premature part failure (knife edge seals) is so pervasive to all jet engines is, itself, a prime indicator of a collapse of quality control in chemical recipe and spray techniques – two areas of Relator's academic training and technical experience.

IX.     **THE FALSE CLAIMS ACT**

468.    The FCA imposes liability upon any person who: (a)"knowingly presents or causes to be presented [to the government] a false or fraudulent claim for payment or approval"; or (b)"knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) and (B), as amended.

469.    The FCA imposes liability not only for intentionally false or fraudulent conduct, but also where an individual "acts in deliberate ignorance of the truth or falsity of the information" or "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(ii) or (iii).

470.    The FCA defines claim as (A) "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

471.    The FCA defines material as "having a natural tendency to influence or be capable of influencing the payment or receipt of property or money." 31 U.S.C. § 3729(b)(4).

## COUNT 1

### Violation of the False Claims Act – Presentation of False Claims

472.     Relator realleges and incorporates paragraphs 1-471 of this Fourth Amended Complaint as if fully set forth herein.

473.     In performing the acts described above, Defendants, through their own acts or through the acts of their officers, employees or agents, knowingly and/or recklessly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

474.     These claims were false and fraudulent because Defendants made claims for payments knowing that they had supplied engines to the Government that did not conform to contractual requirements and had falsely manipulated test results.

475.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments that would otherwise have not been paid and/or were ineligible for payment, which resulted in its being damaged in an amount to be determined.

476.     By reason of Defendants' wrongful conduct, the United States has been damaged by the payment of false and fraudulent claims.

**WHEREFORE**, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

(1)     Three times the amount of actual damages which the United States has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $10,781 and not more than $21,562 for each false claim which Defendants presented or caused to be presented to the United States;

(3)     Pre- and post-judgment interest; and

(4)     All costs incurred in bringing this action.

To the Relator:

(1)    The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs;

(4)    Should the government elect to seek an alternate remedy, the maximum allowed pursuant to § 3730(c)(5); and

(5)    Such further relief as this Court deems equitable and just.

## COUNT II

### Violation of False Claims Act – False Statements

477.    Relator realleges and incorporates paragraphs 1- 476 of this Fourth Amended Complaint as if fully set forth herein.

478.    In performing the acts described above, Defendants through their own acts or through the acts of their officers, agents or employees, knowingly made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

479.    Such records or statements include the false certifications alleged herein.

480.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments which resulted in its being damaged in an amount to be determined.

481.    By reason of each Defendants' wrongful conduct, the United States has been damaged by the payment of false and fraudulent claims.

**WHEREFORE**, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

(1)    Three times the amount of actual damages which the United States has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $10,781 and not more than $21,562 for each false record or statement Defendants made to get false or fraudulent claims paid or approved by the Government;

(3)    Pre- and post-judgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs;

(4)    Should the government elect to seek an alternate remedy, the maximum allowed pursuant to § 3730(c)(5); and

(5)    Such further relief as this Court deems equitable and just.

## COUNT III

### Retaliation and Violation of 31 U.S.C. § 3730

482.    Relator realleges and incorporates paragraphs 1-481 of this Fourth Amended Complaint as if fully set forth here.

483.    At all times material hereto, Defendants were an employer covered by 31 U.S.C. § 3730(h).  Section 3730(h) precludes retaliation, suspension, threats, harassment and other discriminatory conduct against employees who investigate, provide testimony or

assistance in any action filed or to be filed under the FCA or make any efforts to stop one or more violations of the FCA.

484.     The termination of Relator's employment and harassment as set forth above were in violation of 31 U.S. C.§ 3730(h).

485.     As a direct and proximate result of the termination, retaliation and harassment by Defendants, Relator suffered and incurred and continues to suffer and incur loss of compensation and other benefits, harm and damage to reputation and emotional distress.

486.     Defendants' conduct was and is malicious, fraudulent and oppressive in violation of public policy and in violation of 31 U.S.C. § 3730(h).

**WHEREFORE**, Relator requests that judgment be entered against Defendants in his favor and that he be awarded any and all relief pursuant to 31 U.S. C. § 3730(h) including, but not limited to:

a.     Two times the amount of back pay;

b.     Interest on back pay;

c.     Any and all other compensatory and special damages;

d.     All litigation costs and reasonable attorney's fees;

e.     Punitive damages; and

f.     Any and such further relief that this Court deems appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

Relator demands a jury trial on all claims alleged herein.

Respectfully submitted,

*/s/ Michael M. Mustokoff*
DUANE MORRIS LLP

Michael M. Mustokoff, Esquire
mmustokoff@duanemorris.com
Daniel R. Walworth, Esquire
dwalworth@duanemorris.com
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1810

AETON LAW PARTNERS

N. Kane Bennett, Esquire
nkb@aetonlaw.com
101 Centerpoint Drive, #105
Middletown, CT  06457
(860) 724-2163

Attorneys for Plaintiff/Relator

## <u>CERTIFICATE OF SERVICE</u>

I, Michael M. Mustokoff, hereby certify that, on April 15, 2019, a true and correct copy of the foregoing Fourth Amended Complaint, together with the corresponding exhibits, was served via the Court's electronic filing system on the clerk and counsel of record.


*/s/ Michael M. Mustokoff*

Michael M. Mustokoff