UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>EX. REL PETER J. BONZANI, JR,<br>    Plaintiff,<br><br>v.<br><br>UNITED TECHNOLOGIES<br>CORPORATION ET AL.,<br>    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL CASE NO.<br>3:16-CV-1730 (JCH)<br><br><br><br>OCTOBER 22, 2019 |

**RULING RE: DEFENDANTS' MOTION TO DISMISS THE FOURTH
AMENDED COMPLAINT (DOC. NO. 97) AND DEFENDANT'S
MOTION TO FILE RESPONSE TO PLAINTIFF'S SUR-REPLY (DOC NO. 107)**

**I.     INTRODUCTION**

Plaintiff/Relator Peter J. Bonzani, Jr. ("Bonzani") filed suit, on behalf of the United States of America, under the False Claims Act, section 3729 et seq. of title 31 of the United States Code, against defendants United Technologies Corporation ("UTC") and Pratt and Whitney ("PW") (collectively "defendants"). See Fourth Amended Complaint ("FAC") (Doc. No. 96).

The FAC pleads three counts against the defendants. In Counts I and II, Bonzani alleges that the defendants violated the FCA by (1) knowingly or recklessly presenting, or causing to be presented, false or fraudulent claims for payment to the United States; and (2) making, using, or causing to be made or used, a false record or statement in seeking payment from the government. See 31 U.S.C. § 3729(a)(1)(A)–(B); FAC ¶¶ 473, 478. In Count III of the TAC, Bonzani alleges that PW fired him in retaliation for his engaging in protected activity under the FCA. See FAC ¶ 484. This court had previously denied defendants' Motion to Dismiss as to Count III of the Third Amended Complaint ("TAC"). See Ruling (Doc. No. 95) at 11. In that Ruling, this court

1

also granted defendants' Motion to Dismiss as to Counts I and II, but gave Bonzani leave to replead. Id. Bonzani subsequently filed his Fourth Amended Complaint.

Pending before the court are the defendants' Motion to Dismiss the Fourth Amended Complaint (Doc. No. 97) and defendants' Motion to File a Response to Bonzani's Sur-Reply (Doc. No. 107). For the reasons stated below, the Motion to Dismiss is denied, and the Motion to File a Sur-Reply is denied as moot.

## II.   FACTS[1]

On January 1, 2008, the United States Air Force ("USAF") awarded Contract Award Identification Number FA861108C2896 ("the Contract") to PW. FAC ¶ 23. The Contract is a "cost-plus" contract for the manufacture of the F119 engine, which is used in the production of the USAF's F-22 military jet. Id. ¶¶ 25. As of the filing of the FAC, PW had been paid $3.7 billion pursuant to the Contract. Id. The Contract is subject to both the Federal Acquisition Regulation ("FAR") and the Defense Federal Acquisition Regulation Supplement ("DFARS"). Id. ¶ 23. The Contract also incorporates the Pratt & Whitney Quality Management System Manual (the "PW Manual"). Id. ¶ 29.

Critical parts for both the F-22 and the F-35 fighter jet engines, including the Integrally Bladed Rotors ("IBRs"), are manufactured at the PW plant in Middletown, Connecticut ("Middletown Plant"). Id. ¶ 39. During the manufacturing process, IBRs are spray-coated according to detailed specifications, in order to create a "knife edge seal" when the IBR rotates. Id. ¶ 41. A proper seal is critical to proper jet engine function. Id. ¶ 42. From 2012 through November 2015, all F-22 engine cores supplied to the USAF under the Contract were assembled at the Middletown Plant. Id. ¶ 43.

---

[1] The facts are taken from Bonzani's Fourth Amended Complaint ("FAC") (Doc. No. 96).

