## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PETER J. BONZANI, JR., *Plaintiff*, | |
| v. | No. 3:16-cv-01730 (JAM) |
| UNITED TECHNOLOGIES CORPORATION *et al.*, *Defendants*. | |

### RULING GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

It is often said that law is not rocket science. Sometimes, however, the law requires courts to delve into the finer points of aerospace engineering. This case concerns a defense contractor's provision of jet engine parts—specifically, 9th-stage integrally bladed rotors ("IBRs")—to the U.S. Air Force for F-22 fighter jets.

Plaintiff-relator Peter J. Bonzani, Jr., alleges that his former employer, now known as Raytheon Technologies Corp., Pratt & Whitney Division ("Pratt"), violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., by submitting false claims and statements about its failure to properly test the IBRs and then suspending and firing him when he raised concerns.

Pratt has moved for summary judgment on all claims. I will grant Pratt's motion because the allegedly improper testing was not material to the government's payment decision and because there is no evidence that Pratt's decision to suspend and fire Bonzani was informed by his whistleblowing activities.

### BACKGROUND

Pratt is an aerospace manufacturer and defense contractor.[1] Pratt operated as a subsidiary of United Technologies Corporation until 2020, when United Technologies Corporation merged

---

[1] Doc. #111 at 11 (¶ 108). Most of the citations in this part of the ruling are to the parties' respective statements of

with the Raytheon Company to form Raytheon Technologies Corporation.[2] Today, Pratt & Whitney operates as an incorporated division of Raytheon Technologies.[3]

In 2008, the U.S. Air Force awarded Pratt & Whitney contract FA871108-C-2896 ("contract") to supply F-119 engines for F-22 fighter jets.[4] As part of this contract, Pratt delivered 40 9th-stage IBRs to the government between 2012 and 2015.[5] 9th-stage IBRs feature two "knife-edge seals" to prevent air leakage.[6] To create these seals, the IBRs must be sprayed with a plasma coating.[7] Pratt conducted sprayings of the IBRs at its facility in Middletown, Connecticut.[8]

The contract included a "higher level contract quality requirement" whereby Pratt agreed to follow the standards set forth in Pratt & Whitney's Quality Manual.[9] The contract also incorporated other requirements from the Federal Acquisition Regulations ("FAR") and the Defense Federal Acquisition Regulation Supplement ("DFARS").[10] The Quality Manual required that test samples be sprayed in the same manner as the actual parts—that is, that test samples undergo "representative testing."[11]

---

material facts. *See* Doc. #259 (Pratt's statement of material facts); Doc. #283-97 (Bonzani's statement of material facts). I deem those facts as set forth by Pratt to be true to the extent that they are admitted by Bonzani. I also deem those facts as set forth by Pratt to be true to the extent that Bonzani denies them without citation to record support for the denial or to the extent that Bonzani admits them but adds argumentative qualifiers or limitations that are not germane to the facts asserted by Pratt. *See* D. Conn. L. Civ. R. 56(a).

[2] Doc. #111 at 11 (¶ 108); Doc. #156 at 1.

[3] Doc. #156 at 1. Notwithstanding that the fourth amended complaint (Doc #96) names two defendants (United Technologies Corporation and Pratt & Whitney), I assume that the proper defendants are Raytheon Technologies Corporation and Pratt & Whitney and that these two defendants are functionally treated as a single defendant in the parties' court filings.

[4] Doc. #259 at 2 (¶¶ 2–3); Doc. #283-97 at 2 (¶¶ 2–3).

[5] Doc. #259 at 3 (¶ 7). Bonzani denies this statement, but his response—that the relevant time period is 2010 to 2018—does not refute Pratt's contention that it supplied the 40 IBRs between 2012 and 2015, a subset of this time period. *See* Doc. #283-97 at 3 (¶ 7). Moreover, the ruling Bonzani cites as evidence, Doc. #108, was subsequently amended, Doc. #113, and nothing in the amended ruling supports Bonzani's response.

[6] Doc. #259 at 4 (¶ 13); Doc. #283-97 at 5 (¶ 13).

[7] Doc. #259 at 4 (¶ 14); Doc. #283-97 at 5–6 (¶ 14).

[8] Doc. #259 at 7 (¶ 26); Doc. #283-97 at 11 (¶ 26).

[9] Doc. #259 at 2 (¶ 4) (capitalization altered); Doc. #283-97 at 2 (¶ 4); *see* Doc. #259-1 at 181.

[10] Doc. #283-97 at 2 (¶ 4); *see* Doc. #259-1 at 181.

[11] Doc. #283-2 at 11, 13; Doc. #283-8 at 3; Doc. #283-97 at 25 (¶ 66), 27 (¶ 77).

Plaintiff/Relator Peter J. Bonzani, Jr., worked at Pratt as a manufacturing engineer since 2012.[12] When IBR test samples began failing tests in November 2015, Pratt invited Bonzani to inspect the Middletown facility and to offer suggestions.[13] He arrived around 11:00 a.m. on November 19.[14] Around 2:00 or 2:30 p.m., Bonzani alleges that Raymond Hurlburt, a technician at the facility, told Bonzani that in the past "they cheated; they moved the samples closer" to the plasma spray gun.[15] Hurlburt has no recollection of saying this.[16] Bonzani does not recall anyone in Middletown other than Hurlburt telling him that there had been cheating.[17]

In essence, the contract required representative testing of the IBRs—that the plasma spray process be fixed and identical for both the IBR test samples and the actual IBRs.[18] Bonzani alleges that this did not occur.[19] Instead, Bonzani alleges that Pratt sprayed the IBR test samples at a closer distance to the plasma gun and at a different angle than the actual IBRs, thus allowing the samples to pass tests that they otherwise would have failed.[20] The samples only began to fail tests, Bonzani alleges, when Pratt replaced the old test block with one that did not allow operators to manipulate the distance and angle between the plasma spray gun and the IBRs.[21]

---

[12] Doc. #259 at 2 (¶ 1); Doc. #283-97 at 2 (¶ 1); *see also* Doc. #96 at 5 (¶ 21); Doc. #283-77 at 3.

[13] Doc. #259 at 7 (¶ 27), 8 (¶¶ 29–30); Doc. #283-97 at 12 (¶¶ 29–30). Bonzani disputes the exact timing of the failures, but he does not dispute that the failures occurred in November 2015. *See* Doc. #283-97 at 11 (¶ 27), 26 (¶ 71).