2

Bonzani was hired full-time by PW in 2012 "to assist in all aspects of robotic spray-coating of military jet engine parts." Id. ¶ 21. In November 2015, Bonzani was ordered to conduct a "root cause analysis as to why suddenly all test samples for the IBRs for the F119 jet engine were failing contractually-required testing," when they had previously passed such testing. Id. ¶ 44. During the course of his inspection, Bonzani, along with another PW employee, determined that "the use of a wrongly sized spray gun whose spray plumes were unable to sufficiently coat the test piece" had resulted in improper coating of the representative samples of IBRs used for testing purposes.[2] Id. ¶¶ 48, 49. When Bonzani inquired as to whether any production or testing changes had recently occurred, he was informed that a new test apparatus had recently been installed, and that samples began to fail testing after the change in test apparatus. Id. ¶¶ 53, 54. A comparison of the old and new test apparatus revealed that the old apparatus could be manipulated to move samples closer to the spray gun, while the new, contractually compliant apparatus, could not be manipulated in the same manner. Id. ¶¶ 56–59.

When Bonzani inquired as to how previous tests had been successful, an employee at PW's Material Control Laboratory ("MCL"), the lab responsible for quality control testing of representative IBR samples, told Bonzani that employees had "cheated" in the past. Id. ¶¶ 66, 67. The employee also told Bonzani that the "cheating" involved moving the IBR sample closer to the spray gun. Id. ¶¶ 67, 301. Bonzani informed the Production Coatings Engineer at the Middletown Plant of his findings. The

---

[2] Because the quality testing process is inherently destructive, representative samples of IBRs, rather than the components actually used in construction of the engines, are tested. See FAC ¶ 38.

3

engineer did not deny knowledge of the fraudulent testing, but rather responded that he had "inherited the problem." Id. ¶ 69.

Bonzani informed two co-workers at PW's East Hartford location of his findings the next morning, on November 20, 2015. Id. ¶ 70. They responded that it was common knowledge that the Middletown Plant had been "taking short cuts on tests." Id. ¶ 71. Bonzani also informed several members of PW management of his findings later that same morning. Id. ¶ 72. On the afternoon of the same day—November 20, 2015—Bonzani was interrogated, placed on probation, and escorted from PW's East Hartford facility. Id. ¶ 75. Ninety days later, his employment with PW was terminated. Id. ¶ 75.

## III. LEGAL STANDARD

### A. Rule 12(b)(6)

To withstand a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard is not a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief. Id. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. Id. However, when reviewing a motion to dismiss, the court must accept the factual allegations in the operative complaint as true and draw all reasonable inferences in the non-movant's favor. See Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012).

B.   Rule 9(b)

Qui tam complaints filed under the False Claims Act ("FCA") are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc., 865 F.3d 71, 81 (2d Cir. 2017). Rule 9(b) requires that, in alleging fraud, a party must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A complaint alleging fraud must ordinarily "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Chorches, 865 F.3d at 81 (citation omitted). However, allegations may be based on "information and belief when facts are peculiarly within the opposing party's knowledge." Id. at 81–82 (quoting Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990)). Where pleading is permitted on information and belief, the complaint must "adduce specific facts supporting a strong inference of fraud." Chorches, 865 F.3d. at 82.

As relevant to Bonzani's qui tam claim, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). Bonzani must therefore allege that (1) defendant submitted a claim for payment to the government, (2) the claim for payment was false or misleading, (3) the defendant acted knowingly in making that false or misleading claim for payment, and (4) the false or misleading statement was material to the government's decision to pay. See Chorches, 865 F.3d at 81.