[14] Doc. #259 at 8 (¶¶ 31–34); Doc. #283-97 at 12–13 (¶¶ 31–34).

[15] Doc. #259 at 9 (¶ 36); Doc. #283-97 at 14 (¶ 36).

[16] Doc. #259 at 9 (¶ 37); Doc. #283-97 at 14 (¶ 37) (noting that "Mr. Hurlburt testified he had no recollection."). In his complaint, Bonzani further alleges that another employee, when confronted, stated "It's not my fault. I inherited the problem." Doc. #96 at 13 (¶ 69). But the statement does not appear in Bonzani's statement of material facts, even though he references it in his brief in opposition to Pratt's motion for summary judgment. *See* Doc. #283 at 8, 22. Because Bonzani cites no admissible evidence for this allegation, I will decline to credit it.

[17] Doc. #259-24 at 17.

[18] *See supra* note 11.

[19] Doc. #283 at 13–28; *see also* Doc. #283-97 at 27 (¶ 78).

[20] Doc. #283 at 15–16; Doc. #283-97 at 6 (¶ 14), 8 (¶ 18), 9 (¶ 20).

[21] Doc. #283 at 15–16.

Bonzani expressed concerns while he was still at the facility about IBR spray distance to two Pratt colleagues, Michael Flanagan and James Tanguay.[22] Later that day, Bonzani texted and called Ryan Bouffard, the supervisor of Bonzani's supervisor Brad Walsh, to report his concerns.[23] Bouffard does not remember the call, though he says it is possible the call took place.[24]

The next day, Bonzani texted two other Pratt colleagues, Matthew McCormack and Thomas Finnie, to discuss his views on potential causes of the failing tests.[25] Bonzani texted McCormack, "Tooling, devil is in the tooling or a gun component," then followed up with "[o]r crappy calibration and was qualified screwed up. I still think it's tooling."[26] Then, Bonzani texted Finnie that "Middletown was interesting...." to which Finnie responded, "What was the smoking gun?"[27] Bonzani texted back, "Well, they used different tooling for the samples, I can't get a clear story on how they mounted the samples. Nervous about calibration being 'out' when they qualified. Not getting full story."[28] Bonzani followed up with, "Also spraying at a pretty high standoff and narrow angle with helium."[29]

Three weeks later, Bonzani asked McCormack whether they "ever get that plasma fixed down there? What was the issue?"[30] McCormack responded, "Nope. They are prob going to just

---

[22] Doc. #283-97 at 30 (¶ 90); *see* Doc. #283-37 at 6–9.

[23] Doc. #283-34 at 12; Doc. #259-24 at 18, 20; *see also* Doc. #283-93 at 2 (identifying Bouffard as Walsh's supervisor and Walsh as Bonzani's supervisor).

[24] Doc. #283-33 at 4.

[25] *See* Doc. #259 at 9 (¶ 39) ("In text messages with colleagues on November 20, 2015, Bonzani expressed preliminary views about potential causes of the failing tests but raised no concerns of cheating or manipulation."). Bonzani disputes Pratt's characterization of his texts to McCormack and Finnie but does not object to their veracity. Doc. #283-97 at 15 (¶ 39); *see, e.g.*, Doc. #283-71 at 6 (exchange with McCormack included in Bonzani's exhibits in opposition to summary judgment).

[26] Doc. #283-71 at 6.

[27] Doc. #259-25 at 4.

[28] *Ibid.*

[29] *Ibid.*

[30] Doc. #283-71 at 6; Doc. #283-97 at 28 (¶ 85).

put in the new machines."[31] Bonzani wrote back, "Wow, not good. Begs the question how they passed before. The MCL guy told me the[y] used to cheat, between you and I…"[32]

In the meantime, Pratt had been investigating Bonzani for a potential conflict of interest. In September 2015, Pratt received an anonymous complaint through the company's ombudsman alleging that Bonzani was operating an outside consulting firm.[33] In October 2015, Jane O'Neill, Senior Ethics and Compliance Officer for Pratt's Operations & Engineering division, emailed a coworker that

> Yes, I did go through [the Bonzani documents and emails] and there really wasn't anything there. I will share my findings with ME [Military Engines] Counsel and see if she agrees. Is there any way you could provide his calendar/meeting notices? I'm just looking to see if perhaps any outside work was scheduled that I could compare with time charging records. Please let me know.[34]

On November 18, 2015, Pratt investigators interviewed Bonzani's supervisor, Brad Walsh.[35] Walsh told investigators that he did not recall whether Bonzani disclosed any outside business activities to him.[36]

Then, at 10:38am on November 19—the same day that Bonzani visited the Middletown facility—Emily Poulin, associate counsel for Pratt's Military Engines division, emailed other members of Pratt's investigative team that "we need to put [Bonzani] on paid leave until we can talk to him. I don't know that we can keep letting him work in the rooms where he works – or anywhere at PW – while we have the heightened suspicions that we have following the surprise

---

[31] Doc. #283-71 at 6.

[32] *Ibid.* "MCL" stands for "Material Control Laboratory," "Materials Control Laboratory," or "Material Controls Laboratory." *See, e.g.*, Doc. #259 at 4 (¶ 15); Doc. #283-19 at 2; Doc. #283-24 at 6. Hurlburt worked as an MCL technician. Doc. #259 at 9 (¶ 36); Doc. #283-97 at 14 (¶ 36).

[33] Doc. #259 at 10 (¶ 43); Doc. #283-97 at 17 (¶ 43).

[34] Doc. #283-41 at 3; *see also* Doc. #259-35 at 4 (identifying O'Neill's title).

[35] Doc. #259 at 11 (¶ 45). Bonzani disputes Pratt's characterization of the content of the interview but does not dispute that the interview took place. Doc. #283-97 at 17–18 (¶ 45).