5

## IV. DISCUSSION

### A. The FAC Alleges Fraud with Sufficient Particularity

This court previously held that Counts I and II of Bonzani's Third Amended Complaint failed to meet Rule 9(b)'s particularity requirement. See Ruling at 7. In so ruling, this court noted that the TAC speculated—in conclusory fashion—that certain FARS and DFARS provisions "must be included in the contract," Third Amended Complaint ("TAC") (Doc. No. 83), ¶ 137, and that the Contract "surely included a higher-level contract quality requirement," id. ¶ 156. Because Bonzani had gained access to the relevant contract documents and terms through his requests to the government, after he filed his TAC, this court held that he could not plead to the content of the Contract on information and belief. Ruling at 7. The court held that the TAC failed to meet Rule 9(b)'s particularity requirement. Id. at 8. This court nonetheless allowed Bonzani to replead his Complaint, so long as any amendment was "limited to the inclusion and incorporation of the contractual information Bonzani obtained from the government in order to attempt to cure the shortcoming of the TAC with regard to Rule 9(b)." Id.

On April 15, 2019, Bonzani filed the Fourth Amended Complaint (Doc. No. 96). The FAC incorporated excerpts of the contract he received from the government and attempted to address the Rule 9(b) shortcomings identified by this court. The contract provisions confirmed some of Bonzani's previous allegations. For example, the contract provisions confirmed that the contract incorporated FAR and DFARS provisions requiring that PW maintain a quality-control system, mandated defendants to certify conformance with the Contract, and incorporated the PW Manual as the higher-level contract quality requirement. FAC ¶¶ 7, 28, 29, 122, 123, 148, 166, 150–212.

6

Despite these changes, defendants continue to maintain that Bonzani's allegations are not supported by plausible or particular facts as required by Rule 9(b). Defendants' Memorandum in Support of Motion to Dismission ("Def. Mem.") (Doc. No. 98), at 4. Specifically, defendants argue that the FAC must be dismissed because "it omits key details about the spray coating and testing specifications at issue, how those requirements were allegedly violated, the identification of any actual nonconforming parts produced and delivered to the government, and the existence and content of any false statements made to the government concerning such parts." Id. at 5.

Defendants first argue that the FAC fails to include any details regarding the content of the spray-coating and the test specifications that Bonzani alleges defendants failed to follow. Id. at 6. They further argue that "[i]n a False Claims Act case premised on contractual noncompliance, the failure to identify the underlying specifications with which the defendant failed to comply is grounds for dismissal." Id. (citing United States ex rel. Ladas v. Exelius, Inc., 824 F.3d 16, 26 (2d Cir. 2016)).

However, Bonzani has identified the underlying test specification that defendants failed to follow. For example, the FAC sufficiently pleads that the contract adopted the PW Manual as the "higher-level contract requirement" and that defendants therefore were required to adhere to the standards and process set forth in the PW Manual. FAC ¶¶ 5, 29, 31; see also Contract Award ID# FA861108C2896 ("Ex. A") (Doc. No. 96-1) at 180. The PW Manual, in turn, requires that the sample IBRs tested by defendants for quality control be constructed and spray-coated under conditions that mimic the manufacture of the actual IBRs. FAC ¶¶ 46, 316–317. This includes spraying the sample from the same distance and same angle as the actual IBRs. FAC ¶¶ 316–318;

7

see also PW Manual (Doc. No. 105) at 2 ("[Sample] must be coated from same distance and angle as part.").[3]

The FAC provides sufficient details to plead the violation of these contractual provisions with particularity and plausibility. Based on his inspection of the IBRs and the spray guns, Bonzani concluded that, because of the confined space within the IBRs, the spray guns used by defendants could not get closer than six inches from the engine parts manufactured by the defendants. FAC ¶¶ 286, 394. However, his inspection of the test apparatus previously used to spray the samples revealed that a pin had been removed from the old apparatus, "thereby permitting the sample piece to be intentionally manipulated and moved closer to the spray gun than the distance required by the contractually-mandated Work Instructions and specifications." Id. ¶ 58. In other words, the old test apparatus could be manipulated in a such a way to allow for a closer, more favorable spray distance than that used with the parts manufactured by defendants. FAC ¶ 56. The replacement test apparatus did not permit the same manipulation. Id. ¶ 59. Bonzani therefore concluded that "the IBR samples were able to pass quality testing in the past solely because the tests were not performed according to the contractually required quality control requirements specified in the Work Instructions." Id. ¶ 60. Bonzani has pled plausibly and with particularity how this manipulation violates the PW Manual, which is incorporated into the Contract as the "higher-level contract