[36] Doc. #283-97 at 17–18 (¶ 45); Doc. #283-91 at 7; Doc. #283-92 at 25.

from Brad Walsh."[37] Poulin added: "I have been keeping CMcD [Chris McDavid, lead lawyer in Pratt's Military Engines unit] in the loop on this. He's aware that I'm proposing the above."[38]

On November 20, Pratt's investigators interviewed Bonzani, who did not raise any concerns with them about the alleged cheating.[39] Pratt suspended Bonzani later that same day.[40]

Pratt contends that the investigators did not know at the time of their interview and the suspension of Bonzani on November 20 that Bonzani had raised any concerns about operations at the Middletown facility.[41] O'Neill stated at her deposition that she was not aware that Bonzani allegedly uncovered evidence of cheating at Middletown.[42] O'Neill also speculated that McDavid may have encouraged placing Bonzani on paid leave.[43] Poulin stated at her deposition that she became aware of Bonzani's allegations after her investigation into his conflict of interest.[44] Poulin also stated that she did not know whether Bonzani went to Middletown on November 19 or what he did or discovered there.[45] She said that other Pratt attorneys investigated Bonzani's allegations.[46]

In January 2016, O'Neill emailed Poulin and H.R. Manager Shannon Roy asking whether there were "[a]ny updates on the status of the remaining interviews and/or a determination if the employee [Bonzani] needed to be brought back in for another interview."[47] Roy replied that

---

[37] Doc. #259 at 11 (¶ 46); Doc. #259-35 at 3; Doc. #300 at 22 n.4. Bonzani responds that Pratt does not specify the email's time-zone, but he does not assert that Poulin—whose email signature bears a Connecticut address and a Connecticut area code—sent the email at any time other than 10:38 a.m. Connecticut local time. *See* Doc. #283-97 at 18 (¶ 46); Doc. #259-35 at 4; *see also* Doc. #181 at 25–26 (disposing of the same time-zone dispute during the discovery phase of the litigation).
[38] Doc. #259-35 at 3; *see also* Doc. #310 at 63 (describing McDavid as "the head of the military engine legal unit").
[39] Doc. #259 at 11 (¶ 47); Doc. #283-97 at 18 (¶ 47); Doc. #259-24 at 21–22.
[40] Doc. #259-33 at 8–9; Doc. #283-97 at 30 (¶ 95).
[41] Doc. #258 at 47.
[42] Doc. #259-33 at 11.
[43] Doc. #283-46 at 8.
[44] Doc. #259-38 at 6.
[45] *Id.* at 11–14.
[46] Doc. #283-91 at 4.
[47] Doc. #283-47 at 3; *see also* Doc. #283-94 at 6 (identifying Roy's title).

"Based on Maureen[ Waterston]'s feedback, the recommendation on discipline is going to change."[48] Maureen Waterston was the head of Pratt's H.R. team at the time.[49] When O'Neill asked Roy for an update in February, Roy wrote back that "[w]e are moving forward with termination, just working to connect with GSC on what needs to be done from a debrief standpoint. Thanks."[50] GSC presumably refers to Pratt's Government Security Compliance team, which took part in the investigation of Bonzani.[51]

Around February 18, 2016, Pratt fired Bonzani.[52]

In January 2018, Bonzani began working in the coatings business unit of EBTEC Corporation, which does business with Pratt.[53] On March 11, 2019, Pratt employee Rick Shamakian emailed several individuals, including coworker Peter F. Lang and EBTEC employee Donald Ayoub, a message that read in part:

> [P]lus we are supposed to avoid contact with Ebtec due to them hiring a person suing Pratt ... waiting to hear from lawyers.... See the message below from my supervisor ...
>
> Scott / Rick / Tom / Tim –
>
> Please do not have any contact with Ebtec until we receive guidance from Legal.[54]

---

[48] Doc. #283-47 at 2.

[49] Doc. #310 at 34.

[50] Doc. #283-47 at 2.

[51] *See, e.g.*, Doc. #259-39 at 2 (email from Poulin to Roy noting that "[a] joint investigation of HR, Me Legal, ECO, and Government Security Compliance found that Mr. Bonzani falsely completed his 2014 and 2015 annual certifications to the UTC Code of Ethics with respect to having documented waivers for conflicts of interest."); *see also* Doc. #283-76 at 4; Doc. #283-95 at 8.

[52] The parties variously describe Bonzani's date of termination as February 17, February 18, or February 19. *See* Doc. #96 at 67 (¶ 355) (Bonzani complaint noting that termination occurred 90 days after his November 19 suspension, which would have been February 17); Doc. #111 at 32 (¶ 355) (Pratt answer stating that it "admits that relator was notified of his termination on or around February 18, 2016"); Doc. #283-34 at 29 (testimony of Bonzani that Pratt fired him on February 19, 2016); *see also* Doc. #283-92 at 59 (internal Pratt document titled "Talking Points for conversation with Peter Bonzani – 2/18/2016"). Neither party contends that the exact date of termination is material.

[53] Doc. #283-77 at 2; Doc. #283-97 at 31 (¶ 98).

[54] Doc. #283-78 at 2 (emphasis omitted).

In October 2016, Bonzani filed a *qui tam* complaint alleging that Pratt violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*[55] The federal government conducted an investigation, and in January 2018, notified the Court that it declined to intervene.[56]

The government continues to pay Pratt for the 9th-stage IBRs and for providing spare parts and services, and has not asked Pratt to address deficiencies in the testing or spraying of the IBRs.[57] In 2017, the government awarded Pratt a follow-on, $6.7 billion contract for the F-119 engine program under which Pratt continues to provide the government with 9th-stage IBRs that have undergone plasma spraying.[58]

Bonzani's fourth amended complaint—the current operative complaint—brings three claims against Pratt. Count I alleges that Pratt submitted false claims for payment in violation of 31 U.S.C. § 3729(a)(1)(A) by supplying engines to the government that did not conform to contractual requirements.[59] Count II alleges that Pratt made false statements to obtain payment from the government for the engines in violation of § 3729(a)(1)(B).[60] Counts I and II rest on

---

[55] Doc. #1.

[56] Doc. #20 (government declination); Doc. #259 at 12 (¶ 51) ("Over the course of the next 15 months, the government investigated Bonzani's allegations, communicated with relator, and ultimately declined to intervene in January of 2018."). Bonzani disputes Pratt's statement, contending that the government lacked actual knowledge of Bonzani's allegations and that Pratt actively misled the government in seeking dismissal of his claims. Doc. #283-97 at 19 (¶ 51). But Bonzani does not dispute that the government conducted an investigation and declined to intervene.