---

[3] After filing their Reply, defendants provided Bonzani with a portion of the PW Manual. Defendants protest that Bonzani cannot continue to rely on discovery to amend his complaint. See Defendants' [Proposed] Response to Relator's Sur-Rely (Doc. No. 107-1) at 2 n.2. However, because the FAC references the PW Manual and this exact contractual requirement, the court may consider this document at the pleading stage. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) ("In reviewing a motion to dismiss . . . our review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and **any documents incorporated in the complaint by reference**.") (emphasis added).

quality requirement," id. ¶ 30, and mandates that sample IBRs be tested under the same conditions under which the actual IBRs are manufactured, see PW Manual at 2.

Defendants next argue that the FAC failed to plead the details of the fraud from 2012 to 2015—the period before Bonzani inspected the Middletown Plant—with particularity and plausibility and failed to allege with particularity and plausibility that defendants produced or delivered a single nonconforming part. Regarding the period between 2012 and 2015, the FAC plausibly alleges that defendants had committed fraud since at least 2012. From 2012 through November 2015, "every IBR for every F22 engine manufactured for the government under the Contract was spray-coated at the Middletown facility." FAC ¶ 40 (emphasis in original). During this time, defendants used the same spray gun that Bonzani identified to be improper. Id. ¶ 50. Even more, during his inspection of the facility, "Bonzani was informed that no changes had been made . . . to the spray techniques, materials or equipment from 2012 through to the date of his troubleshooting." Id. ¶ 277. Despite a history of passing tests during this period, Bonzani concluded that "the test failure and production stoppage [in November 2015] was the result of spray techniques, equipment and materials that should have resulted in failed tests and stoppage of production for the entire duration of the production of F119 engines for the F-22 dating back to November, 2012." Id. ¶ 289.

The plausibility and particularity of these allegations is further buttressed by his interactions with PW employees. While inspecting the Middletown Plant, Bonzani asked the PW employee responsible for testing the sample engine parts how the factory had previously passed testing. The employee informed Bonzani that "they had 'cheated in the past' by 'moving the sample closer' to the thermal spray gun." FAC ¶ 301. When

9

Bonzani shared with the production coating engineer at the facility his findings regarding the long-standing fraud, the employee did not object, and only stated that: "It's not my fault. I inherited the problem." Id. ¶ 69. The next day, when Bonzani told two PW employees that the Middletown Plant was cheating on the test samples, the employees "acknowledged a company-wide 'common knowledge' about the Middletown Plant having a reputation for quality control problems." Id. ¶ 344. Bonzani's firsthand observations of defendants' manipulation of the test apparatus, along with admissions of employees involved in the fraud, provides sufficient factual basis for the FAC to plead these claims with particularity and plausibility.

The defendants' conduct further supports Bonzani's allegations of fraud. Within twenty-four hours after Bonzani had discovered the alleged fraud and notified management of his concerns, defendants summarily suspended Bonzani. FAC ¶ 12. "[T]the allegation that [Bonzani] was the victim of adverse employment action in retaliation for [his] efforts to expose the many improprieties described casts the entire body of allegations in an even more serious and credible light, and thus, to the extent they needed it, helps 'nudge[ ] [them] across the line from conceivable to plausible.'" United States ex rel. Gelman v. Donovan, 12-CV-5142, 2017 WL 4280543, at *7 (E.D.N.Y. 2017, Sept. 25, 2017) (quoting Twombly, 550 U.S. at 570).