[57] Doc. #259 at 12 (¶¶ 54–56). Bonzani again alleges that the government has been willfully misled by Pratt in continuing to pay and further alleges that the government "has no choice but to continue to purchase parts as a matter of national security as there is no other supplier." *See* Doc. #283-97 at 20–21 (¶¶ 54–56). But he points to no evidence that Pratt's statements regarding the government's actions are false. In response to Pratt's assertion that "[a]t no point has the government declined to pay Pratt for work performed relating to the plasma spraying of knife-edge seals on F119 9th-stage IBRs," Bonzani objects that the cited materials do not support the statement under Federal Rule of Civil Procedure 56(c)(1)(A). Doc. #283-97 at 20 (¶ 54) (responding to Doc. #259 at 12 (¶ 54)). Rule 56(c)(1)(A) requires "a party asserting that a fact cannot be or is genuinely disputed" to support the assertion by, *inter alia*, "citing to particular parts of materials in the record, including … affidavits." Paragraph 54 of Pratt's statement of material facts is supported by the sworn affidavit of Michael Ladue, a Pratt employee, stating that "[a]t no point has the U.S. government declined to pay Pratt for the work it performed relating to the plasma spraying of knife-edge seals on F119 9th-stage IBRs." Doc. #259 at 12 (¶ 54) (citing Doc. #259-41 at 2 (¶ 3)). Because it is properly supported by evidence under Rule 56(c)(1)(A) and Bonzani does not cite evidence to the contrary, I will credit paragraph 54 of Pratt's statement of material facts.

[58] Doc. #259 at 13 (¶ 59); Doc. #283-97 at 23 (¶ 59); Doc. #259-41 at 3 (¶ 5).

[59] Doc. #96 at 85 (¶¶ 472–76).

[60] *Id.* at 86 (¶¶ 477–81).

Bonzani's allegation that Pratt failed to conduct representative testing of the IBRs.[61] Count III alleges that Pratt violated § 3730(h) by firing him in retaliation for raising concerns about IBR testing.[62]

In November 2019, the Court issued an amended ruling denying Pratt's motion to dismiss Bonzani's fourth amended complaint. *See United States ex rel. Bonzani v. United Techs. Corp.*, 2019 WL 13123411 (D. Conn. 2019). Now, Pratt has moved for summary judgment on all counts, both parties have submitted motions *in limine*, and Bonzani has moved for the Court to accept his supplemental calculation of damages.[63]

DISCUSSION

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See*

---

[61] *See* Doc. #283 at 12–31. Bonzani also alleges that Pratt has a "culture of non-compliance," citing an expert report by aerospace engineer Dr. Chetan Daté and a Department of Defense quality assurance report regarding F-135 engines. Doc. #283-97 at 31 (capitalization altered); *see id.* at 31–33 (¶¶ 99–110). These allegations pertain to Bonzani's argument regarding falsity, not materiality. *See* Doc. #283 at 12–39. Because the Court's disposition of Bonzani's substantive False Claims Act claims analyzes only the materiality of Bonzani's allegations, the Court does not address whether Pratt had a "culture of non-compliance" as Bonzani alleges.

[62] Doc. #96 at 87–88 (¶¶ 482–86).

[63] *See* Doc. #254 (Pratt's motion for summary judgment); Doc. #249 (Bonzani's motion *in limine* to preclude the testimony of expert witness Philip S. Deming); Doc. #250 (Bonzani's motion *in limine* to preclude the testimony of expert witness Werner J.A. Dahm); Doc. #260 (Pratt's motion *in limine* to preclude the testimony of expert witness Chetan Daté); Doc. #266 (Bonzani's motion for the Court to accept Bonzani's supplemental damages disclosure).

*generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).[64]

### *Substantive FCA claims (Counts I and II)*

Counts I and II allege that Pratt presented a false claim and made a false statement. The FCA imposes liability on "any person" who either "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B).

In some circumstances, a defendant's "implied false certification" may violate the False Claims Act. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016). In particular, the "implied false certification theory can be a basis for liability … when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement … [and] the omission renders those representations misleading." *Ibid*.

But whether by affirmative misstatement or by omission, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be *material* to the government's payment decision in order to be actionable under the FCA." *Lee v. N. Metro. Found. for Healthcare, Inc.*, 2022 WL 17366627, at *1 (2d Cir. 2022) (quoting *Escobar*, 579 U.S. at 192). The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This is a "demanding" and "rigorous" standard, "inasmuch as it serves to protect the FCA from

---

[64] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

being transformed into a vehicle for punishing garden-variety breaches of contract or regulatory violations." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 1006, 109 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022).

Materiality is a necessary element for both false claims in violation of § 3729(a)(1)(A) and false statements in violation of § 3729(a)(1)(B)—that is, for both Counts I and II of Bonzani's fourth amended complaint. *See Foreman*, 19 F.4th at 104–06, 118. Bonzani bears the burden of proving materiality. *See United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 405 F. Supp. 3d 549, 566 (S.D.N.Y. 2019).

To assess materiality, courts "look[] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *United States v. Strock*, 982 F.3d 51, 59 (2d Cir. 2020). The three relevant factors in evaluating materiality—known as the *Escobar* factors, so named for the Supreme Court's 2016 decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*—include: (1) "whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment"; (2) "the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision"; and (3) "whether the defendants' alleged noncompliance was minor or insubstantial." *Foreman*, 19 F.4th at 110 (citing *Escobar*, 579 U.S. at 194–95); *see also Strock*, 982 F.3d at 59–65. This is a "holistic inquiry" where "[n]o one factor is dispositive." *Foreman*, 19 F.4th at 110.

Bonzani's case rests on a theory of implied false certification.[65] The contract required Pratt to adhere to certain quality assurance procedures when plasma-spraying the IBRs. In particular, Pratt agreed that the IBRs would undergo representative testing. Pratt's failure to properly perform representative testing of the IBRs, Bonzani argues, violated the false-claim

---

[65] Doc. #283 at 12–13.

provision (Count I) and the false-statement provision (Count II) of the FCA.[66] I will now turn to whether the alleged implied false certifications were material.