Defendants next argue that the FAC failed to allege with particularity or plausibility that defendants produced or delivered a single nonconforming engine. Def. Mem. at 10. In support of this argument, defendants rely upon United States ex. rel. Ladas v. Exelis, Inc., 824 F.3d 16 (2d Cir. 2016). In Ladas, the Second Circuit affirmed dismissal pursuant to Rule 9(b) because the complaint lacked factual allegations "that

any finished devices that failed required testing were actually delivered to the government." Id. at 27. Defendants argue that "[m]uch like Ladas . . . the FAC fails to allege any facts as to the actual condition of any of those engines upon or after delivery during that long period." Def. Mem. at 11.

Defendants' reliance on Ladas is misplaced. The Ladas Complaint failed to allege how the defect related to any contractual requirements. Id. at 26 ("[T]he only uncomplied-with specification identified in the [Complaint] was an internal ITT specification that was not part of the Contract."); see also id. at 27 ("[T]he [Complaint] did not plausibly allege that the devices themselves, or the equipment as a whole, were not tested in accordance with the Contract."). Because the Ladas Complaint did not allege any defect related to contractual requirements, there was no basis for the court to infer that "any finished devices that failed required testing were actually delivered to the government." Id. at 27. Here, Bonzani has identified the applicable contract term governing spray-coating and testing IBRs, and explained how PW violated it. Therefore, construing the facts in Bonzani's favor, Bonzani has plausibly alleged with particularity that defendants delivered nonconforming parts to the government.

Although defendants argue that Bonzani has failed to specify when a single nonconforming part was delivered, such identifications are not required to give effect to the "salutary purposes" of Rule 9(b)—specifically, the purpose "to provide a defendant with fair notice of a plaintiff's claim." Chorches, 824 F.3d 86; see also Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674, 680 (6th Cir. 1988) ("Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim."). The

11

defendants have sufficient notice of Bonzani's claim.  Rule 9(b) is a practical standard that "does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations."  United States ex rel. Heath v. AT&T, Inc., 791 F.3d 112, 125 (D.C. Cir. 2015).  The FAC satisfies this standard by describing, in detail, the contractual requirements and explaining how PW violated them.

Finally, defendants argue that the FAC fails to create a strong inference that any false claims were submitted.  Def. Mem. at 14.  As defendants note in their Memorandum, this court previously held that Bonzani may plead the submission of specific false claims on information and belief.  Even so, defendants note that the Second Circuit requires Bonzani to make "plausible allegations creating a strong inference that specific false claims were submitted."  Chorches, 865 F.3d at 86.

The FAC meets this standard.  The defendants manufactured and sold F119 engines to the government under a contract, and, in return, the government paid defendants roughly $3.7 billion.  FAC ¶ 3.  "[B]ecause the function of a cost-plus-fee contract is to secure reimbursement from the government, it creates a strong inference that specific false claims—for those reimbursements—were submitted to the government, satisfying the Chorches standard."  United States ex rel. Hussain v. CDM Smith, Inc., 14-CV-9107, 2017 WL 4326523, at *5 (S.D.N.Y. Sept. 27, 2017).  In Chorches, upon which defendants principally rely, the complaint alleged that between 40% and 70% of defendant's business involved Medicare and Medicaid, which "suggests that any systemic scheme" would cause false claims to be submitted to the government.  865 F.3d at 85 n.10.  Here, "the contract involves only a government buyer and only noncomplying parts."  Bonzani's Memorandum in Opposition ("Pl. Mem.")

(Doc No. 99) at 25 (emphasis in original). Even more, defendants certified compliance with the Contract each time it requested payment for an F199 engine delivered to the government. FAC ¶¶ 6, 7. Bonzani has therefore created a strong inference that false claims were submitted to the government. "It would stretch the imagination to infer the inverse." Chorches, 865 F.3d at 85 n.11 (quoting United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 192 (5th Cir. 2009)).