### *First* **Escobar** *factor – condition of payment*

First, was representative testing of the IBRs expressly designated or identified by the government as a condition of payment? Bonzani says yes. The "engine acceptance" clause of the contract permits the government to refuse to pay for the IBRs if they are delivered with a "[v]ariance," defined in the procurement contract as "a noncompliance to the Performance Specification identified in the articles presented for delivery resulting from a major material/workmanship noncompliance, or a contractor discretionary change."[67] A "major noncompliance," in turn, is defined as "[a] noncompliance to the requirements specified in a contract, specification, drawing or other approved material description which adversely affect[s] performance, durability, reliability, interchangeability, maintainability, effective use or operation, weight or appearance (when a factor), or health … [and] which cannot be completely eliminated by rework or reduced to a minor noncompliance by repair."[68] Bonzani argues that Pratt's failure to conduct representative testing constituted a variance, thereby permitting the government to withhold payment.[69]

Pratt responds that defective IBRs *can* be eliminated by rework or repair, meaning that they do not qualify as variances.[70] Pratt and Bonzani are talking past each other here. The defect Bonzani identifies is not in the delivered IBRs themselves; it is the fact that the IBRs did not undergo proper representative testing.[71]

---

[66] *See id.* at 8, 12–31.
[67] Doc. #96-1 at 15–16.
[68] *Id.* at 16.
[69] Doc. #283 at 39.
[70] Doc. #258 at 33–34; Doc. #300 at 16–18.
[71] *See* Doc. #283 at 36 ("Failing to comply with those quality standards is the defect and the non-compliance with the contract"); *id.* at 46 ("Relator's claim is the same and it is specific–Pratt submitted false claims to the

Still, no evidence in the record reflects that the government expressly identified representative testing of the IBRs as a condition of payment. Instead, the contract merely incorporated the representative testing requirement in Pratt's Quality Manual by reference. But "a contract that merely incorporates by reference and lacks a provision that 'specifically identifies any of the contractual or regulatory requirements' that [the defendant] allegedly violated as an express condition of payment, 'at most, weighs neutrally in the materiality analysis' for this factor." *United States ex rel. Yu v. Grifols USA, LLC*, 2022 WL 7785044, at *3 (2d Cir. 2022) (quoting *Foreman*, 19 F.4th at 110). After all, "if the government were to designate every legal requirement an express condition of payment, it would make it difficult for would-be defendants to anticipate and prioritize compliance obligations because billing parties are often subject to thousands of complex statutory and regulatory provisions." *Foreman*, 19 F.4th at 111.

Moreover, Bonzani does not explain why improper representative testing is a variance in the first place. Although Bonzani speculates in a footnote that the IBRs suffered from premature wear, he concedes in the same footnote that there is no evidence of a connection between any premature wear and Pratt's improper representative testing process.[72] Bonzani does not otherwise explain how improper representative testing "adversely affect[s] performance, durability, reliability, interchangeability, maintainability, effective use or operation, weight or appearance … , or health" of the IBRs.

In addition, the engine acceptance clause permits the government to accept noncompliant goods.[73] This is additional evidence that representative testing was not designated by the

---

Government by violating the contractually-required Pratt Quality Manual because Pratt failed to conduct representative sample testing for the spray coating of 9th Stage IBRs.").

[72] Doc. #283 at 38 n.16.

[73] *See* Doc. #96-1 at 15 ("The Contractor may present to the Government engines that are noncompliant to the

government as a condition of payment. *See United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010) ("[T]he Government's ability to seek a range of remedies in the event of noncompliance suggests that payment is not conditioned on a certification of compliance.").

In short, the government did not designate compliance with representative testing of the 9th-stage IBRS as a condition of payment. Therefore, the first *Escobar* materiality factor weighs in favor of Pratt.

### Second **Escobar** *factor – government's response*

"The second materiality factor concerns the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision." *Foreman*, 19 F.4th at 111. "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195. "Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Ibid*. "[T]hough not dispositive, continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *Foreman*, 19 F.4th at 113.

The government has continued to pay for Pratt's IBRs even after being made aware of Bonzani's allegations and conducting an investigation. And the government has "signaled no change in position" in paying for this "particular type of claim," given that it has since contracted with Pratt for additional F-119 engines and their component IBRs. "We have the benefit of

---

Performance Specification at the time of delivery.").

hindsight and should not ignore what actually occurred: the [government] investigated [Bonzani's] allegations and did not disallow any charged costs … This is very strong evidence" that the allegations are not material. *Ibid.*; *cf. United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842–43 (7th Cir. 2018) ("[T]he fact that the government has allegedly paid millions of dollars for the non-compliant products suggests that Berkowitz cannot satisfy the materiality prong of the implied certification theory.").

Bonzani tries to minimize the fact that the government has continued to pay. First, he argues, Pratt "actively misled" the government about the "root cause" of the testing failures.[74] "Evidence of a cover-up might signal materiality." *United States v. Spectrum Painting Corp.*, 2020 WL 5026815, at *13 (S.D.N.Y. 2020). But even if Pratt misled the government about the cause of the failures, Bonzani does not allege that Pratt misled the government about the existence or nature of the IBR testing failures.[75] "*Escobar* does not distinguish between inadvertent mistakes and intentional violations. What matters is simply whether the government knew that certain requirements were violated." *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1349 (11th Cir. 2021).

Second, Bonzani argues that Pratt itself "did not actually investigate" Bonzani's claims.[76] But the only evidence he cites for this is testimony from Pratt attorney Poulin stating that Pratt actually did investigate Bonzani's claims:

> Q. … [D]id you investigate those allegations at all?
>
> A. Which allegations?
>
> Q. The allegations that Mr. Bonzani raised that you just referred to that his -- he raised through his attorney after your investigation into the ombudsman complaint?

---

[74] Doc. #283 at 32–34 (capitalization altered).
[75] *See ibid.*
[76] *Id.* at 34 (emphasis omitted).

A.      I did not.

Q.      Oh, okay. Who did?

A.      Other attorneys of Pratt & Whitney.[77]

Third, Bonzani argues that the government continued to pay because Pratt is the sole

supplier of IBR engines and replacement parts, and because terminating the contract would

"leav[e] the Government without alternatives."[78] But the two cases Bonzani cites in support of

this proposition are not helpful. The Eleventh Circuit's ruling in *Bibby* refers to a "holistic[]"

evaluation of the government's behavior and notes that "the significance of continued payment

may vary depending on the circumstances." 987 F.3d at 1350, 1352. It does not address sole-

supplier status. Nor does the Ninth Circuit's decision in *United States ex rel. Campie v. Gilead

Scis., Inc.*, 862 F.3d 890 (9th Cir. 2017) say anything more than "that to read too much into the

FDA's continued approval—and its effect on the government's payment decision—would be a

mistake … [T]here are many reasons the FDA may choose not to withdraw a drug approval." *Id.*

at 906.