    B.    The FAC Sufficiently Alleges Materiality

A complaint filed under the FCA must also plead materiality, that is, the misrepresentation must be material to the government's payment decision. Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989, 2002 (2016). The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In Escobar, the Supreme Court declined to decide whether section "3729(a)(1)(A)'s materiality requirement is governed by [section] 3729(b)(4) or derived from common law" because "[u]nder any understanding of the concept, materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." 136 S. Ct. at 2002 (internal quotations omitted). The Escobar Court then enumerated multiple evidentiary indicia of materiality: whether the relevant rule was a condition of payment, whether the defendant's misrepresentation went to the "very essence of the bargain," and how the Government reacted to similar misconduct when it had "actual knowledge" of it. Id. at 2003–04. The Court nonetheless noted that "materiality cannot rest on 'a single fact or occurrence as always determinative.'" Id. at 2001 (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 39 (2011)). Indeed, both the facts of Escobar and the Court's analysis "illustrate that materiality is essentially a matter of

common sense rather than technical exegesis of statutes and regulations." Gelman, 2017 WL 4280543, at *5.

Bonzani argues that adherence to the relevant contractual provisions constituted a condition of payment. Pl. Mem. at 27. The "Contract provides for the government's right to 'take withhold/consideration for a Variance at the time of delivery which may be returned to the Contractor upon closure of the Variance,' i.e., a condition of payment." Id. at 28 (quoting Ex. A at 234). The Contract defines a Variance as "a major material/workmanship noncompliance." Ex A. at 234. Major noncompliance is defined as a "noncompliance to the requirements specified in a contract, specification, drawing or other approved material description which adversely affect performance, durability, reliability, interchangeability, maintainability, effective use or operation[, and] cannot be completely eliminated by rework [or repair]." Id. The FAC pleads that defendants' noncompliance with the proper testing of samples was a violation of the PW Manual, which "calls for representative sample pieces to be sprayed under strictly specified conditions designed to duplicate the production spray-coating applied to the production component (the IBR)." FAC ¶ 46; see also PW Manual at 2. Bonzani alleges that the defendants' failure to adhere to this contractual provision affects the reliability of the engine, FAC ¶ 306, and creates a defect that cannot be eliminated by repair, id. ¶ 312. Therefore, the defects Bonzani identified constitute a Variance. Because the government can withhold payment on account of this Variance, adherence to this contractual provision constituted a condition of payment.

Defendants correctly note that "being labeled a condition of payment does not make a clause material, Escobar, 136 S. Ct. at 2003," and that, in any case, "the

clauses cited by [Bonzani] are not so labeled." Defendants' Reply ("Def. Reply") (Doc. No. 102) at 7. The Escobar Court indeed noted that "[w]hat matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." 136 S. Ct. at 1996. In this regard, Bonzani has alleged facts suggesting that defendants knew the materiality of the fraud. Bonzani alleges that PW employees admitted to cheating in order to pass the quality control tests. FAC ¶¶ 69, 301. Furthermore, when the introduction of the new test apparatus made it impossible to pass the test, defendants halted production of the engine cores. Id. ¶¶ 261–266. Finally, after production was halted, defendants delegated the spray-coating to another company. Id. ¶ 80. These allegations, when considered in the light most favorable to Bonzani, suggest that the defendants understood the contractual requirements involving proper spray-coating protocols to be material to the government's payment decision.

Finally, defendants argue that "Bonzani effectively concedes the FAC's failure to adequately plead materiality by his reference to the government's continued award of and payment under the contracts [Bonzani] cites." Def. Mem. at 21. The Escobar Court noted that, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." 136 S. Ct. at 2003. Here, Bonzani placed the government on notice of his allegations as early as October 18, 2016, when he filed his initial complaint. See Complaint (Doc. No. 1). According to defendants, this provided the government sufficient opportunity to investigate. Nevertheless, Bonzani concedes that the government awarded a follow-on contract to PW on December 15, 2017, and

15

continues to pay on the contracts at issue. FAC ¶¶ 3, 121. This continued payment is evidence of a lack of materiality. Escobar, 136 S. Ct. at 2003–04; see also United States ex rel. Kolchinsky v. Moody's Corp., 12-CV-1399, 2018 WL 1322183, at *3 (S.D.N.Y. Mar. 13, 2018).