In any event, the Second Circuit in *Foreman* rejected a similar argument as the one urged

by Bonzani here. The relator in *Foreman* argued that "the government-response factor is not

entitled to much weight, because there were plausible explanations for why the government did

not stop payment or terminate the [contract], including the fact that … the [contract] was

necessary to support the war effort in Afghanistan." *Foreman*, 19 F.4th at 114. But the Second

Circuit concluded that this was not enough in the face of "documentary evidence" that the

government had "actual knowledge" of the contractor's "failure to meet" the contract

---

[77] Doc. #283-91 at 4.
[78] Doc. #283 at 34 (capitalization altered).

requirements and "yet nevertheless not only continued to extend and pay claims under the [contract], but also never demanded repayment, disallowed any charged costs, or penalized [the contractor]." *Id.* at 115.

In short, the government's response to Pratt's non-compliance was continued payment under the contract. Therefore, the second *Escobar* materiality factor weighs in favor of Pratt.

### Third **Escobar** *factor – the substantiality factor*

In evaluating the final *Escobar* factor, a court must examine whether the defendants' alleged noncompliance was substantial. *Id.* at 116. "Materiality cannot be found where noncompliance is minor or insubstantial because material falsehoods are those that go to the very essence of the bargain." *Ibid.* "This factor looks at the contracts' purpose and whether the defendants' noncompliance deprived the government of the intended benefits of the contract." *Ibid.* "In short, the analysis focuses on the substantiality of the noncompliance and its impact on the goals of the contract." *Yu*, 2022 WL 7785044, at *4.

The government has stated that it does not regard the IBR knife-edge seals as a "critical safety characteristic."[79] Bonzani does not dispute this but argues that the relevant focus should be the entire engine rather than the IBR knife-edge seals. He argues that Pratt took the position at an earlier point in this litigation during a discovery dispute that the entire engine, not just the IBR, "is what would have been subject to false certification."[80] But this is a *non sequitur*. The discovery dispute concerned the scope of discovery as it pertained to damages, not materiality.[81] In any event, alleged improper testing of the IBRs, not the entire engine, is the relevant defect Bonzani has identified for purposes of this litigation.[82]

---

[79] Doc. #259-43 at 2.
[80] Doc. #283 at 37 (citing Doc. #181 at 13).
[81] *See* Doc. #181 at 13, 30.
[82] *See supra* note 71.

Bonzani also asserts that "critical safety characteristic" is a term of art. According to Bonzani, "critical safety characteristic" really means "critical safety item," *i.e.*, parts that are inspected by the government rather than the contractor.[83] But even assuming that the terms correspond, Bonzani concedes that nonconforming critical safety items, as defined by the Department of Defense's Defense Contract Management Agency, "would likely cause serious injury or death to the user or catastrophic failure of a major platform."[84] That the government did not inspect the IBR knife-edge seals themselves nor view them as something that would cause serious injury, death, or catastrophic failure further indicates that any defects in the testing process were minor and insubstantial.

In addition, Bonzani points to a Pratt employee's testimony that "adherence to the Quality Manual [is] critical to government contracts."[85] Given "the backdrop of complex and voluminous regulatory and contractual requirements," however, "broad appeals to the importance of a given regulatory requirement cannot clear the rigorous materiality hurdle." *Foreman*, 19 F.4th at 116.

The employee further testified that "failure of the spray coating of a 9th stage IBR could cause catastrophic engine failure."[86] But the employee's testimony concerns the IBR spray coating itself, not the representative testing process it was supposed to undergo. Improper representative testing is the alleged defect at the heart of this case, and Bonzani offers no evidence that improper representative testing of the IBRs deprived the government of the intended benefits of the contract. In any event, mere speculation about how alleged violations

---

[83] Doc. #283-97 at 23 (¶ 60).
[84] *Ibid.* (quoting Def. Cont. Mgmt. Agency, *Instruction: Critical Safety Items - QA* at 1 (Nov. 9, 2016), available at https://www.dcma mil/Portals/31/Documents/Policy/DCMA-INST-303.pdf [https://perma.cc/A8BP-6JLA]).
[85] *Ibid.* (citing Doc. #283-2 at 10).
[86] Doc. #283 at 37–38. Bonzani cites page 21 of the exhibit, a deposition transcript of Pratt employee Rick Shamakian, but page 20, rather than page 21, features the relevant testimony. *See* Doc. #283-2 at 20–21.

"'may' or 'could' cause negative consequences" is not enough to establish substantiality. *See Yu*, 2022 WL 7785044, at *4.

Indeed, Pratt asserts that there is "no evidence that the alleged testing failures … have led to any adverse impact on [product] quality."[87] Pratt has not discovered "any anomalies related to the 9th-stage IBR plasma spray coating or the knife-edge seal, nor has the inspection and overhaul process revealed any premature erosion, wear, or other issues."[88] Bonzani denies this statement, but nothing in his response refutes it. He states that: "According to documents produced by Pratt in this litigation, knife edge coating failures on the 9th stage at 25% of the life cycle [sic], with 40% of the coating failing."[89] But the exhibit Bonzani cites—a page of internal Pratt emails—says nothing about the 25% statistic, and there is no indication that the mention of the 40% figure ("Found: 40% of missing coating on the tip" for "Forward and Aft Knife Edges Plasma coating") is attributable to improper representative testing.[90] In a later brief, Bonzani agrees that there has been no "identifiable product defect traceable to the false certifications of compliance with quality standards."[91]

Bonzani cites two cases—*United States v. Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017) and *United States v. Academi Training Ctr., Inc.*, 220 F. Supp. 3d 676 (E.D. Va. 2016)— for the proposition that "[g]iven the severity of the consequences for failure resulting from this unquantifiable and untestable non-conformance with the Pratt Quality Manual, it can be presumed that the condition *would be material* to the government's decision to pay."[92] But

---

[87] Doc. #258 at 32 (brackets in original) (internal quotation marks omitted).
[88] Doc. #259 at 13 (¶ 58).
[89] Doc. #283-97 at 22 (¶ 58) (citing Doc. #283-54 at 2).
[90] Doc. #283-54 at 2.
[91] Doc. #305 at 12–13 ("No expert testimony on the lack of an identifiable product defect traceable to the false certification of compliance with quality standards, or the fact that the Government used the engines it was provided, is necessary—Relator would stipulate to that.").
[92] Doc. #283 at 38.

neither case imposes such a presumption. In *Triple Canopy*, a military contractor provided guards for a U.S. airbase in Iraq who were unable to meet a marksmanship requirement included in the contract. 857 F.3d at 175. "Rather than inform the government of this deficiency, Triple Canopy falsified the scorecards." *Ibid*. The court concluded that the falsification was material, reasoning that "[g]uns that do not shoot are as material to the Government's decision to pay as guards that cannot shoot straight." *Id*. at 179.