In response, Bonzani argues that "[t]he government has many reasons for continuing to buy F119 engines and replacement parts from PW, its sole supplier." Pl. Mem. at 32 (citing United States ex rel. Campie v. Gilead Sciences, Inc., 862 F.3d 890, 906–907 (9th Cir. 2017) cert denied, _S. Ct._, 2019 WL 113075 (Jan. 7, 2019) (finding materiality adequately pled when "there are many reasons the FDA may choose not to withdraw drug approval"). Here, the engines are sophisticated technology manufactured exclusively by the defendants. FAC ¶ 43. Bonzani argues that "any switch would cause significant delays of years, and extraordinary additional expenses at a risk to national security." Pl. Mem. 32. Bonzani further argues that, "[a]bsent discovery, it is unknown why and under what terms or circumstances the government entered the new contract." Id.

The court agrees with Bonzani. Although the follow-on contract is evidence against materiality, no one factor is dispositive. Escobar, 136 S. Ct. at 2001. The court understands Escobar "as requiring, at the pleading stage, that the undisclosed regulatory and other violations be plausibly pled as relevant to the payment decision, either as a matter of common sense, or in the mind's eye of the filer of the claim." Gelman, 2017 WL 4280543, at *5. Bonzani has satisfied this standard. Borrowing language from Escobar, "a reasonable person would realize the imperative" of following the proper spray-coating protocols. Escobar, 136 S. Ct. at 2001; see also FAC ¶ 126

(noting that an improperly coated seal will fail prematurely, "with a possibility of catastrophic failure"). Furthermore, defendants' halting of production indicates their belief that compliance with this contractual provision was extremely important. See Gelman, 2017 WL 4280543, at *5 ("Donovan's alteration of the content of internal hospital records strikes a potent materiality chord, as it strongly indicates his belief that content would be important.").

    C.    The FAC adequately pleads scienter

Liability under the FAC is limited to those who "knowingly present[ ] or cause[ ] to be presented, a false or fraudulent claim for payment or approval[.]" 31 U.S.C. § 3729(a)(1)(A). The FCA defines "knowingly" as: (1) possessing actual knowledge; (2) acting in deliberate ignorance of falsity; or (3) acting in reckless disregard of falsity. Id. § 3729(b)(1). The FCA explicitly states that it "require[s] no proof of specific intent to defraud." Id.

"Rule 9(b) permits scienter to be averred generally, but [the Second Circuit has] repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." United States ex rel. Tessler v. City of New York, 712 F. App'x 27, 29 (2d Cir. 2017) (summary order) (citations and quotation marks omitted). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995).

The facts alleged in the FAC adequately plead scienter. Bonzani alleges that defendants intentionally manipulated the test apparatus by removing a pin, and that such manipulation was obvious and could not have been accidental. FAC ¶¶ 290, 294.

17

Bonzani further alleges that defendants knowingly used the wrong spray gun for years, id. ¶ 390, and continued to do so even after Bonzani had recommended a different spray gun in 2014, id. ¶ 441.  Upon inspection of the engine parts, Bonzani concluded that the defects caused by the inappropriate equipment and processes were "readily apparent."  Id. ¶ 51.  Even more, when Bonzani raised his concerns with PW employees—including the PW employee responsible for the testing—they admitted that they had been cheating on the tests.  Id. ¶¶ 67, 69.  After his inspection of the Middletown Plant, two PW employees at the East Hartford facility admitted that "it was common knowledge that taking short-cuts on tests was a common occurrence at [the Middletown Plant] for some time."  Id. ¶ 344.  Statements of PW President Robert LeDuc regarding a "company-wide breakdown in durability testing" at the Middletown Plant further corroborate Bonzani's allegations.[4]  FAC ¶ 86.  These facts, when viewed in the light most favorable to Bonzani, demonstrate that Bonzani has sufficiently pled that defendants knew or "should have known" of the fraud.  In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 695 (2d Cir. 2009).  In sum, the allegations in the FAC are far from conclusory and contain facts which support a strong inference of scienter.