The facts in *Academi Training Center* are similar: a military contractor supplied guards to protect U.S. personnel in Afghanistan and falsely certified the guards' compliance with weapons qualifications requirements. 220 F. Supp. 3d at 678–79. The court wrote that "it strains credulity to argue that the government's payment decision would not have been affected had the government known that the [guards] responsible for protecting U.S. officials in Afghanistan had not fulfilled the weapons qualifications requirement." *Id*. at 682.

Both cases relied on a "common sense" approach in determining that supplying unqualified guards to protect U.S. personnel in warzones, and certifying them to the government as qualified, was a material falsehood. *Triple Canopy*, 857 F.3d at 178; *Academi Training Ctr.*, 220 F. Supp. 3d at 682. Bonzani alleges no facts to justify a similar approach for the allegedly defective testing of IBRs. Indeed, the complete absence of evidence of failure of any 9th-stage IBRs resulting from improper spraying renders irrelevant speculation about the severity of the consequences of failure.

The other cases cited by Bonzani furnish no additional support for his position. Bonzani quotes *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 n.4 (6th Cir. 1998) for the proposition that "the mere fact that the item supplied under the contract is as good as the one contracted for does not relieve the defendants of liability if the item does not in

fact conform to the express contract terms."[93] But in *Compton*, the failure to conform to contractual testing requirements was only one factor in upholding the damages calculation. The products—defective brake parts—were also "completely valueless" in part "because most of them could not withstand 5,000 pounds of force." *Id.* at 304.

Courts have interpreted *Compton* narrowly to apply only to worthless goods or goods that had to be replaced. *E.g.*, *United States ex rel. Concilio De Salud Integral De Loiza, Inc. v. J.C. Remodeling, Inc.*, 962 F.3d 34, 44 (1st Cir. 2020); *United States ex rel. Wall v. Circle C Const., LLC*, 813 F.3d 616, 618 (6th Cir. 2016). And the worthless brake parts in *Compton* are nothing like the IBRs, which the government has not sought to remediate or replace, and because the alleged testing defects have not resulted in any identifiable adverse impact on product quality.

Similarly, Bonzani invokes *Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 430 (6th Cir. 2001) for the proposition that "the failure to comply with government contract specifications can result in an FCA 'injury' to the government, even if the supplied product is as good as the specified product."[94] But a mere possibility of an injury is different than the "demanding" and "rigorous" showing of materiality *Escobar* requires. *See Escobar*, 579 U.S. at 181, 194. Bonzani does not explain how the former is indicative of the latter. Indeed, *Varljen* makes no mention of the FCA's materiality requirement, much less does it apply the *Escobar* factors.

Bonzani also cites *U.S. ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982 (S.D. Ohio 2014) but this case—decided before the Supreme Court articulated a heightened materiality standard in *Escobar*—merely stands for the proposition that failure to meet quality assurance standards may form the basis of a viable FCA claim. *Id.* at 996–97; *see also United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 492 (3d Cir. 2017) ("[W]e now join the

---

[93] *Id.* at 36.
[94] *Ibid.*

many other federal courts that have recognized the heightened materiality standard after [*Escobar*].").

In sum, Bonzani "does not point to anything to suggest that [Pratt's] alleged violations have resulted in significant financial cost to the government." *Yu*, 2022 WL 7785044, at *5. Nor does he "demonstrate that the violations go to the heart of the bargain." *Ibid*. On this basis, I conclude that the third *Escobar* factor weighs against a finding of materiality. *See ibid.*

\*   \*   \*

All three *Escobar* factors weigh against a finding of materiality, and this suffices to grant summary judgment to Pratt on Bonzani's FCA claims under § 3729(a)(1)(A) (false claims) and § 3729(a)(1)(B) (false statements), both of which contain materiality requirements. *Yu*, 2022 WL 7785044, at *2–5 & n.7 (upholding dismissal of false-claim and false-statement FCA claims where two of the three *Escobar* factors weighed against materiality); *see also United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 541–45 (10th Cir. 2020) (upholding summary judgment for defendant on false-claim and false-statement FCA claims where at least two of the three *Escobar* factors weighed against materiality).

It is true that this Court previously denied Pratt's motion to dismiss on materiality grounds. *See Bonzani*, 2019 WL 13123411. But that was at the pleading stage, where Bonzani had to allege materiality only plausibly, rather than provide enough evidence to preclude judgment as a matter of law. *See Foreman*, 19 F.4th at 115. Moreover, the Court's ruling preceded *Foreman* and *Strock*'s elaboration on the FCA's materiality requirement in the wake of *Escobar*. For example, the Court originally found that proper testing was a condition of payment, *Bonzani*, 2019 WL 13123411, at *6, but as explained above, the Second Circuit subsequently held that a contract that merely incorporates a requirement by reference "at most, weighs

22

neutrally in the materiality analysis for this factor." *Yu*, 2022 WL 7785044, at *3 (quoting *Foreman*, 19 F.4th at 110).

Most importantly, the weight of the government's non-response to alleged defects is greater at the summary-judgment stage than at the motion-to-dismiss stage. As the Second Circuit has noted, "it makes sense not to place much weight on the government's response in the wake of [the filing of an FCA complaint] because, prior to discovery and a formal court ruling, the relator's allegations are just that – allegations, and the government may not necessarily have knowledge of all the material facts." *Foreman*, 19 F.4th at 115. Indeed, in ruling on Pratt's motion to dismiss, the Court relied in part on Bonzani's argument that "[a]bsent discovery, it is unknown why and under what terms or circumstances the government entered the new contract." *Bonzani*, 2019 WL 13123411, at *7. Now with discovery complete, I conclude that the government's total non-response to the alleged noncompliance weighs heavily in favor of a finding of immateriality. Indeed, the government-response factor carries exceptional weight in light of *Foreman*, which found that the government's payment and renewal of the challenged contract were enough to dismiss two FCA claims, even when the other two *Escobar* factors were "at best, marginally probative." *Foreman*, 19 F.4th at 118.

Because Bonzani does not offer evidence that establishes a genuine dispute of material fact regarding materiality, I will grant Pratt's motion for summary judgment on Bonzani's two substantive FCA claims under 31 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(B).

### *FCA retaliation claim (Count III)*

The FCA's anti-retaliation provision states that

[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of

an action under this section or other efforts to stop 1 or more violations of [the FCA].