---

[4] Defendants argue that Bonzani's "corporate culture" allegations do not relate to the false claims allegations at issue and should therefore be dismissed.  Def. Mem. at 25.  Defendants correctly note that President LeDuc made these statements in reference PW's production of commercial engines, not the F119 engines at issue here.  Nonetheless, the court disagrees that these allegations should be disregarded.  The proper method to striking certain objectionable matter in the pleadings is Rule 12(f) of the Federal Rules of Civil Procedure.  Courts typically do not dismiss facts on immateriality grounds "unless it can be shown that no evidence in support of the allegation would be admissible."  Lipsky v. Commonwealth United Corp., 551 F.2d 887, 983 (2d Cir. 1976).

D.  The FAC Adequately Pleads Count II with Particularized and Plausible facts

The Second Circuit has held that the analysis of whether a plaintiff has adequately pled a violation under section 3729(a)(1)(A) "applies equally" to the analysis of whether a defendant knowingly used a false record material to a false or fraudulent claim under section 3729(a)(1)(B). See Mikes v. Strauss, 274 F.3d 687, 695 (2d Cir. 2001) ("Plaintiff brought suit under each of these subdivisions [in section 3729(a)(1)], but since our analysis applies equally to all three, we limit discussion primarily to the first."), abrogated on other grounds by Escobar, 136 S. Ct. at 2001. The FAC pleads that the Contract requires that PW provide and maintain an inspection system and, "[a]s part of the system, the Contractor shall prepare records evidencing all inspection made under the system and the outcome." FAC ¶ 155 (citing Ex. A at 180). The FAC alleges that the system used by defendants was falsified and was not "implemented as dictated by the contractual requirements." FAC ¶ 243. For the same reasons discussed above, the FAC pleads these claims plausibly and with particularity.

E.  Statute of Limitations

Finally, defendants argue that the FAC must be dismissed insofar as it alleges conduct outside the statutes of limitations. Def. Mem. at 27. The FCA has a six-year limitations period, which "begins to run on the date the claim is made, or, if the claim is paid, on the date of payment." United States ex rel. Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993). Bonzani does not dispute that this statute of limitation applies to his claims. Therefore, his claims are limited to false claims made on or after October 18, 2010.

The court nonetheless concludes that the statute of limitation does not require dismissal of any of Bonzani's claims, however, because he has specifically alleged false claims within the relevant time period. It is only in fleeting statements like the one cited by defendants, see Def. Mem. at 27 (citing FAC ¶ 385 ("Relator fears that as much as twenty-two years' worth of suspect hardware—obvious product quality 'escapes'—have been put into service.")), that Bonzani makes any reference to defendants' actions occurring before 2010.  Thus, while the Court agrees that the statute of limitation is applicable to Bonzani's claims, it finds that Bonzani has sufficiently alleged that defendants submitted false claims within the statute to survive the Motion to Dismiss.

## V. CONCLUSION

For the reasons stated above, the defendants' Motion to Dismiss the Fourth Amended Complaint (Doc. No. 97) is **DENIED**.  Defendants' Motion to File a Response to Bonzani's Sur-Reply (Doc. No. 107) is **DENIED** as moot.

In the future, unless requested by the court, the parties are ordered not to file sur-replies.

**SO ORDERED.**

Dated at New Haven, Connecticut this 22nd day of October 2019.

                                  /s/ Janet C. Hall  
                                  Janet C. Hall  
                                  United States District Judge