31 U.S.C. § 3730(h)(1). To state a claim for retaliation under the FCA, a plaintiff must "show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017). "[W]here a plaintiff seeks to impute knowledge on the defendant, 'he must specifically tell the employer that he is concerned about possible fraud.' Put another way, the plaintiff must do something to put the defendant on notice that his actions are in furtherance of an FCA action." *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, 2017 WL 2636037, at *11 (D. Conn. 2017) (quoting *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 105 (D. Conn. 2006), then citing *Weslowski v. Zugibe*, 626 F. App'x 20, 22 (2d Cir. 2015)).

The failure of Bonzani's *qui tam* action under § 3729 "does not necessarily preclude him from seeking protection from retaliation under § 3730(h)." *ABC v. NYU Hosps. Ctr.*, 629 F. App'x 46, 49 (2d Cir. 2015). But here Bonzani's retaliation claim fails because there is no genuine fact issue to show that any investigator, decisionmaker, or human resources personnel at Pratt were aware of Bonzani's allegations between November 19, 2015 (the day Bonzani discovered the alleged testing defects) and February 18, 2016 (the day Pratt fired Bonzani).

Pratt began investigating Bonzani for a conflict of interest several weeks before he visited the Middletown plant. The investigative team discussed putting Bonzani on paid leave before he arrived at Middletown. And although Bonzani reported his concerns to Pratt colleagues Tanguay, Flanagan, and Bouffard that day, he does not allege that any of them, or any other colleagues he subsequently communicated with, ever communicated with anyone conducting the conflict-of-interest investigation. Further, no investigators testified that they were aware, during the conflict-

of-interest investigation, of Bonzani's allegations, and Bonzani admitted that he did not raise his allegations during his November 20 interview with investigators.

At oral argument I asked counsel for Bonzani to identify "which of those persons [to whom Bonzani flagged his concerns about IBR testing] are persons who were involved in the investigation of the misconduct or the decision to terminate him?"[95] Counsel replied: "None of those individuals were involved, Your Honor, directly."[96]

Bonzani implies that Poulin changed her recommendation about when to place Bonzani on paid leave at the behest of McDavid.[97] But the email exchange on which Bonzani relies—where Poulin states she had been keeping McDavid in the loop about the investigation—took place before Bonzani even arrived at Middletown. And even if McDavid had a role in the decision to place Bonzani on leave, Bonzani offers no evidence that McDavid knew about Bonzani's allegations during the investigation period.

Bonzani argues that Pratt had cleared him of wrongdoing in October 2015 and that "[i]t was not until the intervention of Maureen Waters[t]on that it was determined that the recommendation would 'change' and Relator was terminated."[98] To support these claims, Bonzani cites an October 2015 email from O'Neill that reads:

> Yes, I did go through [the Bonzani documents and emails] and there really wasn't anything there. I will share my findings with ME [Military Engines] Counsel and see if she agrees. Is there any way you could provide his calendar/meeting notices? I'm just looking to see if perhaps any outside work was scheduled that I could compare with time charging records. Please let me know.[99]

---

[95] Doc. #310 at 62.
[96] *Ibid.*
[97] Doc. #283-97 at 19 (¶ 48).
[98] *Ibid.* (¶ 49).
[99] Doc. #283-41 at 3.

But this email does not clear Bonzani of wrongdoing. First, the email took no official action; it merely communicated O'Neill's intention to tell counsel that she did not find anything at this stage in her investigation. Second, O'Neill sent the email before the interview with Walsh (Bonzani's supervisor), in which Walsh told investigators that he did not recall whether Bonzani disclosed any outside business activities to him. Third, O'Neill indicates her intention to investigate further by requesting Bonzani's "calendar/meeting notices."

Bonzani cites one other piece of evidence: an email exchange between O'Neill and Roy.[100] Roy emailed O'Neill that "Based on Maureen [Waterston's] feedback, the recommendation on discipline is going to change," and that "We are moving forward with termination."[101] But as with the Poulin exchange about McDavid, Bonzani points to no evidence that Waterston knew about Bonzani's allegations, much less that her actions were motivated by such knowledge. And although he alleges that "[e]xecutives of the company were aware of the Middletown shutdown and the contemporaneous investigation of Mr. Bonzani," the two exhibits he cites—a page of internal Pratt emails regarding the shutdown and a page of internal Pratt emails regarding the investigation—concern correspondence between entirely disparate sets of individuals, neither of which include Waterston.[102]

The only other evidence of retaliation Bonzani is left with is Pratt's post-employment actions toward Bonzani—specifically, Pratt's decision not to do business with EBTEC, Bonzani's new employer. "Because an FCA retaliation claim must be based on actions that occurred during the plaintiff's employment," however, Pratt's post-termination conduct cannot form the basis of an FCA retaliation claim. *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d

---

[100] Doc. #283 at 51.
[101] Doc. #283-47 at 2.
[102] Doc. #283-97 at 19 (¶ 48) (citing Doc. #283-45 at 2, then citing Doc. #283-76 at 2).

755, 769 (S.D.N.Y. 2021). This reading comports with the plain language of the FCA, which

provides a cause of action for retaliation only against an "employee, contractor, or agent,"

§ 3730(h)(1), and is in accordance with the "overwhelming majority of courts" that have found

§ 3730(h) inapplicable to post-employment retaliation by former employers. *Knight*, 531 F.

Supp. 3d at 769 (citing cases).

      In short, there is no genuine dispute of material fact to show that Pratt's investigators and

decisionmakers knew of Bonzani's allegations at the time that they investigated him and

terminated him for a conflict of interest. Therefore, I will grant Pratt's motion for summary

judgment on Bonzani's retaliation claim under 31 U.S.C. § 3730(h).

**CONCLUSION**

      For the reasons set forth above, the Court GRANTS the defendants' motion for summary

judgment (Doc. #254). In light of the Court's grant of defendants' motion for summary

judgment, the Court DENIES as moot plaintiff's motion *in limine* to preclude the testimony of

expert witness Philip S. Deming (Doc. #249), plaintiff's motion *in limine* to preclude the

testimony of expert witness Werner J.A. Dahm (Doc. #250), defendants' motion *in limine* to

preclude the testimony of expert witness Chetan Daté (Doc. #260), and plaintiff's motion for the

Court to accept his supplemental damages disclosure (Doc. #266). The Clerk of Court shall close

this case.

      It is so ordered.

      Dated at New Haven this 16th day of March 2023.

                           /s/ *Jeffrey Alker Meyer*
                           Jeffrey Alker Meyer
                           United States District Judge